# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SERVICE EMPLOYEES INTERNATIONAL
UNION NATIONAL INDUSTRY
PENSION FUND
11 Dupont Circle, N.W., Suite 900
Washington, DC 20036-1202

and

ANDREW STERN, RODERICK S. BASHIR,
CHARLIE RIDGELL, SHARLEEN
STEWART, JIM BERG, EDWARD MANKO,
JOHN J. SHERIDAN, LARRY T. SMITH,
DAVE STILLWELL, TRUSTEES OF THE
SERVICE EMPLOYEES INTERNATIONAL
UNION NATIONAL INDUSTRY
PENSION FUND
11 Dupont Circle, N.W., Suite 900
Washington, DC 20036-1202

                                    Plaintiffs,

vs.

ALIQUIPPA COMMUNITY HOSPITAL
2500 Hospital Drive
Aliquippa, PA 15001

                                    Defendant,

Serve:  Connie Moore, Registered Agent
        2500 Hospital Drive
        Aliquippa, PA 15001

Civil Action No.: _____

**COMPLAINT UNDER ERISA FOR DELINQUENT EMPLOYER CONTRIBUTIONS, INTEREST, LIQUIDATED DAMAGES AND REQUEST FOR PAYROLL AUDIT**

## Introduction, Jurisdiction and Venue

1.      This is a civil action brought by an employee benefit plan, and by the Trustees of an employee benefit plan, pursuant to Sections 502(a)(3), (d)(1), (g)(2) and 515 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(3), (d)(1), (g)(2) and 1145 and Section 301(a) of the Labor Management Relations Act of 1947, as amended ("LMRA"), 29 U.S.C. § 185(a) to collect unpaid collectively bargained contributions, interest, and liquidated damages owed by the Defendant.  Because the Defendant has failed to provide any remittance reports or contributions to the Plaintiffs, the Plaintiffs request that the Defendant be ordered to provide all remittance reports and contributions and to submit to a payroll audit in order to ensure that it remits all amounts owed.

2.      Jurisdiction is conferred upon this Court by Section 502(e) and (f) of ERISA, 29 U.S.C. § 1132(e) and (f), and Section 301(c) of the LMRA, 29 U.S.C. § 185(c).  Jurisdiction also lies under 28 U.S.C. § 1331.

3.      Venue is proper under Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), as the Service Employees International Union National Industry Pension Fund is administered in this District.

## Parties

4.      Plaintiff Service Employees International Union National Industry Pension Fund (the "SEIU Pension Fund"), is an employee pension benefit plan within the meaning of Section

2

3(2), (3) of ERISA, 29 U.S.C. § 1002(2), (3), and a multiemployer plan within the meaning of

Section 3(37)(A) of ERISA, 29 U.S.C. § 1002(37)(A), established and maintained for the

purpose of providing pension benefits to eligible employees, their families and dependents.  The

SEIU Pension Fund is and at all times material herein has been, a jointly administered trust fund

established pursuant to Section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5).  The Pension

Fund is administered at 11 Dupont Circle, N.W., Suite 900, Washington, D.C. 20036.

     5.     Plaintiff Trustees of the SEIU Pension Fund, Andrew Stern, Roderick S. Bashir,

Charlie Ridgell, Sharleen Stewart, Jim Berg, Edward Manko, John J. Sheridan, Larry T. Smith,

and Dave Stillwell are the duly authorized Trustees of the SEIU Pension Fund whose duty it is to

administer the SEIU Pension Fund for the benefit of the participants and beneficiaries of the

SEIU Pension Fund.  Plaintiff Trustees are fiduciaries within the meaning of 3(21)(A) of ERISA,

29 U.S.C. § 1002(21)(A), and are authorized and empowered to maintain this action.

     6.     Defendant Aliquippa Community Hospital ("Aliquippa") is an "employer in an

industry affecting commerce" as defined in Section 3(5), (9), (11), (12), (14) of ERISA, 29

U.S.C. §§ 1002(5), (9), (11), (12), (14), and Section 2(2), (6), and (7) of the LMRA, 29 U.S.C.

§§ 152(2), (6), and (7).

     7.     Upon information and belief, Defendant is a corporation incorporated in the State

of Pennsylvania and has a mailing address of 2500 Hospital Drive, Aliquippa, Pennsylvania

15001.

## Factual Background

8.      At all relevant times, District 1199P, Service Employees International Union ("District 1199P"), has been the exclusive collective bargaining agent for certain of Defendant's employees.

9.      On June 6, 2005, the Defendant entered into a collective bargaining agreement ("Collective Bargaining Agreement") with District 1199P effective for the period February 7, 2005, through June 30, 2008. A true, correct and complete copy of the Collective Bargaining Agreement is attached as Plaintiffs' Exhibit 1.

10.     Pursuant to Section 515 of ERISA, 29 U.S.C. § 1145, employers who are obligated to make contributions to a multi-employer employee benefit plan must do so in accordance with the terms of the collective bargaining agreement.

11.     The Defendant is obligated to remit contributions to the SEIU Pension Fund in accordance with Section 19.1 and Appendix J of the Collective Bargaining Agreement. See Plaintiffs' Exhibit 1, p. 32; 62-66.

12.     Specifically, Section 3 of Appendix J requires Defendant to contribute "to the [SEIU Pension] Fund sixty cents ($0.60) per paid hour for all employees covered by the Collective Bargaining Agreement . . . ." See Plaintiffs' Exhibit 1, Section 3 Appendix J.

13.     Appendix J also requires Defendant to remit contributions to the SEIU Pension Fund retroactively for all compensated hours accrued on or after June 30, 2004, and to pay any and all liquidated damages and interest in order to make the SEIU Pension Fund whole for the

4

retroactive contributions. Specifically, under the heading labeled "PENSION" in Appendix J, it

states, in relevant part, the following:

> Effective, and retroactive to June 30, 2004 and in addition to any payment of
> interest or penalties due to the [SEIU Pension] Fund, and for the duration of this
> Collective Bargaining Agreement, including any extensions or renewals thereof,
> the Employer agrees that for each hour of pay paid to each employee to whom
> this Agreement is applicable, for any reason provided for in this Collective
> Bargaining Agreement, it will contribute to the [SEIU Pension] Fund, effective
> and retroactive to the date of Plan Termination, the total sum of sixty cents ($.60)
> per hour.

See Plaintiffs' Exhibit 1, Appendix J.

14.    Pursuant to Section 3(a) and (b) of Appendix J, contributions are due no later than

the fifteenth day of the month following the month in which the covered work is performed and

all contributions must be transmitted with a remittance report to the SEIU Pension Fund. See

Plaintiffs' Exhibit 1, p. 64.

15.    Additionally, Section 4 of Appendix J expressly states that Defendant accepts and

agrees to be bound by the terms and provisions of the Agreement and Declaration of Trust of the

SEIU Pension Fund ("Trust Agreement") and any and all collection policies adopted by the

Trustees. See Plaintiffs' Exhibit 1, p. 64.

16.    At all relevant times, Section 3.1 of the SEIU Pension Fund's Trust Agreement

provides that an employer must submit complete remittance reports to the SEIU Pension Fund

with the employer's contributions. The remittance report must contain the names of each

covered employee and the number of compensable hours for each employee during the reporting

month. The remittance information is necessary in order for the SEIU Pension Fund to properly

credit each employee with the appropriate amount of pension credit and to verify that the

5

employer remitted the correct amount of contributions for the reported hours. Furthermore, Section 5.1(14) of the Trust Agreement empowers the Trustees to examine the payroll records of any employer when such an examination is deemed necessary. A true, correct and complete copy of the Trust Agreement is attached as Plaintiffs' Exhibit 2.

17.    At all relevant times, the Trust Agreement and the SEIU Pension Fund's Policy for Collection of Delinquent Contributions ("Collection Policy") provide that an employer delinquent in its contribution obligations to the SEIU Pension Fund is liable for interest at the rate of ten percent (10%) per annum, liquidated damages at the rate of five percent (5%) prior to the commencement of legal action and twenty percent (20%) thereafter, and attorneys' fees and costs. The Collection Policy also indicates that if a payroll audit discloses an underpayment, an employer is required to pay for the cost of the audit. A true, correct and complete copy of the Collection Policy is attached as Plaintiffs' Exhibit 3.

18.    To date, Defendant Aliquippa has failed to remit any of the contractually required contributions and remittance reports.

## COUNT I

19.    Plaintiffs reallege and incorporate Paragraphs 1 through 18.

20.    This claim arises under Sections 502(a)(3) and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3) and 1145.

21.    On June 6, 2005, Defendant signed the Collective Bargaining Agreement between District 1199P, SEIU, and Aliquippa Community Hospital.

6

22.     Section 19.1 and Appendix J of the Collective Bargaining Agreement require Defendant to remit contributions to the SEIU Pension Fund on behalf of all eligible bargaining unit employees.

23.     In addition, Appendix J requires Defendant to remit contributions to the SEIU Pension Fund for all hours retroactive to June 30, 2004, and Defendant must pay all accrued interest and liquidated damages associated with those outstanding contributions dating back to June 30, 2004.

24.     Prior to commencing this lawsuit, the SEIU Pension Fund attempted to obtain the outstanding remittance forms and contributions from Defendant.

25.     To date the Defendant has failed to submit any remittance reports or pay any contributions to the SEIU Pension Fund from June 30, 2004 to the present.

26.     The Defendant's failure to forward its remittance reports and contributions has caused irreparable harm to the SEIU Pension Fund.

27.     In order for the SEIU Pension Fund to ensure that the Defendant remits all of the delinquent contributions owed, and that its employees receive the proper amount of pension credit, the SEIU Pension Fund must conduct a payroll audit of Defendant's records. See Plaintiffs' Exhibit 2, Section 5.1(14).

**WHEREFORE**, Plaintiffs respectfully request that the Court:

28.     Declare that Defendant is delinquent in remitting its remittance reports and contributions to the SEIU Pension Fund pursuant to the Collective Bargaining Agreement;

29.     Order Defendant to submit to a payroll audit for the period from June 30, 2004 through the present;

30.     Order Defendant to remit all outstanding remittance reports and contributions from June 30, 2004 to the present;

31.     Enter judgment in the full amount for any additional delinquent contributions revealed by payroll audit that become ascertainable upon completion of the audit;

32.     Enter judgment for all interest, liquidated damages, and attorneys' fees and costs, as required by the Collective Bargaining Agreement, the Trust Agreement and Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2);

33.     Enter judgment for all costs associated with the payroll audit if the audit reveals additional unreported contributions that are owed to the SEIU Pension Fund;

34.     Enter a permanent injunction requiring the Defendant to timely file its remittance reports and to pay all contributions as they become due and owing to the SEIU Pension Fund in the future;

35.     Retain jurisdiction of this case pending compliance with its Orders; and

36.     Grant such further relief as the Court may deem appropriate.

Respectfully Submitted


Mark J. Murphy, Esq. (Bar # 453060)
Paul A. Green, Esq.  (Bar # 383588)
Mooney, Green, Baker & Saindon, P.C.
1920 L Street, NW
Washington, D.C.  20036
(202) 783-0010
(202) 783-6088 Facsimile
mmurphy@mooneygreen.com
pgreen@mooneygreen.com
Counsel for the Plaintiffs

Dated:  *3-12-07*

9

**I (a) PLAINTIFFS**

Service Employees International Union National Industry Pension Fund, and the Trustees of the Service Employees International Union National Industry Pension Fund

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____11001_____
**(EXCEPT IN U.S. PLAINTIFF CASES)**

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Mark J. Murphy, Esq.
Mooney, Green, Baker & Saindon, P.C.
1920 L Street, N.W., Suite 400
Washington, DC 20036
(202) 783-0010

**DEFENDANTS**

Aliquippa Community Hospital

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____88888_____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

ATTORNEYS (IF KNOWN)

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

● 3 Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**     OR     ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Tort to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ⊙ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☒ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

To collect unpaid collectively bargained contributions, interest, and liquidated damages owed by Defendant. 29 USC §§ 1132(a)(3), (d)(1), (g) and 1145.

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____  Check YES only if demanded in complaint  JURY DEMAND:  YES ☐  NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE  March 12, 2007    SIGNATURE OF ATTORNEY OF RECORD  _(signature)_

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

AGREEMENT


BETWEEN


ALIQUIPPA COMMUNITY HOSPITAL


AND


DISTRICT 1199P
SERVICE EMPLOYEES INTERNATIONAL UNION
AFL-CIO, CLC


FEBRUARY 7, 2005 – JUNE 30, 2006

**EXHIBIT**

PLAINTIFFS'
1

## TABLE OF CONTENTS

AGREEMENT ................................................................................................ 1

ARTICLE  1    RECOGNITION ........................................................... 1

ARTICLE  2    UNION SECURITY AND CHECKOFF........................... 4

ARTICLE  3    NON-DISCRIMINATION ........................................... 6

ARTICLE  4    MANAGEMENT........................................................ 7

ARTICLE  5    NO STRIKE - NO LOCKOUT .................................... 8

ARTICLE  6    GRIEVANCE PROCEDURE AND ARBITRATION ............... 8

ARTICLE  7    DISCIPLINE AND DISCHARGE.............................. 10

ARTICLE  8    UNION VISITATION AND BULLETIN BOARDS .............. 11

ARTICLE  9    HOLIDAYS ........................................................... 12

ARTICLE 10    VACATIONS.......................................................... 15

ARTICLE 11    JURY DUTY .......................................................... 16

ARTICLE 12    FUNERAL LEAVE ................................................... 16

ARTICLE 13    MILITARY LEAVE .................................................. 17

ARTICLE 14    SENIORITY ........................................................... 17

ARTICLE 15    HOURS OF WORK ................................................. 24

ARTICLE 16    MEET AND DISCUSS ............................................. 28

ARTICLE 17    JOB DESCRIPTIONS/NEW CLASSIFICATIONS................. 29

ARTICLE 18    WAGES, OVERTIME, AND SHIFT DIFFERENTIAL ............. 29

ARTICLE 19    PENSIONS AND INSURANCE ............................... 32

ARTICLE 20    SICK LEAVE ....................................................... 35

ARTICLE 21    UNPAID LEAVE OF ABSENCE ............................... 35

ARTICLE 22      IN SERVICE TRAINING AND STAFF DEVELOPMENT ................................................ 37

ARTICLE 23      SEPARABILITY................................................................ 37

ARTICLE 24      MISCELLANEOUS........................................................ 38

ARTICLE 25      TEMPORARY EMPLOYEES.......................................... 39

ARTICLE 26      HEALTH & SAFETY ...................................................... 39

ARTICLE 27      PERSONNEL FILE......................................................... 40

ARTICLE 28      TRANSPORTATION ...................................................... 40

ARTICLE 29      MANDATORY MEETINGS............................................ 40

ARTICLE 30      EDUCATIONAL ASSISTANCE .................................... 40

ARTICLE 31      STAFFING-QUALITY CARE-RETENTION AND RECRUITMENT................................................. 41

ARTICLE 32      SUBCONTRACTING..................................................... 43

ARTICLE 33      SUCCESSORSHIP ....................................................... 43

ARTICLE 34      REOPENER ................................................................... 43

ARTICLE 35      DURATION..................................................................... 44

APPENDIX A     DUES CHECK-OFF AUTHORIZATION CARD ...................... 45

APPENDIX B     POLITICAL ACTION-SOLIDARITY CARD .............................. 46

APPENDIX C     VACATION CONVERSION AT THE HOSPITAL.................... 47

APPENDIX D     VACATION CONVERSION AT THE M/H UNIT ...................... 48

APPENDIX E     WAGE SCALE................................................................ 49

APPENDIX F     WAGE SCALE................................................................ 51

APPENDIX  G        MEDICAL, PRESCRIPTION, DENTAL AND
VISION BENEFITS.................................................................52

APPENDIX  H        MONTHLY EMPLOYEE CONTRIBUTION.............................58

APPENDIX  I        LIFE INSURANCE, AD&D, LONG-TERM
AND SHORT-TERM DISABILITY..........................................61

APPENDIX  J        OUTLINE OF UNION RETIREMENT PLAN...........................62

APPENDIX  K        NURSING AND BEHAVIORAL
HEALTH UNIT ISSUES.........................................................67

APPENDIX  L        HOUSEKEEPING AND MAINTENANCE ISSUES ................68

APPENDIX  M        DIETARY ISSUES.................................................................69

APPENDIX  N        LABOR-MANAGEMENT COMMITTEE FOR
A STRONG ALIQUIPPA COMMUNITY HOSPITAL ...............70

APPENDIX  O        FOR AN EXPEDITED UNION
RECOGNITION PROCEDURE .............................................71

ATTACHMENT A       .............................................................................75

APPENDIX  P        AGREEMENT........................................................................76

## AGREEMENT

This Agreement made and entered into this 7th day of February, 2005, by and between the Aliquippa Community Hospital, hereinafter designated as the "Hospital", and District 1199P, Service Employees International Union, AFL-CIO,CLC with its offices at 1500 North Second Street, Harrisburg, PA 17102, hereinafter referred to as the "Union".

## WITNESSETH

WHEREAS, the parties hereto recognize that the enlightened participation of the public, the patients, management, and labor is needed if the Hospital is to make its maximum contribution to the community, and recognizing that complete and uninterrupted patient care is of vital importance to the health, welfare, safety and comfort of the community, and desiring to establish a standard of wages and other conditions under which members of the Union shall work for the Hospital during the term of the Agreement; and

WHEREAS, the parties hereto desire to regulate relations between the parties with a view of securing harmonious cooperation in mutual objectives and averting interruptions and interferences with services to patients;

NOW THEREFORE, in consideration of the mutual promises hereinafter set forth, it is agreed by and between the parties as follows:

## ARTICLE 1
## RECOGNITION

1.1   It is agreed that this Contract shall apply and continue in full force and effect at the Aliquippa Community Hospital facility located at 2500 Hospital Drive, Aliquippa, PA 15001, at any future location to which the current Hospital facilities may move, and at any new or additional facilities which the Hospital owns at least fifty percent (50%) and which are under its principal direction and control.

1.2   The Hospital hereby recognizes and acknowledges the Union as the exclusive representative of the employees of the Hospital in the unit described below in respect to collective bargaining in respect to wages, hours and terms and conditions of employment. The Hospital agrees that non bargaining unit employees will not perform bargaining unit work currently performed under this Agreement which the hospital intends to continue to perform at Aliquippa Community Hospital facilities in a way that would erode such work or result in lay off or reduction of hours of bargaining unit employees.

1.3   The bargaining units at the Hospital are as follows:

(a) a subdivision of the employer unit comprised of the following classification of employees: all full-time, regular part-time, Per Diem, and PRN licensed practical nurses in the nursing department of the Hospital (including graduate practical nurses and

1

excluding managerial employees, supervisors, first level supervisors, confidential employees, and guards as defined by the Act.

(b) a subdivision of the employer unit comprised of the following classifications of employees: all full-time, regular part-time, Per Diem, and PRN service and maintenance employees employed in the nursing, housekeeping, dietary and maintenance department, excluding security personnel, and all confidential, managerial, first level supervisors and supervisors as defined in the Act.

(c) a subdivision of the employer unit comprised of the following classifications of employees: all full-time, regular part-time, Per Diem, and PRN registered nurses in the nursing department of the Hospital (including graduate nurses), excluding all other employees of the Hospital, and further excluding managerial employees, supervisors, first level supervisors, confidential employees and guards as defined by the Act.

(d) a subdivision of the employer unit comprised of the following classification of employees: all full-time, regular part-time, Per Diem, and PRN nonprofessional employees in the Behavioral Health/Inpatient Psychiatry Unit, and excluding management level employees, supervisors, first level supervisors, confidential employees and guards as defined in the Act.

(e) a subdivision of the employer unit comprised of the following classifications of employees: all full-time, regular part-time, Per Diem, and PRN professional employees in the Behavioral Health/Inpatient Psychiatry Unit excluding management level employees, supervisors, first level supervisors, confidential employees and guards as defined in the Act

(f) a subdivision of the employer unit comprised of the following classifications of employees: all full time, part time, and PRN/Per diem rehab therapists, respiratory therapists, and sleep lab respiratory therapists/coordinators excluding management level employees, supervisors, first level supervisors, confidential employees and guards as defined in the Act

(g) a subdivision of the employer unit comprised of the following classifications of employees: all full time, part time, and PRN/Per diem radiology techs, lab med techs, pharmacy techs, orthopedic techs, and EEG techs excluding management level employees, supervisors, first level supervisors, confidential employees and guards as defined in the Act

(h) a subdivision of the employer unit comprised of the following classifications of employees: Residual clerical bargaining unit, including full time, part time, and PRN/Per diem unit secretaries/unit clerks, lab med secretaries, phlebotomists, registration/patient access clerks, patient finance clerks, radiology aides, rehab aides, radiology transcriptionists, and radiology registration clerks excluding management level employees, supervisors, first level supervisors, confidential employees and guards as defined in the Act

2

1.4  "Employee(s)," whenever used in the Agreement, shall be deemed to mean the employees in the bargaining unit covered by this Agreement as defined herein.

1.5  "Full-time employee" as used herein shall mean an employee in the bargaining unit who has completed his/her probationary period and who regularly works on a full-time basis and who, with the exception of vacation time or other excused absence from work as provided herein are scheduled to work a full work week during each week of the calendar year. A full work week is defined as thirty-seven and one-half (37½) hours to 40 hours per week.

1.6  "Regular part-time employee" as used herein shall mean an employee who regularly works twenty-two and one-half (22½) or more hours but less than thirty seven and one-half (37½) hours during each week of the calendar year. Regular part-time employees participate in benefits as specifically set forth under the provisions related to benefits. "Part-time employee" as used herein shall mean an employee who regularly works fifteen (15) or more hours but less than twenty two and one-half (22½) hours during each week of the calendar year. A part-time employee is covered by the terms of this Agreement, provided however, a part-time employee is not eligible for any benefits as set forth in this Agreement.

1.7  "Temporary employee" as used herein shall mean an employee who is excluded from the bargaining unit, who is hired for a period of limited duration (not to exceed three months except for leaves of absence as set forth hereinafter in Article 21) and is so informed at the time of hire.

1.8  (a)  A part-time employee who averages thirty-seven and one-half (37½) or more hours for eight (8) consecutive weeks shall at the employee's option be reclassified to full-time status upon the completion of the eighth (8th) week.

It is understood that the above shall apply except when an employee is filling in for another employee who is on vacation, out ill, or otherwise on an approved leave of absence.

(b)  Any employee classified as a per Diem employee, who averages twenty-two and one-half (22 ½) hours or more per week for eight (8) consecutive weeks shall, at the employee's option, be reclassified as a part-time employee upon completion of the eighth week.  It is understood that the above shall apply except when an employee is filling in for another employee who is on vacation, out ill, or otherwise on an approved leave of absence.

(c)  Any employee classified as a per Diem employee, who averages thirty-seven and one-half (37 ½) hours or more per week for eight (8) consecutive weeks shall, at the employee's option, be reclassified as a full-time employee upon completion of the eighth week.  It is understood that the above shall apply except when an employee is filling in for another employee who is on vacation, out ill, or otherwise on an approved leave of absence.

1.9    Volunteer workers who donate their services to the Hospital are not covered by the terms of this Agreement. The Hospital may continue to use such volunteers to perform in the capacities as they are currently used or are used within the industry, provided however, that the parties specifically agree that the operation of "The Gift Shop" shall remain a volunteer function during the term of this Agreement. Such volunteers shall not be used to replace the work performed by bargaining unit employees at the time of the signing of this Agreement except that during the term of this Agreement an emergency, such as flood, fire, epidemic or other unforeseen major contingency arises, the Hospital shall have the right to use volunteers as may be reasonably necessary.

1.10    The Hospital agrees to send to the Union at the Harrisburg Office a quarterly report only of all hours worked by part-time and per diem employees.

1.11    Where it has been determined and agreed to by the parties that employees in any of the residual units / classifications (organized into the Union and so recognized by the Hospital in December 2004, and January 2005), are not subject to, or afforded benefits under any particular section(s) of the Collective Bargaining Agreement, said employees, including all those hereafter under the employ of the Hospital, shall be subject to the terms, wages, benefits, and any other conditions that may apply, which so existed as of the effective date of this agreement.  Such conditions and terms of employment shall not be subject to change or alteration by the Hospital without the express, signed consent of the Union.  The Hospital hereby recognizes and acknowledges the Union as the exclusive representative of the employees of the Hospital in all bargaining units in respect to collective bargaining in respect to wages, hours and terms and conditions of employment.

### ARTICLE 2
### UNION SECURITY AND CHECKOFF

2.1    All bargaining unit employees on the active payroll, excluding those within the probationary period of employment, shall become members of the Union within thirty-one calendar days after the effective date of this Agreement and shall thereafter maintain their membership in the Union in good standing or pay the Union a representation fee as a condition of their continued employment. All employees hired after the effective date of this Agreement who successfully complete the probationary period and employees hired before the effective date who successfully complete the probationary period shall, as a condition of employment, join the Union and maintain membership in the Union in good standing or pay a representation fee.

2.2    For the purpose of this Article, an employee shall be considered as a member of the Union in good standing by tendering their periodic dues and initiation fees, uniformly required as a condition of membership, or other lawfully prescribed fees.

2.3    The Employer shall inform all eligible employees at the time of hire of the existence and terms of this Agreement and the obligation of such employee as to Union

membership. The Employer shall provide the new employee with a copy of the job description and the wage group to which she/he has been assigned. Once a month, the Employer shall submit to the Union the name, address, telephone number, social security number, job classification, date of hire, job location and full-time and part-time status of all new employees. At the time of any orientation given to new employees by the Employer, or at such other mutually agreed upon time and place, the Union will be provided an opportunity to sign-up new Union members and provide orientation to new employees. Union representatives will not be paid for time spent in such orientation, but orientees will, and such time shall be limited to one (1) hour, shall not interfere with patient care or the operations of the Employer and shall be without Management representatives present.

2.4   An employee who has failed to maintain membership in good standing as required by this Article shall, within twenty (20) days following receipt of a written demand from the Union requesting their discharge, be discharged if, during such a period, the required dues, initiation fees and assessments, or other lawfully prescribed fees, have not been tendered.

2.5   A newly hired employee shall have no seniority for the first ninety (90) calendar days of his/her employment, which shall be defined as the probationary period. During or at the end of this period, the employee is a probationary employee, and during said period discharge may be made by the Hospital without being subject to the grievance procedure. If a temporary employee not covered by this Agreement is hired as a regular part-time or full-time employee, the probationary period shall be computed from the employee's date of hire as a regular employee. After the completion of his/her probationary period, the employee shall have bargaining unit seniority from his/her last date of hire or rehire.

2.6   Upon receipt of a voluntary, written authorization form from a Union member (a true and correct copy of the authorization to be signed is attached hereto as Appendix A and is made a part hereof), the Hospital shall, pursuant to such authorization, deduct from the wages due the Union member and remit to the Union regular monthly dues, assessments and initiation fees (as authorized by applicable law), if any. Remission of monthly dues shall start not earlier than the first pay period following the completion of a Union member's probationary period of employment.

2.7   The Hospital shall not be obligated to make dues deductions of any kind from any Union member who, during any dues month involved, shall have failed to receive sufficient wages to equal the dues deduction.

2.8   Each month, the Hospital shall remit to the Union all deductions for dues, assessments and initiation fees, if any, made from the wages of Union members for the preceding month, together with a list of all Union members from whom dues, assessments and/or initiation fees have been deducted. The Hospital will submit a copy of the dues report to the Union at its office at 1500 North Second Street, Harrisburg, PA 17102.

The dues report will include:

(a)  hourly rate;

(b)  number of hours worked and the gross earnings that the dues deduction is based on;

(c)  full, part-time, per diem, or PRN status;

(d)  month the deduction is based on;

(e)  name and social security number;

(f)  initiation fees listed separately;

(g)  political action deductions, listed separately and payable by separate check;

(h)  check should be made payable to District 1199P and remitted to 1500 North Second Street, Harrisburg, PA 17102;

2.9   The Employer assumes no obligation, financial or otherwise, arising out of the provisions of this Article, and the Union shall indemnify and hold the Employer harmless for any and all claims, grievances, arbitrations, awards, suits, attachments, or other proceedings, arising out of or by reason of any action taken by the Employer for the purpose of complying with any of the provisions of this Article. Once such funds are remitted to the Union, their disposition thereafter shall be the sole and exclusive obligation and responsibility of the Union.

2.10   Credit Union   The Hospital shall provide for employees the opportunity to enroll, via payroll deduction, in a properly licensed Credit Union. The Union agrees that it will indemnify and hold the Hospital harmless in any claim by any person by reason of any such action taken under this Article, including the costs of defending against any such claim.

2.11   The Employer agrees to make a payroll deduction monthly from an employee's pay for the District 1199P/SEIU Solidarity-Political Action Fund upon written authorization of any employee covered under this Agreement and remit the same to: District 1199P/SEIU Solidarity-Political Action Fund at 1500 North Second Street, Harrisburg, PA 17102. Said authorization of any employee shall be in the form annexed hereto as Appendix B.

## ARTICLE 3
## NON-DISCRIMINATION

3.1   The Hospital and the Union agree that they will not discriminate against any

employee on account of race, color, religious creed, national origin, disability, political belief, sex, age, sexual orientation, or member or non-membership in the Union and Union activity.

3.2   The parties recognize that under the Americans with Disabilities Act of 1990 and the Pennsylvania Human Relations Act, the Employer is required to make reasonable accommodations for qualified individuals with disabilities.  The parties recognize that in making these reasonable accommodations in accordance with the statutes, the Employer may be required to take actions which are not consistent with the provisions of this Agreement.  Prior to taking any such action, the Employer agrees to meet and discuss the issue with the Union.  Upon agreement by the Union, the applicable provisions of this Agreement shall be waived in order to make such reasonable accommodations and such waiver shall not be subject to the grievance and arbitration provisions of this Agreement.

### ARTICLE 4
### MANAGEMENT

4.1   The management of the Hospital and the direction of the working forces are vested exclusively with the Hospital.

4.2   Matters of inherent managerial policy are reserved exclusively to the Hospital. These include, but shall not be limited to, such areas of discretion or policy as the functions and programs of the Hospital, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel.

4.3   The Union recognizes that the Hospital may introduce a revision in the method or methods of operations, which will produce a revision in job duties and a reduction in personnel in any department. The Union agrees that nothing contained in this Agreement shall prevent the implementation of any program and of workforce reductions on any program to be hereafter undertaken by the Hospital.

4.4   Except where expressly abridged by a specific provision of this Agreement the Hospital retains the sole right to exercise the customary functions of management whether or not exercised by the Hospital prior to the execution of this Agreement including (by way of example and not by way of limitation) the right to determine the type of work to be performed and the number of employees to be actively employed; to schedule and assign work; to establish new jobs, eliminate jobs, and increase or decrease the number of jobs; to determine the number of shifts and the schedule of each shift; to maintain and improve the skill, efficiency, ability, and production of its employees; to hire, promote, transfer, and layoff employees; to transfer work between units and departments; to set work standards and maintain performance records; to establish and require employees to observe reasonable rules and regulations; to demote, discipline, suspend or discharge employees for cause.

4.5  The Union, on behalf of the employees agrees to cooperate with the Hospital to attain and maintain maximum patient care and full efficiency.

4.6  There shall be no individual agreements between employees and the Hospital.

4.7  Nothing herein contained shall be deemed to mean that any employee or group of employees covered by this Agreement has inherent rights to a particular job or task, nor is their work restricted to a particular task or job. Nothing in this Agreement shall be interpreted as limiting the current practice of employees performing duties other than those they normally perform or from helping other employees.

## ARTICLE 5
## NO STRIKE - NO LOCKOUT

5.1  The Union will not call, cause, assist, encourage, participate in, condone, ratify or sanction nor will the employees engage in any strike, sitdown, slowdown, boycott, or stoppage of work, sympathy strike or other interference with the operations of the Aliquippa Community Hospital during the period of this Agreement.

5.2  Should a strike, slowdown, stoppage of work, sympathy strike or other interference with the operations of Aliquippa Community Hospital occur, not called or sanctioned directly or indirectly by the Union, the Union, within four (4) hours following the request of Aliquippa Community Hospital, shall:

(a)  Immediately at Aliquippa Community Hospital's request publicly disavow such action by the employees;

(b)  Advise Aliquippa Community Hospital in writing that such action by the employees has not been called or sanctioned by the Union; and

(c)  Post notices on the Union Bulletin Boards advising that it disapproved such action, and instruct employees to return to work.

5.3  The Hospital shall have the right to discharge for cause, with loss of all rights and benefits, any or all employees when the actual reason for said discharge is the incitement, inducement or participation in a violation of any of the provisions of this Article, without recourse to the grievance or arbitration procedures.

5.4  The Hospital agrees that it will not lock out employees during the period of this Agreement.

## ARTICLE 6
## GRIEVANCE PROCEDURE AND ARBITRATION

6.1  A grievance is defined as being any question or controversy between the Hospital and one or more employees or the Union as to the interpretation or application of or

compliance with the terms of this Agreement. If a grievance shall arise, there shall be no strike, sympathy strike, sit down, slow down, stoppage of work, boycott, or any other interference with the operations of the Hospital, and the following procedure shall be followed:

**STEP 1**   If the matter is not resolved by discussion, the employee and/or a local Union representative shall within fifteen (15) working days after he is aware of, or should be aware of, the action upon which the grievance is based, present the same in writing to his supervisor (or designee). The written grievance shall be submitted on a form which shall be provided by the Hospital for that purpose and available through the Union. It shall show the name and job title of the employee, the date of the action upon which the grievance is based, the provision or provisions of this Agreement (if any) allegedly violated and shall set forth the facts related to the action and the remedy sought by the grievant. The grievance form shall be signed by the grievant and/or the local Union representative. The grievant's supervisor (or designee) shall, within three (3) working days after receipt of the grievance, give the grievant and/or the local Union representative a written answer;

**STEP 2**   If the grievance is not settled at Step 1, the grievant and/or the local Union representative may appeal by giving written notice of such appeal to his department head (or designee) within five (5) working days after receipt of the supervisor's written answer. The department head (or designee) shall meet with the grievant, his supervisor and the grievant's local Union representative at a mutually agreed upon time within five (5) working days after receipt of the appeal. The department head (or designee) shall give a written answer to the grievant and the local Union representative within five (5) workings days after the Step 2 meeting;

**STEP 3**   If a grievance is not settled in Step 2 and the Union still decides to further process the grievance, the Union shall, within five (5) working days after the department head's answer from the Step 2 meeting, give the appropriate Hospital Vice President (or designee) written notice of its appeal from Step 2. A representative of the Union, the local Union representative, and the grievant will meet with the appropriate Hospital Vice President, the grievant's supervisor and department head (or designees) at a time mutually agreed upon by the parties within ten (10) working days after receipt of the Union's appeal to Step 3. The appropriate Hospital Vice President (or designee) shall give an answer in writing to the Union within ten (10) working days after the close of the Step 3 meeting.

6.2   Anything to the contrary herein not withstanding a grievance concerning a discharge or suspension may be presented initially at Step 3 in the first instance within five (5) days exclusive of weekends, after receipt of the notice of discharge.

6.3   All time limits herein specified shall be deemed to be exclusive of Saturdays, Sundays and Holidays (including religious holidays) and may be extended by mutual agreement confirmed in writing.

9

6.4   Failure on the part of the Hospital to answer a grievance at any step shall not be deemed acquiescence thereto, and the Union may proceed to the next step.

6.5   A grievance which affects a substantial number or class of employees, and which the Hospital's representative designated in Steps 1 and 2 lacks authority to settle, may initially be presented at Step 3 by the Union representative.

6.6   When a grievance has been processed to its completion under the grievance procedure and the grievance remains unresolved, it may be appealed to arbitration by the Union or the Hospital by means of a written notification to the other party of the intent to arbitrate within ten (10) working days after the receipt of the answer from Step 3 of the grievance procedure. Such notification of the intent to arbitrate shall be signed by a representative of the Union.

6.7   Within ten (10) working days after receipt of the appeal to arbitration the parties shall attempt to mutually agree upon an arbitrator. If such agreement cannot be reached, the American Arbitration Association (AAA) will be requested to submit lists of seven (7) suggested arbitrators from which one will be selected by mutual agreement or by alternately crossing off arbitrators not desired until one (1) remains on the list.

6.8   The decision of the arbitrator shall be final and binding upon both parties and the aggrieved employee. The arbitrator shall have no power to add to, subtract from, or modify any of the provisions of this Agreement. The decision of the arbitrator must be based only on the expressed terms of this Agreement and the evidence presented to him.

6.9   Each party shall share equally the costs of the services of the arbitrator, as well as other costs relating to said arbitration, such as rent for a meeting room.

## ARTICLE 7
## DISCIPLINE AND DISCHARGE

7.1   After the completion of his/her probationary period the Hospital shall have the right to discharge, suspend or discipline any employee for just cause.

7.2   An employee discharged for cause shall not be entitled to receive any of the benefits provided for in this Agreement.

7.3   <u>Discipline</u>   Disciplinary action or measures may include the following:

(a)   Oral Reprimand

(b)   Written Reprimand

(c)   Suspension (notice to be given in writing)

10

(d)   Discharge

Disciplinary measures used will be related to the seriousness of the offense under all the circumstances.

Disciplinary Warnings, notices of Suspension and notices of Discharge will remain in an employee's file. Disciplinary Warnings and notices of Suspension(s) will not be used for the purposes of progressive discipline after one (1) year from the date of the occurrence which resulted in disciplinary warning or notice of suspension(s) being issued to the employees provided that no further violation of a similar offense has occurred.

7.4   The Hospital will notify the Union in writing within twenty-four (24) hours following the discharge, suspension or issuance of a formal written disciplinary action with respect to any employee in the bargaining unit who has completed his/her probationary period.

7.5   The Union may elect to contest the discharge or suspension of any employee but must give written notice thereof to the appropriate Hospital Vice President or to his/her designated representative within five (5) days, exclusive of weekends, after receipt of the notice of discharge. In such event, the issue shall thereafter be submitted and determined under the grievance and arbitration procedure hereto set forth, commencing at Step 3.

7.6   Any employee who is required to attend a meeting at which he/she is to be disciplined or at which an investigation will be conducted which might result in a disciplinary action, such employee will be told the purpose of the meeting in advance so that he/she may request that a representative may accompany her/him at such a meeting. This provision shall not foreclose the Hospital from imposing immediate disciplinary action where such action is appropriate. It is understood that if the Hospital determines that immediate disciplinary action is appropriate, they will inform the Union immediately after such action.

7.7   This Article does not apply to probationary employees.

7.8   If representatives of the Hospital have reason to reprimand an employee, it shall be done in a manner that will not embarrass the employee before other employees or the public.

## ARTICLE 8
## UNION VISITATION AND BULLETIN BOARDS

8.1   Upon notice to the Hospital, a representative of the Union shall have reasonable access to the Hospital's premises for purposes of conferring with Hospital representatives, delegates of the Union and/or bargaining unit employees, and for the purpose of investigating a grievance or administering this Agreement. Such access

11

shall be subject to reasonable notice and the Hospital's policies, procedures and rules of conduct. Discussions and/or grievance investigations shall be conducted in such a manner to avoid interference with patient care, the work of employees or the operations of the Hospital.

8.2   The Hospital shall provide two (2) locked Bulletin Boards which shall be used for the purpose of posting proper union notices. Such Bulletin Boards shall be placed at places readily accessible to bargaining unit employees in the course of employment. In addition, the Hospital shall allow the Union reasonable space to post proper union notices in each Hospital department or unit in which bargaining unit employees are regularly assigned. Such postings shall not encroach upon the space needed for official Hospital postings related to the operation of the facility. The Union agrees to post good taste factual educational and informational material and notices of Union meetings, activities, and social events.

8.3   The Union will notify the Hospital of the names of the employees elected as Union officers, delegates, and work area leaders and the Hospital will adjust the work schedule or will schedule excused absent days to permit attendance at the annual Leadership Assembly or the International Union Convention, provided notice is given to the Hospital six (6) weeks prior to the meeting.

The Union will notify the Hospital of the name of one employee elected as the Executive Board Member and the Hospital will adjust the work schedule or will schedule excused absent days to permit the attendance of this employee at the District Executive Board Meeting four (4) times a year provided notice is given to the Hospital six (6) weeks prior to the meeting.

The Hospital in its sole discretion will permit additional employees to trade scheduled days off in order to attend such meetings provided, however, that no overtime is incurred.

8.4   Union officers, delegates, and work area leaders shall be permitted reasonable time while on duty to conduct legitimate Union business. In no event shall activities be engaged in which interfere with the efficient and proper functioning of the hospital. An employee Union officer, delegate or work area leader intending to go to a department or unit other than the one he/she represents must receive permission from his/her department head or supervisor to leave the department or unit in which he/she works and the permission of the department head or supervisor of the department or unit he/she is entering, and such permission shall not unreasonably be denied.

## ARTICLE 9
## HOLIDAYS

9.1 All bargaining unit employees shall be subject to the terms set forth in Article 9, provided however, current practices for Per Diem employees (in effect as of December 31, 2004) shall be maintained by the Hospital throughout the term of this agreement

12

unless mutually and explicitly agreed otherwise, and in writing, between the Union and the Hospital

9.2  Holidays with pay shall be granted to full-time employees as follows: New Year's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day.

(a)  For employees who regularly work a Monday through Friday work schedule, if any of the Holidays listed above shall fall on Saturday, the preceding Friday shall be observed as the Holiday or whenever any of the Holidays listed above shall fall on a Sunday, the succeeding Monday shall be observed as the Holiday.

(b)  When a Holiday falls on a Saturday or Sunday employees in work units with a seven day work schedule will observe the holiday when it occurs.

9.3  A regular full-time employee who works on any of the recognized holidays shall be paid at one and one-half (1½) times his/her regular hourly rate of pay for each hour worked on the holiday. In the event that such hours are overtime hours, the employee shall be paid at double time and one-half (2 ½) times his or her regular rate of pay for each overtime hour worked on the holiday.  , and shall receive, in addition, his/her pro rata holiday pay benefit.  For purposes of this section, the holiday is the period beginning at 12:01 AM on the calendar day of the holiday (or the designated day as herein defined) and ending at 11:59 PM on the calendar day of holiday (or the designated day as herein defined). Full-time employees who work on any of the said holidays may take off additional scheduled work hours, or may choose to receive straight time compensation in lieu of taking such additional hours off, at their regular hourly rate up to a maximum of eight (8) hours regardless of the number of hours worked on the holiday. If an employee opts for the day off, any request from that employee for a specific day off, submitted by the employee one week prior to the scheduled posting, shall not be unreasonably denied by the Hospital, provided however, the Hospital retains the right of final approval as to when the additional time shall be taken.

9.4  If a regular full-time employee's scheduled day off should fall on a holiday, he/she shall receive seven and one-half (7½) hours straight time pay for the holiday if the employee regularly works a thirty-seven and one-half (37½) hour workweek as defined in Article 1, Section 1.5 or eight (8) hours straight time pay for the holiday if the employee regularly works a forty (40) hour work week as defined in Article 1, Section 1.5, provided however, the employee and his/her supervisor can mutually agree that the employee may take an additional day off at his/her regular hourly rate, providing the provisions of Section 9.4 of this Article are met and the additional day off is taken within thirty (30) days before or after the holiday with the understanding that the Hospital retains the right of final approval.  An employee's request to take an additional day off under this section shall not be unreasonably denied by the Hospital.  In the event a request is denied, the time frame for the employee taking the additional day off shall be extended by an additional thirty (30) days.

13

9.5   In order to qualify for compensatory time off, or holidays with pay, a full-time employee must be on the active payroll (i.e., not on leave of absence or layoff) during the week in which the holiday falls, and must have worked the last compete shift prior to the holiday, have worked on the complete shift scheduled on the holiday, if any, and the next complete scheduled shift following the holiday unless the employee reports to work and must leave early due to illness (verified by the ER physician in the Emergency Room) or can produce a valid physician's certification of illness or injury. Valid shall mean the employee was either hospitalized or off sick for a period of three days prior to any of the foregoing specified scheduled days of work, or off work due to verified injury or illness.

9.6   If a recognized holiday falls within a full-time employee's vacation period, he/she shall receive eight (8) hours pay for the holiday and that day shall not count as a vacation day.

9.7   In no event will an employee who is on a leave of absence (of any duration) be eligible for holiday pay.

9.8   Temporary employees shall not be eligible for holiday benefits provided herein.

9.9   Paid Holidays not worked shall be considered as time worked for the purpose of computing overtime.

9.10   In addition to the holidays set forth above, a full-time employee upon completion of the probationary period, will accrue personal days at the rate of .923 hours per payroll period up to a maximum of three (3) days if the employee regularly works a forty (40) hour workweek as defined in Article 1, Section 1.5, or will accrue personal days at the rate of .865 hours per payroll period up to a maximum of three (3) days if the employee regularly works a thirty-seven and one-half (37½) hour workweek as defined in Article 1, Section 1.5, provided however, an eligible employee shall be permitted to accumulate a negative balance of accrued hours so long as by the end of the calendar year the balance is at a minimum zero. Such personal days may not be accumulated from year to year and must be used before the end of the final pay period each calendar year or the benefit is lost. An employee may use personal days in minimum units of one-half (½) days on any scheduled workday.

Except in cases of extreme emergency, an employee must give the Hospital at least five (5) days advance notice, in writing, of the day which the employee wishes to use as a personal day. Personal holidays shall be scheduled and granted for time requested by the employee and shall not be unreasonably denied provided, however, the Hospital retains the right of final approval as to when the additional time shall be taken. Two (2) personal days may be taken or scheduled prior to October 1 of each year or else the Hospital may schedule such personal day.

9.11   Regular part-time employees shall receive pro rata holiday benefits based on the

14

ratio of time worked to full-time. A regular part-time employee who works on any of the recognized holidays shall be paid at one and one-half (1½) times his/her regular rate of pay and shall receive, in addition, his/her pro rata holiday pay benefit. In the event that such hours are overtime hours, the employee shall be paid at double time and one-half (2 ½) times his or her regular rate of pay for each overtime hour worked on the holiday, and shall receive, in addition, his/her pro rata holiday pay benefit.

9.12    In the event that an employee is unable to schedule his/her Christmas Day Holiday before the end of the calendar year due to the operating needs of the Hospital, the employee must schedule the Christmas Holiday within the next thirty (30) days on a mutually agreed upon date with the employee's supervisor with the understanding that the Hospital retains the right of final approval.

## ARTICLE 10
## VACATIONS

It is mutually understood and agreed to by the Union and the Hospital that Article 10 shall be applicable only to those bargaining units specified in the 2002-2004 collective bargaining agreement. All newly organized residual units, so organized in the period from December 2004 through January 2005 shall be subject to the Paid Time Off policy applicable to said employees as of December 31, 2004 unless mutually and explicitly agreed otherwise, and in writing, between the Union and the Hospital

10.1    <u>Eligibility and Allowances</u>    (a) Full-time Employees: Beginning at the date of hire, full-time employees will earn ten (10) days annually at the rate of 3.08 hours per bi-weekly payroll. At the completion of five (5) years full-time work, full-time employees will accrue fifteen (15) days annually at the rate of 4.62 hours per bi-weekly payroll. At the completion of ten (10) years of full-time work, full-time employees will accrue twenty (20) days annually at the rate of 6.15 hours per bi-weekly payroll.

(b) <u>Other Eligibility Rule</u>    Vacation may not be taken until a full-time employee has actually worked six (6) full months or 1,040 hours, whichever comes first. Vacation may not be taken until a regular part-time employee has actually worked six (6) full months or 520 hours whichever comes first. No employee may accrue vacation time in excess of 1.5 times the employee's annual vacation, i.e., the amount you accrue during 18 months. At that time the employee stops accruing vacation time until some of the accrued vacation time has been used after which accrual begins again.

(c) Employees subject to the terms of the Collective Bargaining Agreement that expired on September 17, 1996 of the Aliquippa Hospital Mental Health Services Unit who have accrued fifteen (15) days of vacation or have accrued twenty (20) days of vacation pursuant to the vacation schedule as set forth in that previously expired Agreement shall, during the term of this Agreement, continue to receive the accrued fifteen (15) days or the accrued twenty (20) days. Provided however, those Mental Health employees who have not accrued the fifteen (15) or twenty (20) days of vacation shall accrue vacation as set forth in Subsection (a) during the term of this Agreement.

15

(d) Regular part-time employees shall receive pro rata vacation benefits based on the ratio of time worked to full-time.

(e) It is understood that one week shall be equivalent of forty (40) hours or thirty seven and one-half (37½) hours of pay at the applicable straight time hourly rate and one day shall be the equivalent of eight (8) or seven and one-half (7½) hours of pay at the applicable straight time hourly rate. In the event that an employee is normally scheduled to work other than an eight (8) or seven and one-half (7½) hours per day and is on vacation that day, the vacation pay for that day shall be the normally scheduled hours of pay at the applicable straight time hourly rate.

10.2  <u>Vacation Pay</u>   Vacation pay shall be the employee's regular straight time rate of pay in effect for the employee's regular job on the pay day immediately preceding the employee's vacation.

10.3   There shall be no pay in lieu of vacation benefits, except that when an employee terminates his/her employment, or is terminated, he/she shall be paid for the number of his/her unused vacation hours.

10.4   During January and February of each year, all regular full-time and regular part-time employees will be given the opportunity to state their choices of vacation periods during the current calendar year. Vacation schedules shall then be established taking into account the wishes of the employees and the needs of the hospital. Where there is a conflict among employees on a unit or in a department in regards to the choice of vacation periods, Hospital seniority on the unit or in the department shall prevail. The Hospital shall post the vacations for the current calendar year no later than April 1. Requests for vacation periods during the current calendar year made after the last day of February shall be on a first come first serve basis; and no employee shall exercise his/her seniority after the last day of February to "bump" a less senior employee from the vacation schedule.

ARTICLE 11
<u>JURY DUTY</u>

11.1   Any full-time employee who is called upon for jury duty by either the state or federal courts, and who thereby loses time from work, shall receive for each day of jury duty the difference between his/her applicable regular straight time daily pay and the daily jury fee received but no more than eight (8) hours in each day. The employee shall notify the supervisor immediately upon receipt of the jury duty notification. To be compensated, the employee must submit proof of jury pay to the Hospital and must report for work on days he/she is excused from jury duty provided that the excused jury duty day is a scheduled workday. The appropriate proof is a certificate of service duly signed by the Clerk of Court. An employee summoned for jury duty agrees to cooperate with the Hospital should the Hospital deem it necessary to attempt to have the employee excused from jury duty. The provisions of this Article do not apply if an

16

employee volunteers for jury duty.

## ARTICLE 12
## FUNERAL LEAVE

12.1    When death occurs in a full-time employee's immediate family defined as spouse, children, grandchild, parents, or legal guardians, parents-in-law, brother, sister (or any of the relatives listed below for the one (1) day provision if such person lives in employee's household) such employee, upon request will be excused for up to three (3) scheduled workdays next immediately following the date of death. Upon the death of a full-time employee's brother-in-law, sister-in-law, grandparent, son-in-law or daughter-in-law, such employee, upon request, will be excused for one (1) scheduled workday next immediately following the date of death. An employee may substitute the day of the funeral for any one of the scheduled workdays or scheduled workday to which he otherwise would be entitled. Such employee shall receive pay at his/her applicable regular straight time hourly rate for any such excused workdays. The employee shall, upon request of the Hospital, furnish valid proof of death and relationship. If there is a death in a regular part-time employee's immediate family (as defined above) the Hospital will grant upon request one (1) paid regularly scheduled working day off, that day being the day of the funeral.

12.2    A full-time employee otherwise entitled to funeral leave for the death of an immediate family member as set forth in Section 12.1 may be granted, at the request of the employee and upon agreement by the employee's supervisor, which agreement will not be unreasonably denied, up to an additional five (5) scheduled workdays off without pay, to run consecutively with the days of paid funeral leave. Employees may use earned vacation and personal time for such days off upon the agreement of the employee's supervisor which shall not be unreasonably denied. A regular part-time employee otherwise entitled to funeral leave for the death of an immediate family member as set forth in Section 12.1 may be granted, at the request of the employee and upon agreement by the employee's supervisor, which agreement shall not be unreasonably denied, up to an additional five (5) scheduled workdays which in no event shall exceed seven (7) calendar days from the day of the funeral, without pay, to run consecutively with the day of paid funeral leave. The regular part-time employee may use earned vacation time for such days off upon the agreement of the employee's supervisor which shall not be unreasonably be denied.

## ARTICLE 13
## MILITARY LEAVE

13.1    Leaves of absence for the performance of duty with the United States Armed Forces shall be granted in accordance with applicable Federal and State law.  All hospital personnel activated for military duty will continue to receive compensation as if they were employed at the hospital, net of military pay, and will continue to participate in all benefits of hospital employment.  At the conclusion of their service, employees who have actively served in the military will be reinstated in their previous position, with no

17

interruption in benefits due.

### ARTICLE 14
### SENIORITY

14.1    Hospital seniority is defined as the length of time an employee has been continuously employed by the Hospital, provided however, Per Diem employees shall receive one-quarter (25%) credit for each year worked for purposes of job bids/awards only. (Example: A Per Diem employee with four (4) years service would be credited with one (1) year of Hospital seniority.)

14.2    An employee's Hospital seniority shall be the employee's most recent date of hire and Hospital seniority shall commence after the employee completes his/her probationary period and shall be retroactive to the date of his/her date of hire. Temporary employees hired by the Hospital shall have their seniority date retroactive to their date of hire following the completion of their probationary period only in the event that there is no hiatus between the time of their temporary service and the commencement of their probationary period if they are hired as a regular full-time or regular part-time employee.

Seniority shall accrue for employees on layoff for up to one year, provided, however, there shall be no accrual for benefit purposes during the layoff period. An employee who transfers or is promoted to a non-bargaining unit position and who subsequently returns to the bargaining unit without a break in hospital employment shall have his or her seniority frozen and shall not accrue seniority during the period that he or she is working in a non-bargaining unit position; upon his or her return to a bargaining unit position, he or she shall resume accruing seniority but shall not receive seniority credit for the period during which he or she was working in a non-bargaining unit position.

The Seniority list that shall be effective at the commencement of this Agreement shall contain each employee's seniority date based upon his/her most recent date of hire as previously defined in the Collective Bargaining Agreements that expired just prior to the commencement of the term of this Agreement for the Hospital and the Mental Health Unit. Once determined, the seniority date shall remain for each employee and shall not be changed unless seniority is broken or ended as defined under Section 14.8.

14.3    All bargaining unit position vacancies shall be posted for a period of five (5) consecutive calendar days, excluding Holidays and weekends, on all Hospital bulletin boards used for the purpose of notifying employees of vacant positions. Job postings will set forth the job classification, department, nursing units whenever applicable, the shifts where applicable and the required qualifications. Bids for such postings shall be on a standard bid form agreed to by the Hospital and the Union. The Hospital agrees to continue to make a good faith effort to fill job openings on a full-time basis whenever practicable and consistent with operating requirements, provided however, the final determination of the number of employees in each category of employee remains with

the Hospital.

14.4  (a) An employee who wishes to apply for a position which is vacant may make application in the Human Resources Office during the posting period. The Hospital shall select the successful bidder on his/her qualifications to do the posted job and when these elements are equal, preference will be given to the employee with the greatest Hospital seniority within the job classification, then within the Hospital department, and then within the Hospital. Qualification will be based on the job description and/or the requirements specified in the job posting. However, an employee who has filled a posted vacancy by lateral transfer or demotion at any time in the past six (6) months shall not be permitted to make application for another lateral transfer or demotion.

(b) At the end of the five (5) day period, the successful bidder will be placed in the vacant position within forty-five (45) days. The successful bidder shall be paid at the rate of pay plus any applicable differential rate of pay of the position if not placed in the position.

(c) The Hospital within its sole discretion and judgment agrees to make a reasonable effort to provide training and orientation necessary for current LPNs and RNs to qualify such employees for promotion into the Emergency Room, Operating Room, Recovery Room, Outpatient Surgery, CCU/PCU, Inpatient Psychiatric Unit and Outpatient Psychiatric Nursing inclusive of positions that are newly created at Aliquippa Community Hospital facilities. The Union recognizes that the Hospital may within its sole discretion and judgment limit the number of such training opportunities to be available based upon cost, budget and operational needs and that factors such as turnovers and the length of time for training may make it necessary to hire qualified personnel from outside the bargaining unit, from time to time, rather than to promote from within the bargaining unit.

14.5  A bargaining unit employee who fills a posted vacancy shall serve the same probationary period in the new position as a new hire. If, in the sole judgment of the Hospital, he/she demonstrates that he/she is not qualified for the position or is not performing the work satisfactorily, he/she shall be returned to the job from which he/she came without loss of seniority, except that he/she may be discharged for just cause.

14.6  (a) In the event of a layoff or a reduction of hours, the Hospital will provide the Union with notice as soon as practicable but no later than fourteen (14) calendar days prior to the effective date of the layoff. If the Union requests the Hospital to meet after the layoff notice is given to discuss only Union suggestions for alternatives to the layoff or reduction of hours, the Hospital will do so but such meeting shall not delay the layoff or reduction in hours and the Hospital is not required as a result of such a discussion to change its layoff or reduction in hours plan.

(b) In the event of a layoff or a reduction of hours, temporary employees shall be first laid off in the job classification in the department involved, provided the senior employees retained have the ability and qualifications to do the available work.

(c)  Following (b) above, probationary employees, then employees on the seniority list in the following order (per diem, part-time, regular part-time, full-time) with the least hospital seniority shall be laid off in the job classification in the department involved, provided the senior employees retained have the ability and qualifications to do the available work. Casual, per diem, PRN employees will not be scheduled if part-time, regular part-time, or full-time employees are laid off.  If bargaining unit employees who are on lay off status want to be considered for work, the Hospital will maintain a volunteer list from which to call laid off employees with the understanding that the employee must have qualifications and ability to perform the work available and that the Hospital will make one call and only one call in the order that the employee signs the volunteer list. If the bargaining unit employee refuses the offer of the available hours on three occasions, he/she shall be removed from the list. A call answered by an answering machine will qualify as a refusal. Any hours worked on this basis does not qualify the employee to change from layoff status until such time as the employee is officially recalled to work under the terms of this Agreement.

(d)  When an employee is subject to layoff in his classification and department and there exists a vacant position in another department which the employee can perform by reason of his/her qualifications and ability, he/she shall be assigned to that vacant position. If there are more employees subject to layoff than there are available vacancies which they can fill, based on qualifications and ability, Hospital seniority shall prevail in the assignment to vacancies.

(e)  If a full-time employee is laid off and the only vacancy available to him/her is part-time, he/she may elect to fill the vacancy or go on layoff status. If a part-time employee is laid off and the only vacancy available to him/her is full-time, he/she may elect to fill the vacancy or go on layoff status. The Hospital shall not challenge the eligibility for unemployment compensation benefits of employees who choose to go on layoff status under the provisions of this subsection.

(f)   Whenever a vacancy occurs in a classification, employees who are on layoff from that classification shall be recalled in accordance with their Hospital seniority in the reverse order of their layoff. If a vacancy occurs in a classification for which no employee is on layoff status, the most senior laid off employee in another classification who has the qualifications and ability to do the available work shall be recalled. If a vacancy occurs which cannot be filled by a laid off employee the hospital may post the position as a vacancy and in the event there are no qualified employees to fill the position the Hospital may hire a new employee to fill it. A laid off employee may choose to remain on layoff rather than being recalled to a position at a lower rate of pay than the position from which he or she was laid off.  The Hospital shall not challenge the eligibility for unemployment compensation benefits of employees who choose to remain on layoff status under the provisions of this subsection.

(g)  It is understood that a full-time employee who accepted a part-time vacancy rather than layoff shall be reinstated to full-time status before any laid off employee is recalled to a full-time job.

14.7    (a)  In the event of the closing or reorganization of an entire department, displaced employees of the department involved shall be offered positions open at the time of such change on the basis of their Hospital seniority provided such employees have the ability and qualifications to do such work. Said employees not placed at the time of such change shall go on layoff status and shall be offered employment on the basis of Hospital seniority, provided they have the ability and qualifications to do the applicable work, as positions become open.

(b)  An employee who is placed on layoff status under the terms of (a) above may elect to accept the severance package described in paragraph (c) below by notifying the Hospital, within fifteen (15) working days after he/she receives notice of layoff, of his/her intention to do so in writing. If an employee files a grievance over his/her termination from employment and then elects to accept the severance payment, he/she must first withdraw the grievance, with prejudice, before being eligible to accept the severance package. An employee who does not notify the Hospital, in writing, within fifteen (15) days of his/her intention to accept the severance package shall permanently lose all rights to severance pay. An employee who accepts the severance package shall have no right to be recalled to any position within the Hospital and shall have no right to grieve any matter connected with the termination of his/her employment. It is specifically agreed that by accepting the severance payment described below, the employee permanently and completely severs all rights to reemployment at the Hospital.

(c)  An employee who elects to accept the severance package by waiving his or her recall and grievance rights shall be paid a lump sum representing a number of weeks of pay depending on the length of the employee's hospital seniority as follows:

| Years of Hospital Seniority | Weeks of Severance Pay |
| --- | --- |
| Less than five 5 years | 1 week |
| At least 5, but less than 10 years | 2 weeks |
| More than 10 years | 3 weeks |

A week of pay for a regular full-time employee shall be calculated by multiplying the employee's final regular hourly wage rate times the number of hours the employee is regularly scheduled to work per week. A week of pay for a regular part-time employee shall be calculated by multiplying the employee's final regular hourly wage rate times 20. A week of pay for a part-time employee shall be calculated by multiplying the employee's final regular hourly wage rate times 15.

(d)  If the Hospital implements a severance program for non-supervisory non-bargaining unit employees that is more generous in its payment formula or different in any terms and conditions than that set forth in (b) and (c) above, the Hospital shall notify the Union of such program, meet with the Union to discuss such program, and upon request of the

21

Union extend such program to bargaining unit employees.

(e)   For those units organized into the Union and so recognized by the Hospital between December, 2004 and January 2005, the severance policy in effect as of December 31, 2004, or 14.7C herein, shall apply, whichever severance benefit is greater

14.8    Seniority shall end when an employee:

(a)  Quits, resigns or retires;

(b)  Is discharged for just cause;

(c)  Is laid off for a period of twelve (12) continuous months or for a period equal to his/her bargaining unit seniority, whichever is less;

(d)  Fails to report to work immediately upon the expiration of a leave of absence, unless the employee has a valid reason as determined by the Hospital for his/her inability to respond, or is absent from employment for any reason for a period of a year or more;

(e)  Fails to return to work on a recall from layoff within three (3) days after the Hospital has, by letter or telegram to the last address furnished to the Hospital by the employee, sent notice to him/her to return, unless the employee has a valid reason for his/her inability to respond. Notice of recall shall also be sent to the office of the Union;

(f)  Is absent from work without notice to the Hospital for three (3) consecutive scheduled workdays, unless the employee was physically unable to provide such notice;

(g)  Failure to return to work within one (1) year of the date that the employee is off work due to an on the job injury which is compensable under the provisions of the Pennsylvania Workers' Compensation Act.

14.9   A seniority list shall be posted by the Hospital on May 1 and November 1 of each year. Employees may grieve any errors in the seniority list during the two (2) week period in which the seniority list is posted. Any changes made as a result of such a grievance shall have no retroactive effect or applicability. In addition to posting the list, the Hospital shall send representatives of the Union a copy of the list.

14.10   Agency Approval   Notwithstanding any and all other provisions of this Agreement, no employee may be awarded a bid on a job or be allowed to occupy the job in a recall situation, nor shall the Hospital be required to pay an employee not so allowed to bid, or be recalled to a job unless the person to so occupy the job, and his/her qualifications, are approved by the agency funding the position. This determinations shall be made solely in the discretion of the funding agency and is not

22

subject to the grievance and arbitration procedures set forth in this Agreement, even if the agency applies criteria other than those which would have been applied by the Hospital.

14.11   No employee on layoff shall continue to receive any fringe benefits set forth in this Agreement for the duration of the layoff.

14.12   In the event of a layoff or reduction in hours during the term of this Agreement which affects the registered nurses clinically involved in providing Med/Surg care at the Hospital, the following procedures are applicable in the following classifications:

(a)  The Classifications are:

1. RN
2. OR RN
3. ER RN
4. CCU/PCU RN
5. Outpatient Surgery RN
6. Recovery Room RN
7. SNF RN
8. Behavioral Health Unit RN

(b)  The affected registered nurses will have the right to bump based on Hospital seniority providing the bumping nurse is presently qualified and able to perform the remaining work as determined by the Hospital. In determining if nurses are qualified to perform the remaining work all items designated in job descriptions under educational or experience requirements must be complied with in all cases before seniority is considered.

(c)  Nurses on Med/Surg units must be presently qualified for the OR, ER, CCU/PCU, Outpatient Surgery, Recovery Room, SNF, and Behavioral Health Unit in order to bump into those positions.

(d)  When a nurse is laid off he/she can exercise his/her Hospital seniority right to bump. The bumping employee must have greater Hospital seniority than the nurse who he/she bumps and the bumping nurse must be qualified per Subsection (b) above. Full-time employees must bump the least senior full-time employee. Part-time and regular part-time employees must bump the least senior part-time or regular part-time employee.

(e)  The bumping employee will be paid the hourly rate of the position he/she bumps into but in no case can the bumping employee receive an hourly rate greater than the one he/she is being paid at the time of the bump.

(f)  The bumping process is mandatory and no nurse can opt out of the process.

(g)  The bumping process will take from start to finish seventy-two (72) hours from first

23

notification. All selections must be completed in the time allowed and on forms provided by the Hospital.

14.13   The Hospital shall continue its established and jointly (with the Union) recognized practice of allowing any Full-time, regular part-time, or part-time employee to change their status from FT/RPT/PT to Per Diem Status.

ARTICLE 15
HOURS OF WORK

15.1   The bi-weekly time period shall be of fourteen (14) days duration and shall be considered as beginning at 12:01 AM Sunday and ending at Midnight on Saturday. For payroll purposes a shift falls into the day and week in which it begins notwithstanding the shift definitions hereinafter set forth in 15.4.

15.2   The normal workday shall be a twenty-four (24) hour period commencing with the start of the employee's shift.

15.3   The normal work shift shall consist of from four (4) up to twelve (12) scheduled hours, excluding an unpaid one-half hour lunch period.  The scheduling of split shifts may continue only in the Hospital dietary department and the Transportation department. There shall be two fifteen (15) minute paid rest periods in the work schedule of eight (8) or more hours, with the one rest period normally taken during the first four (4) hours and one rest period normally taken during the second four (4) hours of the shift provided, however, the operating and clinical needs of the Hospital shall prevail in scheduling rest periods.

15.4   All shifts shall be scheduled as follows:

(a)  any shift that starts on or after 6:00 AM, but before 10:59 AM, is a day shift;

(b)  any shift that starts on or after 11:00 AM, but before 9:59 PM, is an evening shift;

(c)  any shift that starts on or after 10:00 PM, but before 5:59 AM, is a night shift. For scheduling purposes, the weekend for night shifts shall include the shift that begins on or after 10:00 PM on Friday, but before 5:59 AM on Saturday, and the shift that begins on or after 10:00 PM on Saturday, but before 5:59 AM on Sunday. For scheduling purposes, the weekend for employees working twelve (12) hours in a shift in order to define a night shift shall include the shift that begins on or after 7:00 PM on Friday but before 5:59 AM on Saturday, and the shift that begins on or after 7:00 PM Saturday but before 5:59 AM on Sunday.

15.5   A work schedule for employees shall be posted as follows:

(a)  The schedule for full-time employees (except in the Behavioral Health Unit) and for part-time employees in the maintenance department, shall be posted four (4) weeks in

24

advance.

(b)  The schedule for part-time employees (except in the maintenance department) and for all employees in the Behavioral Health Unit shall be posted two (2) weeks in advance.

(c)  The practice of allowing Mental Health professional employees and their supervisors to mutually agree on the scheduling of a workday or work week so as to provide maximum flexibility in patient care shall continue.  In the event the supervisor cannot arrive at a mutually agreeable schedule the Hospital shall determine the schedule irrespective of items (a) and (b) above.

(d)  Once posted, schedules may not be changed except by mutual agreement between the Hospital and the affected employee, provided however, in the case of an emergency the Hospital shall be able to change a schedule for the sole purpose of meeting the needs of that emergency. "Emergency" is herein defined as any suddenly arising situation which makes necessary immediate action by the Hospital to maintain patient care and protection and the safety and/or health of all persons; to prevent damage to equipment facilities, property and/or materials and to aid in correcting or repairing malfunctions.

(e)  Following the scheduling of full-time employees, to the extent that workdays are available for part-time employees, the Hospital will take reasonable efforts to schedule part-time employees based on the needs of the Hospital and not determined by the employee, at least two (2) full shifts per week based on Hospital seniority in the classification, provided the senior employees have the required experience, orientation and qualifications to perform the available work.

(f)  In the event an employee is called out to work and reports to work within one-half (½) hour of the start of the work shift to which the employee has been called to work, the employee shall receive pay for the entire one-half (½) hour provided, however, that the Employer calls the employee out to work less than one (1) hour prior to the start of the shift.

(g)  The Hospital will continue its policy of allowing employees to change scheduled days with the Supervisor's approval which shall not be unreasonably denied, provided however, that no overtime can be incurred.

(h)  Acute care registered nurses (in any of the acute care nursing classifications), LPN's and nursing assistants will normally be scheduled to work no more than two different shifts during a posted four week work schedule unless requested by the employee.

(i)  The Hospital recognizes that certain acute care registered nurses (in any of the acute care nursing classifications), desire to be assigned to a steady day, evening or night shift and the Hospital will, consistent with scheduling and operating needs,

25

continue to accommodate such schedules provided, however, no such assignment is permanent.

15.6 PER DIEM NURSING GUIDELINES

In order to remain an active member of the per diem staff, nurses must fulfill the following minimum requirements:

1. Schedule one off-shift* per month
2. Schedule one weekend shift* per month
3. Holiday coverage

(a)     One summer holiday shift (Memorial Day, Independence Day, Labor Day)

(b)     One winter holiday shift (Thanksgiving, Christmas Eve and New Year's Eve beginning at 1600, Christmas day, new years day)

(c)     Keep current your annual competencies, certifications, and ppd.

(d)     Call off must be placed to the nursing supervisors at least two hours before the start of your scheduled shift. Credit will only be given for shifts worked unless flexed down by ACH supervisors.

*shift is defined as your usual coverage, that is, if you normally work an eight-hour shift, then your requirement is at least one eight-hour shift.

Employees may combine their off-shift and weekend requirement to fulfill the obligation. (For example, 7p.m. to 7a.m. on Saturday fulfills both obligations.)

Per Diem guidelines for all other departments/units shall be discussed within the context of the labor-management process set forth in Section 7 of this agreement

15.7   No employee shall be scheduled to work more than two (2) different shifts in any seven (7) consecutive day period, unless requested by the employee.

15.8   An employee not scheduled for a twelve (12) hour shift shall be scheduled off work for a minimum of fifteen (15) hours between scheduled shifts except when the employee and the Hospital mutually agree to a lesser number of hours off between scheduled shifts. An employee scheduled for a twelve (12) hour shift shall be scheduled off work for a minimum of eleven and one-half (11½) hours between scheduled shifts, except when the employee and the Hospital mutually agree to a lesser number of hours off between scheduled shifts. If the employee is not scheduled off work for a minimum of fifteen (15) hours or eleven and one-half (11½) hours as appropriate between scheduled shifts, he/she shall be paid one and one-half (1½) times his/her regular hourly rate of pay for one-half (½) of the hours worked on the first (1st) scheduled shift after the change. It being understood that this does not apply when the change is made

26

as mutually agreed upon.

15.9   This Article shall not be construed as a guarantee of hours of work per day or per week or days of work per week. If an employee reports for work on his or her scheduled shift and no work is available, he/she shall receive two (2) hours pay at the normal straight time hourly rate; provided however, that if the employee has been notified or if an attempt has been made to notify an employee not to report to work at least one hour in advance of the scheduled starting time the employee shall not receive said reporting pay. The above reporting pay shall not be paid where work cannot be provided by the Hospital due to circumstances beyond the Hospital's control or because the Hospital utilizes the provisions of Section 15.14 hereinafter stated.

15.10   Employees who are scheduled to work more than six (6) consecutive days in a work week shall be paid at the rate of one and one-half (1½) times the straight time hourly rate of pay for each consecutive scheduled day of work in excess of six (6). The Hospital will make a reasonable effort based on clinical operating needs not to schedule employees for three (3) consecutive days on 12-hour shifts.

15.11   An employee shall be paid at the rate of one and one-half (1½) times his/her regular straight time hourly rate for all hours worked in excess of thirty-seven and one-half (37½) hours in a week for seven and one-half (7½) hour per day employees; forty (40) hours in a week for eight (8) hour per day employees; and either thirty-six (36) hours or forty (40) hours in a week for twelve (12) hour per day employees [depending on whether the twelve (12) hour per day employee is scheduled thirty six (36) or forty (40) or more hours in a particular week]. There shall be no pyramiding or duplication of overtime pay.

15.12   An employee called out to work outside her/his regular shift shall be guaranteed a minimum of four (4) hours pay or work, unless called out to complete a shift for a period of less than four (4) hours in which case she/he shall be paid for the hours actually worked plus one-half (½) hour pay.

15.13   Paid time such as straight time pay for such time as personal days, funeral leave, jury duty, and sick leave shall not be considered as time worked for the purpose of computing overtime.

15.14   Payment of Meal Periods   Should the Hospital direct employees to eat their lunch in the building while remaining on call for their units or should the Hospital direct an employee to eat lunch with a patient outside the building or should an employee's lunch period be interrupted for work-related reasons, the employee shall be paid for his or her lunch period at the appropriate rate of pay.  The Hospital may, at its option, send such employee home early on a day the employee is so directed in order to avoid overtime payments for that day.  Employees who volunteer to work a double shift shall receive a meal ticket.

15.15   Flexible Scheduling   The Hospital shall post schedules with adequate staffing

27

levels and shall make its best efforts to avoid involuntary reductions in staffing in any unit or department.  In the event that patient census or work volumes are at a level that require a downward adjustment in staffing, the Hospital shall reduce staff in the affected work unit by using the following procedure:

The Hospital shall first seek volunteers from among employees in the affected classification(s) based on seniority on a rotating basis, with the preference being given to the person with the most Hospital seniority in the classification affected. If there are not sufficient volunteers, then the Hospital shall have the right to cancel an employee's shift or send an employee home for the day. The Hospital shall choose the least senior employee based on Hospital seniority in the classification affected on a rotating basis. Employees shall be given the option of being pulled to an available position in another unit, based upon the needs of the Hospital, rather than having their shift cancelled or being involuntarily sent home.

Employees taking time off under this section, whether such time is voluntary or not, may elect to utilize accrued benefit time (vacation, personal and/or holiday time) or may elect to take non-paid time off. Employees taking time off under this section shall not have their status as regular full-time or regular part-time changed as a result of such time off. Further, when the time off is taken without pay, the time shall be counted as time worked for the accrual of benefit time (vacation, sick, and personal), for pension accrual, and for purposes of computing overtime.

This section is applicable to acute care nurses (in any of the acute care nursing classifications), inpatient psychiatric nurses, LPNs and nursing assistants.

15.16   The Hospital shall continue its current practice in the housekeeping and maintenance departments, as follows: Employees shall be granted shift preferences based on seniority.  The Employer may change an employee's shift for good and sufficient reason, any such change shall be assigned by taking volunteers first and then by inverse seniority.  There shall be no rotating shifts, except to provide relief for sickness, vacations, holidays, or other paid time off.  There shall be no split shifts.

### ARTICLE 16
### MEET AND DISCUSS

16.1   The Hospital and the Union agree to establish a Labor-Management Committee to meet and discuss on policy matters affecting wages, hours, and terms and conditions of employment.

16.2   Such meetings shall be held at a mutually agreeable time within fourteen (14) days of a request by an appropriate Union representative, provided the Union submits an agenda of issues to be discussed at least seven (7) days prior to the designated meeting date.

16.3   Two (2) days prior to the meeting date the Hospital shall designate by name(s) to the Union who will be in attendance representing the Hospital. The Union may be

represented by up to six (6) representatives of the Union including the full-time representative of the Union. Employees' time for such meetings shall be paid by the Hospital.

16.4   The parties shall from time to time upon the request of the Union convene departmental Labor-Management Meetings in nursing, housekeeping, dietary, and maintenance to discuss issues specific to those departments. The protocol for such meetings shall be the same as that described in 16.2 and 16.3 above.

## ARTICLE 17
## JOB DESCRIPTIONS/NEW CLASSIFICATIONS

17.1   In the event that the Employer establishes a new job classification within the bargaining unit in addition to those now in existence, or substantially changes the duties of an existing job classification, and the Union disagrees with the pay grade to which the job is assigned, the Employer may institute its proposal, subject to the right of the Union to submit the matter to arbitration following such institution in accordance with the provisions of Article 6 hereof.

## ARTICLE 18
## WAGES, OVERTIME, AND SHIFT DIFFERENTIAL

18.1   The regular rate of pay or the regular hourly rate is defined as the straight time rate of pay per hour without the inclusion of any differential or premium.

18.2   OR On-Call Duty   The Hospital shall pay an operating room employee who is on-call duty time, defined as those hours other than his or her regularly scheduled shift during which he or she is available for emergency surgical procedures, as follows:

| | |
|---|---|
| Effective February 10, 2002 | at the rate of two dollars ($2) per hour; |
| Effective January 1, 2003 | at the rate of two dollars and fifty cents ($2.50) per hour; and |
| Effective January 1, 2004 | at the rate of three dollars ($3) per hour. |

An employee called to work outside his/her regular shift who is in on-call status will be offered a minimum of two (2) hours work at time and one-half (1½) the employee's regular straight time hourly rate.

(a) For those units organized into the Union and so recognized by the Hospital between December 2004 and January 2005, the on-call policy and rate schedule in effect as of December 31, 2004 shall apply

18.3   Operating room employees who work past midnight may take the following day off with pay if it is a scheduled workday.

18.4   Shift Differential   The Hospital shall pay an amount of fifty cents ($0.50) per hour in excess of the regular hourly base rate for those hours worked by an employee between the hours of 3:00 PM and 7:00 AM, except for employees whose scheduled shift begins after 7:00 AM and ends before or at 6:00 PM.

18.5   Charge Person   If an employee is designated by the Hospital to fill the position of a supervisor and be in charge in their absence for a minimum of one (1) full hour, such employee will receive a differential of fifty cents ($0.50) per hour in addition to the employee's regular rate of pay for those hours worked in the capacity of a charge person. In Charge duties may include, but are not limited to, such activities as: assigning work, checking work, answering calls, replacing staff, reporting problems to appropriate supervisor.

Lead Person   If an employee is designated by the Employer to serve as a Lead Person, such employee shall receive a differential of one dollar and fifty cents ($1.50) per hour in addition to the employee's regular rate of pay and two dollars ($2) per hour in addition to the employee's regular rate of pay in the maintenance department. Lead person duties may include, but are not limited to, such activities as: tracking call offs and paid leave in order to expedite preparation of payroll, preparing schedules, preparing and checking orders for supplies and parts, answering pages and dispatching other employees to handle calls, coordinating project work, assisting with training and retraining of employees, reporting problems to the appropriate supervisor or director.

18.6   Registered nurses and licensed practical nurses with prior relevant nursing experience prior to being hired at the Hospital may be credited for such experience for pay purposes provided that no newly hired nurse shall have an hourly rate of pay greater than any incumbent nurse with equivalent relevant nursing experience in the Classification to which the newly hired nurse has been assigned.

18.7   In the housekeeping and maintenance departments, when extra work becomes available after the posting of the schedule, the Employer will first offer such hours to part-time employees based upon Hospital seniority on a rotating basis.

18.8   Due to the nature of the Hospital's operations, the parties recognize that it may be necessary to assign employees to work in a job classification other than the employee's regular job classification on a temporary basis. If the temporary transfer is to a job classification in a higher pay grade for one (1) or more consecutive hours, the employee shall be paid the higher straight time hourly rate of pay. If the temporary transfer is to a lower paid grade than the employee's regular job classification, the employee shall continue to be paid at the rate of pay of the employee's regular job classification.

18.9   The Hospital shall not require employees to work mandatory overtime. In the event that overtime work is required, the hospital shall offer shifts or hours of work on a voluntary basis, whether the employee is scheduled or unscheduled, to qualified

employees in the classification where the overtime work is required. The hospital shall offer this work to employees based upon hospital seniority in the classification involved on a rotating basis.

18.10   While it is the hospital's intent to utilize volunteers to the greatest extent possible as set forth above and to minimize the use of agency staff, it is understood that patient needs and short notice situations may require the use of agency staff.

18.11   The following is specific to the Dietary Department.

(a) For hours available prior to the posting of the schedule and after all full shifts of seven and one-half (7½) hours have been scheduled, available hours will be offered to regular part-time employees on a rotating basis, beginning with the employee with the most Hospital seniority in the classification and then the most senior regular part-time employee who is qualified to do the work.

(b) For hours which become available after the posting of the schedule and are not overtime hours, the Hospital will offer such hours to regular part-time employees based on Hospital seniority in the classification or are qualified to perform the work on a rotating basis;

(c) For hours which become available after the posting of the schedule and are overtime hours, the Hospital will offer such hours to full-time employees with the least overtime hours in the classification or who are qualified to perform the work.

(d) Dietary employees shall not be required to work mandatory overtime, and employees who volunteer to work overtime shall be paid time and one-half.

18.12   The LPN II situation is resolved in the that the classification of LPN II is eliminated. Any LPN II after the signing of this Agreement shall be red circled with no increases in hourly rate of pay.

18.13   (a) Effective January 1, 2004, the wage scales set forth in Appendix E, Part I shall remain the same, and employees at or above the maximum of the wage scale for their job classification shall receive an increase of three and one-half percent (3.5%) on their hourly rate of pay. Effective January 1, 2004, the wage rates on the wage scales for registered nurses shall be increased by three and one-half percent (3.5%) as set forth in Appendix F, Part III.

(b) In the event that the increase in the cost of living exceeds four percent (4%) in the twelve (12) months preceding December 1, 2003, the parties agree to reopen the contract with regard to wages only. Should the parties fail to reach an agreement, the provisions of Article 5 – No Strike/No Lockout shall be waived, effective January 1, 2004. The parties agree that the minimum increase for the third year of the contract shall be a three and one-half percent (3.5%) increase on the hourly rate of pay of the employees at or above the maximum of the wage scale for their job classification for the

31

employees in job classifications listed in Appendix E, effective January 1, 2004, and a three and one-half percent (3.5%) increase on the wage rates on the wages scales in Appendix F, Part II, effective January 1, 2004. For purposes of this section, the increase in the cost of living shall be based upon the Consumer Price Index of the Bureau of Labor Statistics, U.S. Department of Labor (1967=100) using the United States All Item Index for Urban Wage Earners and Clerical Workers (CPI-W).

18.14    An employee who takes a lateral transfer within the bargaining unit (a transfer to a position with the same wage scale as his/her current position) shall be paid according to his/her years of service in his/her current position. An employee who takes a promotional transfer within the bargaining unit (a transfer to a position with a higher wage scale than his/her current position) shall be placed on the wage scale of the new position at a rate either equal to or greater than his/her wage rate in his/her current position, whichever is less.

18.15    Retroactive to January 1, 2005, all per diem employee wage rates, in all classifications/departments/units, including all start rates, shall be increased by 1.5%

ARTICLE 19
PENSIONS AND INSURANCE

19.1    (a)  The Hospital agrees to participate in, and contribute to, for all eligible bargaining unit  employees, the Service Employees International Union, National Industry Pension Fund, subject to the terms set forth in Appendix J.

(b)  Employee contribution rates for those benefits set forth in Art. 19.1(a) shall be those illustrated in Appendix J, subject to the 2005 wage/benefit re-opener of the parties

19.2    (a)  Employees shall be permitted to enroll in medical, prescription, dental, and vision benefits as described in Appendix G.

(b)  The Employer shall contribute the difference between the full monthly premium cost for the coverage described in (a) above and the employee monthly contributions as set forth in Appendix H.

(c)  Employees shall be permitted to enroll in the life insurance, accidental death and dismemberment, short-term disability and long-term disability plans as described in Appendix I, and shall contribute to the premium cost for supplemental coverage for each plan as described in Appendix H.

(d)  All grand fathered benefits and grand fathered premium contribution provisions in effect in the previously expired collective bargaining agreement, including but not limited to the employees permitted to enroll in vision-only coverage, shall be maintained.

(e)  All bargaining unit employees, Per Diem and Part-Time employees excepted, shall be eligible for, and entitled to, health insurance benefits in accordance with Article 19 of the Collective Bargaining.

32

(f) Effective July 1, 2001, employees shall be permitted to participate in a hospital-sponsored 401(k) plan. Employees may contribute to this plan up to the legal maximum, and the Hospital will match any contribution on the employees' behalf at a rate of fifty cents ($0.50) for each one dollar ($1) contributed by the employee up to a maximum of four percent (4%) of the employee's salary.

(g) In addition to the employer's matching contribution, the Hospital shall contribute one thousand dollars ($1,000) annually for the next five (5) years to the 401(k) plan for every employee on the seniority list for April 17, 2001. Employees shall be considered fully vested in this sum regardless of actual years of service defined in the plan.

For employees hired on or after April 18, 2001 through March 10, 2002, the Hospital shall, in addition to the employer's matching contribution, contribute one thousand dollars ($1,000) annually for five (5) years to the 401(k) plan. Employees shall be considered fully vested in this sum after one (1) year of service regardless of actual years of service defined in the plan.

(h) For employees employed at the Hospital between October 1, 2000 and April 17, 2001 who have experienced a break in service for any reason other than termination for just cause and who returned to employment status at the Hospital on or before February 1, 2002, the following special provisions shall apply:

1. Vacation, sick time, and wages shall be restored as if there were no break in service.

2. For all other reasons, including but not limited to vacation selection and job awards, a new seniority date shall be calculated based on the new date of hire.

3. In the event there is any question or dispute related to a benefit or issue not enumerated above, the Hospital and the Union agree to place the matter on the agenda of the next Labor Management meeting to resolve the issue.

19.3   Employees on Leave of Absence or layoff who wish to have the benefits referred to in Article 19.2 continued must pay the monthly premium in advance during such Leave of Absence or Layoff. Payment must be received by the Payroll Department no later than the 5th of each month for coverage in the following month. Payment of the monthly premium means the employee will be required to pay the Hospital's share of the premium expense in addition to the employee's share for the period of Leave of Absence.

19.4   The Hospital shall not be required to provide hospitalization insurance inclusive of eye and dental insurance for those employees who are not already enrolled in the Hospital's plan and who are covered by such insurance by reason of a spouse's or any other family member's employment by an employer other than the Hospital, unless the Hospital determines that the benefits provided by such other insurance are less than those provided by the Hospital Plan. However, should an employee's family status or

33

coverage under a family member's plan change, the employee would immediately become eligible for coverage under the appropriate Hospital Plan.

19.5   The Hospital retains the right, in its sole discretion to designate or change the insurance company or carrier through which benefits specified in this Article are to be provided. In such a case, the benefits will be no less than those provided in this Article.

19.6   The costs and benefits under this Article shall be credited against the requirements of any Federal, State, or local law requiring the same during the term of this Agreement.

19.7 The Hospital agrees that it shall continue, for the full term of this agreement, to pay an opt-out bonus to all full-time employees who carry health insurance benefits and subsequently opt-out of said benefits offered by the Hospital as such benefits are required by this agreement.  The amount of the opt-out bonus shall be seventy-five dollars ($75), and shall be paid monthly to all full-time employees participating in the opt-out program, until such time as the employee has opted to receive health insurance benefits.

19.8 The Hospital agrees that it shall continue, for the full term of this agreement, to pay a non-medical benefit stipend to all full-time bargaining unit employees.  The amount of the stipend shall be fifty dollars ($50), and shall be paid monthly to all full-time bargaining unit employees regardless of whether the employee has opted to carry health insurance benefits through the Hospital.  There shall be no cash value to any employee for any unused stipend funds.

## ARTICLE 20
## SICK LEAVE

It is mutually understood and agreed to by the Union and the Hospital that Article 20 shall be applicable only to those bargaining units specified in the 2002-2004 collective bargaining agreement.  All newly organized residual units, so organized in the period from December 2004 through January 2005 shall be subject to the Paid Time Off policy applicable to said employees as of December 31, 2004 unless mutually and explicitly agreed otherwise, and in writing, between the Union and the Hospital

20.1   Sick leave is defined as the absence of an employee from work by reason of illness or accident which is non-work connected and not compensable under the Pennsylvania Workers' Compensation Laws.

20.2   A full-time employee who has completed his/her probationary period, and who is absent from work due to illness or accident shall be eligible to receive one (1) day of paid sick leave at his/her regular rate of pay upon the completion of each month worked following the date of completion of his/her probationary period. Sick Leave may not be accumulated in excess of a total at any time of sixty-five (65) days. Employees currently employed who were subject to the terms of the former Mental Health Unit Collective

Bargaining Agreement that have an accumulation of more than sixty five (65) days shall not lose that accumulation, but shall not continue to accrue until the accumulation is less than sixty-five (65) days.

20.3   Any absence by reason of illness or accident which is non-work connected and not compensable under the Pennsylvania Workers' Compensation Act which occurs during a full-time employee's scheduled vacation or holiday shall not constitute Sick Leave under this Article, nor shall it entitle such employee to benefits under this Article during any such holiday or scheduled vacation.

20.4   To be eligible for benefits under this Article, a full-time employee who is absent must notify his/her supervisor at least two (2) hours before the start of his/her regularly scheduled workday unless proper excuse is given for failure to comply with this requirement. The Hospital may require written certification of a physician or other proof of illness or injury hereunder. Employees who have been on sick leave may also be required to be examined by a physician chosen by the Hospital before being permitted to return to duty. Any such examination shall be at the Hospital's expense.

## ARTICLE 21
## UNPAID LEAVE OF ABSENCE

21.1   An employee who has competed one (1) year of continuous employment may be granted a Leave of Absence without pay for a period of up to a maximum of one (1) year upon written application to the Hospital for the following reasons only: employee illness or injury; employee pregnancy and maternity; employee's infant (preschool) child care; education relating to the retaining or improvement of the employee's position with the Hospital, or full-time employment by the Union. An employee who has completed one (1) year of continuous employment may be granted a Leave of Absence without pay for a period of up to a maximum of three (3) months for the following reasons only: illness or injury of employee spouse, child or parent. Such leave may be extended upon request of the employee for up to an additional three (3) months in the sole discretion of the Hospital.

21.2   An employee absent on leave shall be considered as having quit if it is determined that he/she falsified his/her reason for a Leave of Absence or engages in other employment without the consent of the Hospital.

21.3   Application for a leave of absence without pay shall be made in writing on a form provided by the Hospital for this purpose. It should be submitted to the immediate supervisor at least one (1) month in advance of the desired leave except in case of emergency or personal illness.

21.4   An employee requesting a Leave of Absence for illness (employee or employee's spouse, child or parent), or injury (employee or employee's spouse, child or parent), or pregnancy and maternity shall furnish to the Hospital certification by a qualified physician confirming the fact of illness, injury or pregnancy, and in the case of

pregnancy indicating the anticipated date of delivery.

In the case of pregnancy, it is understood by the parties that no employee shall be required to leave at any arbitrary time but may continue to work as long as her physician certifies that she is capable of performing her assigned duties.
An employee taking a Leave of Absence for personal illness, personal injury, pregnancy or other qualifying leave under the Family Medical Leave Act shall be required to take accrued Sick Leave and Vacation prior to the commencement of the unpaid portion of the Leave of Absence.

Before returning from a Leave of Absence for personal illness, personal injury, or pregnancy an employee may be required by the Hospital to submit certification by physician confirming that the employee is capable of performing the duties of his/her job. The Hospital may also require the employee to be examined at the Hospital's expense, by a physician chosen by the Hospital, before being permitted to return to duty.

21.5    An employee's job will be held open for the employee for any leave of absence (other than illness or injury) having a duration of thirty (30) calendar days or less. The employee's job will be held open for the employee on a leave of absence for illness or injury having a duration of ninety (90) calendar days or less or, in the alternative, consistent with the terms and conditions of the Family and Medical Leave Act (FMLA) of 1993, as amended, and its supporting regulations. Employees returning from a leave of absence granted for any reason of more than ninety (90) days but less than one (1) year or for non injury or illness reasons between thirty (30) and ninety (90) days shall be returned to a vacant available position within their classification and in the event there is no vacancy available, the employee shall be laid off subject to the layoff and recall provisions in this Agreement.

In all cases where the employee's job is held open, the employee must give one (1) week written notice of the date the employee wishes to return to work. In the event an employee is released for work from sick leave or returns from a leave of absence, the Hospital may modify the hanging schedule to accommodate the return of this employee within forty-eight (48) hours. No compensation shall be due to the employee(s) who may be removed from the schedule to permit the individual's return from sick leave or leave of absence. The Hospital shall notify the affected employee as soon as possible, but no later than twenty-four (24) hours before the change will go into effect.

## ARTICLE 22
## IN-SERVICE TRAINING AND STAFF DEVELOPMENT

22.1    An employee required to participate in or attend Hospital training or educational programs which are held at times other than during an employee's scheduled work hours shall be paid the applicable hourly rate of pay.

22.2    In-service programs will be available to employees wishing to attend Hospital

sponsored in-service programs on their own time.

22.3   The Hospital retains the sole discretion to determine which, if any, employee shall be permitted to attend work shops, professional conferences, or other educational sessions relating to their field of work during their normal working hours. When the Hospital designates an employee to attend any such session, the Hospital will pay the registration fee and transportation expenses relating thereto and the employee will be paid at his/her regular rate for all hours spent at the session during which he/she would have normally been scheduled to work. If any employee requests permission to attend such a function during normal work hours, the Hospital may determine, in its sole discretion, to allow such participation, and to pay for all, none, a mixture, or a portion of the registration fees, transportation expenses and lost hours of work. In no circumstance will an employee be paid for hours spent at such a session outside his scheduled work hours without the express prior written consent of the Hospital. Time paid for attending such a session during scheduled working hours will be considered as time worked.

## ARTICLE 23
## SEPARABILITY

23.1   In the event any of the terms or provisions of this Agreement shall be or become invalid or unenforceable by reason of any federal or state law, directive, order, rule or regulation now existing or hereafter enacted or issued, or any decision of a court of last resort, such invalidity or unenforceability shall not effect or impair any other terms or provisions hereof.

23.2   In the event that any article or section of this Collective Bargaining Agreement is held invalid or the enforcement of or the compliance with any article or section of this Agreement has been restrained under the above paragraph, upon the request of either party to this Collective Bargaining Agreement, the parties shall enter into collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement for such article or section. During the period of invalidity or restraint during such negotiations, there shall be an absolute prohibition against strikes and lock outs over the issue or issues being negotiated.

## ARTICLE 24
## MISCELLANEOUS

24.1   A high standard of efficiency and performance shall be maintained by all employees represented by the Union and the Union will cooperate with the Hospital in maintaining this standard.

24.2   It is also agreed that in case of emergency, such as flood, fire, epidemic, or other unforeseen major contingency, the terms of this Agreement shall not be deemed to apply in connection with measures deemed necessary by the Hospital for the care and

protection of patients, the equipment and the buildings of the Hospital or reasonably necessary to repair and place the same in condition thereafter for occupancy.

24.3   Employees shall be reimbursed, within thirty (30) days for normal work clothing and/or glasses ruined in a patient-related situation during the course of actual work for the Employer. Maintenance employees shall be reimbursed within thirty (30) days for personal hand tools damaged, stolen or lost in a work-related situation during the course of actual work for the Employer.

24.4   This Agreement sets forth the wages, hours and other terms and conditions of employment for bargaining unit employees which are to govern during the terms of this Agreement and is in full settlement of all bargainable issues.

24.5   The Union and the Hospital each voluntarily and expressly agrees that the other shall not be obligated for the life of this Agreement to bargain collectively with respect to any matter or issue covered or not covered by this Agreement.

24.6   The Hospital shall continue the policy of employees in the housekeeping and maintenance departments not being required to be on-call.

24.7   In the event that the Hospital implements benefits or other programs for non-supervisory non-bargaining unit employees that are different from or more generous than those afforded to or covering bargaining unit employees, or that are new, the Hospital shall notify the Union of such benefits or programs, meet with the Union to discuss such benefits or programs, and upon request of the Union extend these benefits or programs to bargaining unit employees.

24.8   The Union shall, upon request, receive the last-prepared statement of operations and balance sheet in the form in which it was, or is to be, submitted to the Aliquippa Community Hospital Board of Trustees.  The Union shall be entitled to receive, upon demand of same, documented verification from the Hospital of its timely remittance of union dues, health insurance contributions (Hospital share), 401k contributions (Hospital and Employee shares), pension contributions, and payroll tax withholdings.

24.9   The Hospital and the Union hereby agree that neither party may petition the United States Bankruptcy Court for relief from, or absolution of selected terms or the entirety of the collective bargaining agreement of and between the parties.

### ARTICLE 25
### TEMPORARY EMPLOYEES

25.1   Temporary employees defined as those who have been advised at time of hire they are temporary to fill in for employees on Leave of Absence, or because they are students, or for short term special projects and whose tenure will not exceed three (3) months, shall not be covered by the terms of this Agreement. A temporary employee who is employed to replace an employee on a Leave of Absence that exceeds the three

38

(3) months time limit will continue in that capacity up until the time the employee returns from the Leave of Absence or one (1) year, whichever occurs first. In the event that a temporary employee becomes an employee covered by the terms of this Agreement the temporary employee shall be subject to the requirements of serving the probationary period.

## ARTICLE 26
## HEALTH & SAFETY

26.1   The Hospital agrees to provide a safe and healthful work environment for employees and to maintain high standards of work place sanitation, ventilation, cleanliness, light and noise levels, adequate heating and cooling, and health and safety in general. The employer shall maintain a program of infectious and communicable disease control which meets the requirements of governmental regulations as promulgated by OSHA and the CDC.

26.2   The parties hereby agree to establish a joint safety and health committee to monitor the work environment. The committee shall be composed of two (2) employee representatives of the Union and two (2) representatives of the Hospital. The Union's authorized representative or her/his designee, and the Director of Human Resources or her/his designee, shall be ex-officio members of the committee.

26.3   The purpose of the committee is to examine any complaints or questions concerning safety or health and to make recommendations for improvements. Any grievance concerning safety or health may be initially referred to the committee for review. If not resolved by the committee to the satisfaction of the grievant, it shall then be processed in accordance with the contractual procedure.

26.4   The committee may meet as often as the need arises and may conduct inspections of the Hospital for the purposes of investigating safety and health issues. Scheduled time spent in all committee activities shall be considered as time worked.

26.5   The Union agrees to encourage its members to use the health and safety committee and/or grievance procedure to handle health and safety complaints before making such complaints to outside agencies.

## ARTICLE 27
## PERSONNEL FILE

27.1   An employee shall have the right to inspect his or her personnel file at a time mutually agreed upon and said inspection shall be limited to one occurrence per year.

27.2   An employee who disagrees with an item contained in his or her personnel file shall have the right to submit his or her objections in writing to the Hospital for inclusion in the Personnel file.

ARTICLE 28
TRANSPORTATION

28.1   Employees will be reimbursed for the use of their private vehicles when requested by the Hospital to use their vehicles in connection with their work at the rate established by the Internal Revenue Service as the allowable rate exempt from taxation for income tax purposes. Such rate shall change as the IRS rate changes. Employees will be reimbursed for parking meter fees and parking lot fees incurred in connection with their jobs.

ARTICLE 29
MANDATORY MEETINGS

29.1   Whenever possible, mandatory meetings and in-services shall be scheduled and held at times as convenient as practicable for all shifts. Notice of all mandatory meetings shall be posted at least seven (7) days in advance. Employees who come in to attend a mandatory meeting on a shift that they are not otherwise working shall be paid for the time in attendance at the meeting.

ARTICLE 30
EDUCATIONAL ASSISTANCE

30.1   Bargaining Unit employees shall be eligible to receive tuition assistance benefits during the term of this Agreement as set forth below, provided however, it is agreed and understood by the parties that the operation of the tuition assistance policy is governed by the provisions of the policy itself as promulgated by the Hospital and any improvements, deletions or changes made in the policy for non bargaining unit employees shall be implemented at the same time for bargaining unit employees.

30.2   Regular full-time bargaining unit employees who have completed at least one (1) year of service are eligible for tuition assistance for up to twenty-four (24) credits or three thousand dollars ($3,000) per calendar year. Credits and the tuition assistance dollars are prorated according to hire date as follows:

| Hire Date | Credits | Dollar Amount |
|-----------|---------|---------------|
| January-May | 24 | $3,000 |
| June-August | 16 | $2,000 |
| September-December | 8 | $1,000 |

Regular part-time bargaining unit employees who have completed at least one (1) year of service are eligible for tuition assistance for up to twelve (12) credits or one thousand five hundred dollars ($1,500) per calendar year. Credits and the tuition assistance dollars are prorated according to hire date as follows:

40

| Hire Date | Credits | Dollar Amount |
|---|---|---|
| January-May | 12 - 9 - 6 | $1,500 – $1,125 – $750 |
| June-August | 9 - 6 - 4 | $1,125 – $ 754 – $500 |
| September-December | 6 - 3 - 2 | $ 750 – $ 375 – $250 |

30.3    Effective January 1, 2003, the Hospital agrees to pay the fees associated with registered nurses' participation in accredited, nursing-related continuing education programs, up to a maximum of two hundred fifty dollars ($250) per RN per calendar year. The procedure for implementing this provision shall be developed through the Joint Quality Care Committee.

## ARTICLE 31
## STAFFING-QUALITY CARE-RETENTION AND RECRUITMENT

31.1    Staffing Levels    Recognizing the importance of adequate staffing to the provision of high quality patient care, the Employer agrees to provide an adequate number of licensed and unlicensed staff in all units and departments on each shift. Staffing levels in the nursing department shall be based upon acuity and case mix of patients, degree of complexity of care required, average daily census, staff mix, skill and qualifications of staff, technology, and other relevant factors, and shall be adequate to ensure high quality patient care and high standards of patient and employee safety.

Effective February 7, 2005. the parties agree to the re-activation of the so-titled "Joint Quality Care/Staffing/Retention and Recruitment Committee" (below).  Said committee shall be reconstituted, and shall meet collectively no later than April 7, 2005, and in accordance with the terms set forth in Article 31 of the CBA.

For those units organized into the Union and so recognized by the Hospital between December 2004 and January 2005, Article 31, inclusive of any contractually required committees, shall apply provided however that its application shall not result in the loss of any currently functioning committee in any unit/department

As part of this objective, the parties agree to establish a Joint Quality Patient Care/Staffing/Retention and Recruitment Committee (hereafter referred to as the Joint Quality Care Committee), no more than half of whom shall represent management.  At least half of the members of the Joint Quality Care Committee shall be selected by bargaining unit nursing staff through a process to be determined by the Union.  The Joint Quality Care Committee shall begin meeting no later than sixty (60) days following the ratification of this Agreement, unless the time frame is extended by mutual agreement of the parties. The Joint Quality Care Committee shall:

(a) review the existing system of determining nursing staffing levels in each unit;

(b)  solicit input from employees in the unit regarding staffing issues and staffing level development;

(c)  discuss and analyze potential changes in policies and procedures;

(d)  arrive at nursing staffing levels for each work area that ensure high quality patient care and productive utilization of Hospital resources.

The Joint Quality Care Committee will meet regularly on an on-going basis with the frequency to be determined by the members of the Committee.  Members of the Joint Quality Care Committee shall be paid to attend meetings.  The Employer will provide the Committee members with the data and documents necessary for the Committee to carry out its work.

Recommendations of the Joint Quality Care Committee shall be submitted to Hospital administration, which shall finalize staffing levels for each unit giving full consideration to Committee recommendations.

In addition to staffing levels, the Joint Quality Care Committee shall discuss other professional practice issues as may be placed on the agenda by management or the union, including but not limited to staff retention and recruitment initiatives; professional development programs; and staffing and scheduling related issues.

31.2   Pulling/Floating   The parties agree that it is in the interest of patient care that all staff assigned to a particular nursing unit are properly trained, oriented, and familiar with the policies and procedures of that unit.

(a)  No employee shall be pulled or floated to a unit in which he or she does not have proper qualifications/training and current orientation to perform his or her duties.  The orientation program for each unit shall be determined by the Hospital, giving full consideration to input from the Joint Quality Care Committee.

(b)  The Hospital shall not provide regular ongoing staffing in a unit through the use of floating and/or pulling of employees.

(c)  In the event that an employee is to be involuntarily pulled or floated to another unit, PRN or Per Diem employees will be floated/pulled first, followed by part-time employees, followed by full-time employees.  The Hospital shall make all reasonable efforts to ensure that pulling/floating is distributed equitably among employees within a unit.

### ARTICLE 32
### SUBCONTRACTING

32.1    The Hospital shall not subcontract or outsource work currently performed by bargaining unit employees in a manner that would result in the layoff or reduction of

hours of bargaining unit employees.

## ARTICLE 33
## SUCCESSORSHIP

33.1   In the event of a sale, merger, affiliation, or other transaction resulting in the transfer of control of the Hospital to another entity, the Hospital will condition such transaction upon the new entity's agreement to recognize the Union and honor the current collective bargaining agreement.

## ARTICLE 34
## REOPENER

34.1   The Collective Bargaining Agreement established herein shall expire at 11:59PM, on June 30, 2006.  Notwithstanding the above expiration, the parties shall re-open this agreement for the purpose of negotiation concerning wages, health insurance benefits (including relative plan designs and contributions thereto) and residual unit issues not finalized herein

34.2   The parties shall convene such negotiations at such time prior to June 17, 2004, as they may agree.  The parties shall recognize however that the re-opener shall expire at 11:59PM on June 17, 2005.  At the time of the re-opener expiration, the parties hereby agree that the no-strike / no lockout terms set forth in Article 5 of the CBA shall be waived, provided however any action taken by either party to this agreement with respect to implementation or work stoppage shall be limited in scope to only those issues subject to the terms of this re-opener, or (any) charges filed on behalf of either party before the National Labor Relations Board or other governing body which stem from the negotiation of the terms set forth herein, or events related thereto.

34.3   The parties recognize that the negotiation of this agreement was conducted in such a manner that may result in the inadvertent omission or miscalculation of certain terms or conditions, either economic or non-economic in nature, which the parties agree may require correction or interpretation.  To that end, the subject matter of the June 2005 re-opener shall, beyond wages and benefits, be inclusive of such terms and conditions which the parties may not have had the opportunity to address within the context of the negotiations leading to this agreement.  In order to ensure efficiency during the course of the re-opener negotiations, the parties agree to meet once per month through June 17, 2005 in a mutual effort to address such residual unit issues, and further agree to memorialize any agreements reached as a result of said discussions in the full re-opener agreement arrived at by the parties on, before, or after, June 17, 2005.

43

## ARTICLE 35
## DURATION

35.1   This Agreement shall become effective February 7, 2005, and shall continue in full force and effect until 11:59 PM on June 30, 2006. Ninety (90) days prior to June 30, 2006, either party may, in writing notify the other of its desire to continue, modify or terminate this Agreement.

IN WITNESS WHEREOF, the parties hereto by their duly authorized officers have executed this Agreement the day and year hereinbefore first mentioned.

District 1199P, Service Employees
International Union, AFL-CIO, CLC

Aliquippa Community Hospital

_____
For the Union

_____
For the Employer

_____
Date
6/23/05

_____
Date
6-6-05

**44**

# APPENDIX A



## DUES CHECK-OFF AUTHORIZATION CARD
## APPLICATION FOR MEMBERSHIP
### (*PLEASE PRINT*)

Name_____Social Security #_____

Address_____ City_____

State_____Zip_____ Home Phone(___)_____

Work Location (Facility or District)_____

Job Title_____Probation Ended_____Date Hired_____

Hourly Wage_____ ☐Full Time ☐Part Time  E-mail_____

I hereby accept membership into District 1199P, Service Employees International Union, AFL-CIO, CLC at its principal office located at 1500 North 2nd Street, Harrisburg, Pennsylvania, 17102, and designate said Union to act for me as collective bargaining agent in all matters pertaining to conditions of employment. I hereby pledge to abide by the Constitution and By-Laws of District 1199P, Service Employees International Union, AFL-CIO.

Signed_____Today's Date_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - Cut along this line - - - ✂.

## CHECK-OFF AUTHORIZATION

To Employer:_____

You are hereby authorized and directed to deduct initiation fees, assessments or any other fee as required by the By-laws and Constitution of the Union, as a condition of membership and in addition thereto, to deduct each month my monthly membership dues from my wages and salary; and to remit all such deductions so made to District 1199P, Service Employees International Union, AFL-CIO, CLC at its principal office at 1500 North 2nd Street, Harrisburg, Pennsylvania, 17102, no later than the tenth (10th) day or each month immediately following the date of deduction.

Name_____Social Security # _____

Address_____

City _____State_____Zip_____

Work Location (Facility or District )_____

Agency (State Unit Only)_____

Job Title_____

Signature_____Date_____

## APPENDIX B
## SOLIDARITY-POLITICAL ACTION CHECK-OFF CARD

### Help Working Families Gain a Stronger Voice
### Contribute to SEIU's Committee on Political Education (COPE)

**Yes! I will do my part to make elected officials listen to health care workers. Sign me up to contribute to the 1199P Solidarity-Political Action Fund as a voluntary contribution to SEIU COPE.**

I authorize my local union to file this payroll deduction with my employer and for my employer to deduct _____ $5.00 per month; _____ $10.00 per month; or (other) _____ per month; and transfer the funds to the 1199P Solidarity-Political Action Fund as a voluntary contribution to SEIU COPE.

I understand that: 1) I am not required to sign this form or make COPE contributions as a condition of my employment by my employer or membership in the union; 2) I may refuse to contribute without any reprisal; 3) Only union members and executive/administrative staff who are U.S. citizens or lawful permanent residents are eligible to contribute to SEIU COPE; 4) The amounts on this form are merely a suggestion, and I may contribute more or less by this or some other means without fear of favor or disadvantage from the union or my employer; 5) SEIU COPE uses the money it receives for political purposes, including but not limited to addressing political issues of public importance and contributing to and spending money in connection with federal, state and local elections.

Contributions to SEIU COPE are not deductible for federal income tax purposes. This authorization shall remain in effect until revoked in writing by me.

*My signature below shows that I have reviewed and agree with the terms above.*

Signature _____ Date _____

Name _____

Home Address _____

Home Phone_____ Home Email_____

Occupation_____ Employer_____

Birth Date_____

---

### Help Working Families Gain a Stronger Voice
### Contribute to SEIU's Committee on Political Education (COPE)

**Yes! I will do my part to make elected officials listen to health care workers. Sign me up to contribute to the 1199P Solidarity-Political Action Fund as a voluntary contribution to SEIU COPE.**

I authorize my local union to file this payroll deduction with my employer and for my employer to deduct _____ $5.00 per month; _____ $10.00 per month; or (other) _____ per month; and transfer the funds to the 1199P Solidarity-Political Action Fund as a voluntary contribution to SEIU COPE.

I understand that: 1) I am not required to sign this form or make COPE contributions as a condition of my employment by my employer or membership in the union; 2) I may refuse to contribute without any reprisal; 3) Only union members and executive/administrative staff who are U.S. citizens or lawful permanent residents are eligible to contribute to SEIU COPE; 4) The amounts on this form are merely a suggestion, and I may contribute more or less by this or some other means without fear of favor or disadvantage from the union or my employer; 5) SEIU COPE uses the money it receives for political purposes, including but not limited to addressing political issues of public importance and contributing to and spending money in connection with federal, state and local elections.

Contributions to SEIU COPE are not deductible for federal income tax purposes. This authorization shall remain in effect until revoked in writing by me.

*My signature below shows that I have reviewed and agree with the terms above.*

Signature _____ Date _____

Name _____

Home Address _____

Home Phone_____ Home Email_____

Occupation_____ Employer_____

Birth Date_____

APPENDIX C
## VACATION CONVERSION AT THE HOSPITAL

1.  Effective January 1, 1998 the pay stub reflects a dump of hours based on the old contract of earned vacation the year before.

(a)  A staff member with two weeks of vacation for the year 1998 gets a pay stub with a vacation allotment of 80 hours.

(b)  Effective with the first bi-weekly payroll the staff member begins to accrue vacation hours at the rate of 3.08 hours per bi-weekly pay period.

(c)  The staff member continues to accrue until he/she attains a total of 1.5 times the number of vacation hours that he/she is entitled to receive.

(d)  An example of this is on 1/1/98 a staff member that qualifies for two weeks of vacation (80 hours) will have accrued an additional 40 hours at the conclusion of the 13th bi-weekly pay period (6/20/98). Assuming that no vacation time has been taken at that point the accrual stops. The staff member will have 120 vacation hours on his/her pay stub.

(e)  Using the example the staff member schedules and takes a two week or 80 hour paid vacation during August 1998. The vacation is scheduled during the 17th bi-weekly payroll period (8/2/98 to 8/15/98). On the paycheck for that payroll period the staff member will have deducted the 80 hours of vacation but will have credited the 3.08 hours of accrual so the balance will be 43.08 hours. At the end of the year assuming no other vacation time was taken the staff member's vacation account will have 70.8 hours in it. In order to achieve another 80 hours the staff person continues to accrue at the 3.08 rate for another 3 payroll periods (3.08 x 3 = 9.24 hours) (70.8 + 9.24 = 80.04).

2.  The same program is applicable to other staff who have a higher rate of accrual because of length of service.

3.  New hires will be able to take accrued vacation upon completion of his/her probation period (that is 6 months from date of hire as vacation will begin to accrue with the first bi-weekly payroll period that the new hire is on the payroll).

47

APPENDIX D
<u>VACATION CONVERSION AT THE M/H UNIT</u>

1.   Effective January 1, 1998 the pay stub reflects the number of accrued vacation hours based on old contract accrual system.

   (a)  A staff member with one year of accrual will have 80 vacation hours assuming no vacation was taken during 1997. The actual accrual is 79.9999 hours.

   (b)  Effective with the first bi-weekly payroll the staff member begins to accrue vacation hours at the rate of 3.08 hours per bi-weekly pay period.

   (c)  The staff member can continue to accrue vacation hours until he/she attains 1.5 times the number of vacation hours that he/she is entitled to receive.

   (d)  An example of this is on 1/1/98 a staff member that qualifies for two weeks of vacation (80 hours) will have accrued an additional 40 hours at the conclusion of the 13th bi-weekly pay period (6/20/98). Assuming that no vacation time has been taken at that point the accrual stops. The staff member will have 120 vacation hours on his/her pay stub.

   (e)  Using the example the staff member schedules and takes a two week or 80 hour paid vacation during August 1998. The vacation is scheduled during the 17th bi-weekly payroll period (8/2/98 to 8/15/98). On the paycheck for that payroll period the staff member will have deducted the 80 hours of vacation but will have credited the 3.08 hours of accrual so the balance will be 43.08 hours. At the end of the year assuming no other vacation time was taken the staff member's vacation account will have 70.8 hours in it. In order to achieve another 80 hours the staff person continues to accrue at the 3.08 rate for another 3 payroll periods (3.08 x 3 = 9.24 hours) (70.8 + 9.24 = 80.04).

2.   The same program is applicable to other staff who have a higher rate of accrual because of length of service. If a M/H staff person has not yet acquired the 15 days that staff person will not acquire 15 days until he/she has completed 5 years of full-time service. In respect to the M/H staff who have accrued 15 days of vacation (120 hours) these hours will not be reduced provided however this staff member waits until achieving 10 years of service to pick up an additional 5 days of vacation. Staff members who have achieved the 20 days of vacation will not have this vacation amount reduced.

3.   New hires will be able to take accrued vacation upon completion of his/her probation period (that is 6 months from date of hire as vacation will begin to accrue with the first bi-weekly payroll period that the new hire is on the payroll).

48

APPENDIX E
WAGE SCALE

I. Effective January 1, 2002

| | Start | 1 year | 2 years | 3 years | 4 years | 5 years | 6 years | 7 years |
|---|---|---|---|---|---|---|---|---|
| Cook I | $ 9.14 | $ 9.81 | $10.28 | $10.78 | $11.07 | $11.29 | $11.92 | $12.52 |
| Cook II | 8.65 | 9.38 | 9.86 | 10.37 | 10.70 | 10.91 | 11.60 | 12.12 |
| Dietary Aide | 8.53 | 9.14 | 9.74 | 10.26 | 10.47 | 10.68 | 11.39 | 11.96 |
| Dietary Clerk and Hostess | 8.70 | 9.46 | 9.92 | 10.45 | 10.66 | 10.87 | 11.47 | 12.06 |
| Storeroom Clerk | 8.76 | 9.52 | 10.00 | 10.49 | 10.71 | 10.92 | 11.52 | 12.11 |
| Housekeeping Aide I | 8.39 | 9.00 | 9.61 | 10.11 | 10.31 | 10.82 | 11.30 | 11.78 |
| Housekeeping Aide II | 8.53 | 9.14 | 9.74 | 10.26 | 10.47 | 10.68 | 11.39 | 11.96 |
| Laboratory Aide | 8.53 | 9.14 | 9.74 | 10.26 | 10.47 | 10.68 | 11.39 | 11.96 |
| Maintenance Specialist | 11.99 | 12.43 | 12.74 | 13.09 | 13.29 | 13.71 | 14.45 | 15.19 |

APPENDIX E
WAGE SCALE (continued)

| | Start | 1 year | 2 years | 3 years | 4 years | 5 years | 6 years | 7 years |
|---|---|---|---|---|---|---|---|---|
| Escort | 8.53 | 9.14 | 9.74 | 10.26 | 10.47 | 10.68 | 11.39 | 11.96 |
| Orderly | 8.85 | 9.45 | 10.07 | 10.58 | 10.79 | 11.01 | 11.61 | 12.21 |
| CNA | 8.79 | 9.41 | 10.02 | 10.53 | 10.74 | 10.95 | 11.55 | 12.15 |
| Nurses Aide, Central Supply, And Messenger | 8.53 | 9.14 | 9.74 | 10.26 | 10.47 | 10.68 | 11.39 | 11.96 |
| LPN I* | 10.33 | 11.72 | 12.31 | 12.93 | 13.57 | 14.25 | 14.96 | 15.71 |
| MH Community Aide II | 8.53 | 9.14 | 9.74 | 10.26 | 10.47 | 10.68 | 11.39 | 11.96 |
| MH Unit Clerk | 8.76 | 9.52 | 10.00 | 10.49 | 10.71 | 10.92 | 11.52 | 12.11 |
| MH Worker III | 10.33 | 10.58 | 10.86 | 11.12 | 11.40 | 11.74 | 12.09 | 12.64 |

*LPN I rates are based upon relevant nursing experience as an LPN.

II.  Effective January 1, 2003, employees at or above the maximum of the wage scale for their classification set forth in (I) above shall receive an increase of three percent (3%) on their hourly rate of pay.

III.  Effective January 1, 2004, employees at or above the maximum of the wage scale for their classification set forth in (I) above shall receive an increase of three and one-half percent (3.5%) on their hourly rate of pay. NOTE: The wage reopener provisions of Article 18.13 (d) shall apply.

APPENDIX F
WAGE SCALE

Effective January 1, 2004
Registered Nurse*

| GN/Start | 1 year | 2 years | 3 years | 4 years | 5 years | 6 years | 7 years | 8 years | 10 years | 15 years | 20 years | 25 years |
|----------|--------|---------|---------|---------|---------|---------|---------|---------|----------|----------|----------|----------|
| 17.85 | 18.47 | 18.87 | 19.40 | 19.93 | 20.49 | 21.34 | 21.94 | 22.54 | 23.70 | 25.05 | 25.98 | 26.50 |

*Registered Nurse rates are based upon relevant nursing experience as an RN

· Per Diem nurse rates:

$24.38/hr. for shifts worked from midnight on Sunday till midnight on Friday.

$26.39/hr. for shifts worked from midnight on Friday till midnight on Sunday.

Holiday pay is $26.39/hr.  Holiday bonus pay is $100 for a twelve-hour shift and $70 for an eight-hour shift.

51

# HealthAssurance *POS*                 *Aliquippa Community Hospital*

**HEALTH AMERICA
HEALTH ASSURANCE**
*Coventry Health Care Plans*

## MEMBER CHOOSES:

| | Coordinated Care | Self-Referred Care |
|---|---|---|
| **ANNUAL DEDUCTIBLE** | *Combined* | |
| Individual | $2,000 | |
| Family (aggregate) | $4,000 | |
| **OUT-OF-POCKET MAXIMUM** (Excludes deductibles and Copays) | | |
| Individual | None | $5,000 |
| Family | None | $15,000 |
| **HOSPITAL/SURGICAL & OUTPATIENT CARE** | | |
| Coinsurance | 100% (after deductible) | 70% of R&C* (after deductible) |
| Inpatient Copay (per admission) | $200 Copay (then deductible) | $500 Copay (then deductible) |
| Outpatient Services (non-surgical) | 100% (after deductible) | 70% of R&C* (after deductible) |
| Outpatient Surgical Copay (per visit) | $100 Copay (then deductible) | 70% of R&C* (after deductible) |
| Hospital Precertification Required | By Physician | By Patient |
| Penalty (By Patient) | None | $300 |
| **Lab** | 100% (after deductible) | 70% of R&C (after deductible) |
| **Radiology Copay** | $25 Copay (then deductible) | 70% of R&C (after deductible) |
| **PHYSICIAN OFFICE VISITS** (for illness or injury) | | |
| Primary Care Physician | $15 Copay | 70% of R&C (after deductible) |
| Specialist Physician | $25 Copay | |
| **PREVENTIVE CARE** | | |
| Gynecological Exam | $15 Copay (PCP) | 70% of R&C (after deductible) |
| Well Child Exam | $15 Copay (PCP) | Not Covered |
| Adult Physical Exam | $15 Copay (PCP) | Not Covered |
| Routine Pediatric Immunizations | 100% | 70% |
| Routine Mammograms | 100% | 70% (after deductible) |
| **PRESCRIPTION DRUGS** (Includes oral contraceptives, managed formulary, Mail Order and mandatory generic substitution) | $10 generic/$20 brand copay Two copays apply to mail order | Covered only at participating pharmacies |
| **ALLERGY SERUM** | 100% (after deductible) | 70% (after deductible) |
| **CLAIM FORMS REQUIRED** | No | Yes |
| **VISION SERVICES** | 20% discount off the normal retail price of most vision services at NVA Providers | |
| **HEALTH EDUCATION** | Members receive reimbursement of the cost of approved wellness programs offered through local hospitals and organizations. | |
| **MENTAL HEALTH SERVICES** | | |
| Inpatient | 100% (after deductible) | 70% of R&C (after deductible) |
| Inpatient Copay (per admission) | $200 Copay (then deductible) | $500 Copay (then deductible) |
| Outpatient | $20 Copay per Visit | 70% of R&C (after deductible) |
| **EMERGENCY ROOM CARE** | 100% after $75 Copay (Copay waived if admitted) | |
| **REHABILITATION SERVICES** | | |
| Inpatient | 100% (after deductible) | 70% of R&C (after deductible) |
| Inpatient Copay (per admission) | $200 Copay (then deductible) | $500 Copay (then deductible) |
| | *(45 day maximum per calendar year)* | |
| Outpatient Office Visit | 100% (after deductible) | 70% of R&C (after deductible) |
| | *(30 Visits per calendar year)* | |
| **CHIROPRACTIC CARE** | $25 Copay per Visit | 70% of R&C (after deductible) |
| | *(Maximum $1,000 Per Calendar Year)* | |
| **MEMBERS CHOICE** | A complementary alternative medicine program offered in partnership with American Specialty Health Network (ASHN) provides discounts on: <br> • Nutritional Supplements and Vitamins <br> • Health Clubs – best rates guaranteed! <br> • Massage Therapy, Acupuncture and Chiropractic | |
| **LIFETIME MAXIMUM** | $2,000,000 | |

# APPENDIX G
## BENEFITS (continued)

| PROVIDER RESTRICTIONS | All services including facility and all physician charges incurred in conjunction with any service or procedure performed at any of the following facilities or their affiliated clinics are covered only for emergencies or if approved in advance by HealthAmerica or HealthAssurance: Eye and Ear Hospital, Falk Clinic, Montefiore Hospital, Presbyterian University Hospital, and Shadyside Hospital |
|---|---|

This managed care plan may not cover all your health care expenses. Read your contract carefully to determine which health care services are covered. If you have questions call us at 800.788.8445 in Central /Eastern Pennsylvania, and 800.788.4404 in Western Pennsylvania and Ohio.

Benefits are administered on a contract year basis.

Benefits are paid based on Reasonable and Customary as determined by the usual fee received by similar providers or health professionals for the same services or supplies in the same geographic area based upon generally acceptable industry standards.

Reimbursement for Weight Management programs is limited to $150 per calendar year per member.

— Dependent Coverage Age Limit is 19; extended to 25 for full-time Student.

*July 1, 2004*

**ACH Plan Reimbursements (as long as services are rendered at ACH):**

| | |
|---|---|
| Inpatient | $200 Copay per admission |
| Outpatient Surgical | $100 Copay per visit |
| Radiology Copay | $25 Copay |
| Emergency Copay | $75 Copay |
| Deductibles | $2,000 Individual/$4,000 Family |

Reimbursement will be made through Benefit Coordinators Corporation

Case 1:07-cv-00468-GKK    Document    Filed    Page



# *MetLife Dual Option Dental*

Choose the dental plan option – Low or High – that best fits the needs of you and your family. See the attached Q&A for additional information about your MetLife Dual Option Dental benefits.

**MAC Primary**
**Plan Design for: Aliquippa Community Hospital**
**Effective Date: July 1, 2004**

| Low Plan Benefit Highlights: | | | High Plan Benefit Highlights: | | |
|---|---|---|---|---|---|
| **Coverage Type:** | **In-Network[1]** | **Out-of-Network[1]** | **Coverage Type:** | **In-Network[1]** | **Out-of-Network[1]** |
| Type A - Preventive | 100% of PDP Fee[2] | 80% of PDP Fee[2] | Type A - Preventive | 100% of PDP Fee[2] | 80% of PDP Fee[2] |
| Type B – Basic Restorative | 80% of PDP Fee | 60% of PDP Fee | Type B – Basic Restorative | 80% of PDP Fee | 60% of PDP Fee |
| Type C - Major Restorative | 0% of PDP Fee | 0% of PDP Fee | Type C - Major Restorative | 50% of PDP Fee | 40% of PDP Fee |
| Type D – N/A | N/A | N/A | Type D - Orthodontia | 50% of PDP Fee | 50% of PDP Fee |
| **Deductible[3]:** | **In-Network** | **Out-of-Network** | **Deductible[3]:** | **In-Network** | **Out-of-Network** |
| Individual | $50 | $50 | Individual | $50 | $50 |
| Family | $150 | $150 | Family | $150 | $150 |
| **Annual Maximum:** | **In-Network** | **Out-of-Network** | **Annual Maximum:** | **In-Network** | **Out-of-Network** |
| Per Person | $1,000 | $1,000 | Per Person | $1,000 | $1,000 |
| Orthodontia Lifetime Max - Child Only: | N/A | | Orthodontia Lifetime Max - Child Only: | $1,000 per Person | |

"...Network Benefits" means benefits provided under this plan for covered dental services that are provided by a participating PDP provider. "Out-of-Network

## *Example of Savings When You Visit a Participating PDP Dentist*

...a look at an example* that shows how receiving services from a participating PDP dentist can save you money:

| Low Plan Option: | | High Plan Option: | |
|---|---|---|---|
| **Your Dentist says you need an Extraction, a Type B service:** | | **Your Dentist says you need a Crown, a Type C service:** | |
| **PDP Fee: $300.00** | | **PDP Fee: $300.00** | |
| **Dentist's Usual Fee: $500.00** | | **Dentist's Usual Fee: $700.00** | |
| ...lease note: this example assumes that your annual deductible has been met. | | *Please note: this example assumes that your annual deductible has been met. | |
| **(IN-NETWORK)** When you receive care from a participating PDP dentist… | **(OUT-OF-NETWORK)** When you receive care from a Non Participating PDP dentist… | **(IN-NETWORK)** When you receive care from a Participating PDP dentist… | **(OUT-OF-NETWORK)** When you receive care from a Non Participating PDP dentist… |
| ...PDP Fee is:   $300.00 | Dentist's Usual Fee is:   $500.00 | The PDP Fee is:   $300.00 | Dentist's Usual Fee is:   $700.00 |
| Your Plan Pays: | Your Plan Pays: | Your Plan Pays: | Your Plan Pays: |
| ...x $300 PDP Fee)  -$240.00 | (60% x $300 PDP Fee)  -$180.00 | (50% x $300 PDP Fee)  -$150.00 | (40% x $300 PDP Fee)  -$120.00 |
| Out-of-Pocket Cost:  $60.00 | Your Out-of-Pocket Cost:  $320.00 | Your Out-of-Pocket Cost:  $150.00 | Your Out-of-Pocket Cost:  $580.00 |
| ...n this example, YOU SAVE $260.00 ($320.00 minus $60.00)… by using a participating PDP dentist! | | In this example, YOU SAVE $430.00 ($580.00 minus $150.00)… by using a participating PDP dentist! | |

..." means benefits provided under this plan for covered dental services that are not provided by a participating PDP provider.
...Fee refers to the fees that participating PDP dentists have agreed to accept as payment in full.
...nd High plans -Waived on Type A Service In-Network.

**MetLife** Small Business Center

APPENDIX G
BENEFITS (continued)

## MetLife Dual Option Dental
### List of Primary Covered Services & Limitations*

**High Plan:**

| Type A – Preventive | How Many/How Often: |
|---|---|
| rophylaxis (cleanings)<br>ral Examinations<br>opical Fluoride Applications<br>-rays<br><br>pace Maintainers<br>ealants | • Scaling and polishing of teeth (oral prophylaxis) but not more than once every 6 months<br>• Oral exams but not more than once every 6 months.<br>• Topical fluoride treatment for a Dependent child under 14 years of age but not more than once every 12 months.<br>• Full mouth X-rays: one per 60 months.<br>• Bitewing X-rays but not more than: once every 6 months for Dependent children under 19 years of age; and once every 12 months for all other Covered Persons.<br>• Space Maintainers for dependent children to age 19.<br>• Sealants which are applied to non-restored, non-decayed, first and second permanent molars only, for dependents up to the age of 14, but not more than one tooth per lifetime |

| Type B – Basic Restorative | How Many/How Often: |
|---|---|
| illings<br>eriodontal Maintenance<br><br><br>ral Surgery<br><br><br>epair of crowns, dentures, inlays, and nlays<br><br>nesthesia<br>mergency palliative treatment<br>jections of Antibiotic Drugs | • Periodontal maintenance where periodontal treatment has been previously performed, but the total of covered periodontal maintenance treatments and the number of covered oral prophylaxes will not exceed four treatments in a calendar year.<br><br>• Extractions<br>• Oral Surgery<br><br><br><br>• When dentally necessary in connection with oral surgery, extractions or other covered dental services. |

| Type C - Major Restorative | How Many/How Often: |
|---|---|
| ndodontics<br><br>eriodontics<br><br><br>ridges and Dentures<br><br><br>rowns/Inlays/Onlays<br><br>elining and Rebasing | • Pulp Capping, pulpal therapy, & therapeutic pulpotomy.<br>• Root canal treatment not more than once every 24 months for the same tooth.<br><br>• Periodontal scaling and root planing once per quadrant or area, every 24 months.<br><br>• Initial placement to replace one or more natural teeth, which are lost while covered by the Plan.<br>• Dentures and bridgework replacement: one every 10 years.<br>• Replacement of an existing temporary full denture if the temporary denture cannot be repaired and the permanent denture is installed within 12 months after the temporary denture was installed.<br>• Replacement: once every 10 years.<br>• Relining and Rebasing of existing removable dentures but not more than once in 36 months |

The service categories and plan limitations shown above represent an overview of your Plan of Benefits. This document presents many services within each ategory, but is not a complete description of the Plan. A summary plan description will be made available following your plan's effective date, and will govern if ny discrepancies exist between this overview and the actual summary plan description.

ke most group dental insurance policies, MetLife group policies contain certain exclusions, limitations and waiting periods and terms for keeping them in force. lease contact MetLife for details.

**MetLife® Small Business Center**

55



BENEFITS (continued)

# ALIQUIPPA HOSPITAL
### VBA# 1711

# MANAGED VISION CARE PROGRAM
### ZERO COPAYMENT PROGRAM

## FREQUENCY OF SERVICE:                    STUDENT AGE: 25

|  | Employee | Spouse | Children (to age 19) |
|---|---|---|---|
| Vision Exam | 12 Months | 12 Months | 12 Months |
| Lenses | 12 Months | 12 Months | 12 Months |
| Frames | 24 Months | 24 Months | 24 Months |

## BENEFITS:                          EMPLOYEE CAN SELECT EITHER:

| | VBA Participating Doctor (12,000 Nationwide) | Non-Participating Doctor |
|---|---|---|
| | Amount Covered | Amount Reimbursed |
| Vision Exam | 100% | $ 35.00 |
| **Clear Standard Lenses** *(Pair)*: | | |
| Single Vision | 100% | $ 30.00 |
| Bifocal | 100% | 40.00 |
| Trifocal | 100% | 60.00 |
| Lenticular | 100% | 80.00 |
| Polycarbonate Lens Material*** | 100% | N/A |
| Frame | 100%* | $ 50.00 |
| – OR – | | |
| **Contacts** *(includes the vision exam allowance)*: | | |
| Selected in Lieu of Glasses | $140.00 | $140.00 |
| Medically Required | UCR** | 300.00 |

(O R between the two doctor columns)

Laser Vision Correction: Discount off of prevailing fees at TLC Laser Eye Centers.

\*    Within the program's $50 wholesale allowance *(approximately $100 $135 retail)*.
\*\*   Usual, Customary and Reasonable as determined by VBA.
\*\*\*   Available In-Network at no charge for children under age 19.

## COST PER EMPLOYEE PER MONTH: Rates are guaranteed for the full 2 years of the contract and are based on 100% employee contributions through a qualified section 125 plan. Once an employee makes this selection, they are committing to a 24 month participation period.

|  | Employee | Employee + 1 | Employee + Family |
|---|---|---|---|
| Zero Copay Program | $ 7.55 | $ 13.50 | $18.50 |

03\vba#1711-6.prp

### Vision Benefits
of America

# LIMITATIONS

Vision Benefits of America is designed to cover visual needs rather than cosmetic materials, and consequently includes some limitations in order to control costs. The following options or services will generally result in additional charges to the patient or are not covered under the plan.

## ADDITIONAL CHARGES

A patient selecting any of the following items will be responsible for the additional charges, all of which are monitored and controlled by VBA.

- Tinted Lenses
- Photochromic lenses
- Polycarbonate (covered under age 19)
- Hi-Index lenses
- Progressive/No-Line multifocal lenses
- The coating of the lens or lenses
- The laminating of a lens or lenses
- A frame that costs more than the plan allowance
- Rimless frames

Additionally, costs for contact lenses/services in excess of the plan's scheduled reimbursement allowances are the responsibility of the patient.

## NOT COVERED

The contract gives VBA the right to waive any of the plan limitations if, in the opinion of our optometric consultants, it is necessary for the patient's welfare. VBA provides no benefit for professional services or materials connected with the following:

- Orthoptics or vision training
- Non-prescription lenses
- Two pair of glasses in lieu of bifocals
- Medical or surgical treatment of the eyes
- Any eye examination, or corrective eyewear, required by an employer as a condition of employment
- Services or materials provided as a result of any Workers' Compensation Law or similar legislation
- Glasses and contacts during the same eligibility period

Lenses and frames furnished under this program which are lost or broken will not be replaced except at the normal intervals when services are otherwise available.

NOTE: In addition, if the covered person does not obtain the VBA benefit form in advance, but visits the Participating Doctor as a private patient, the Participating Doctor is not obligated to accept VBA fees as full payment for these services, and may elect to charge his or her usual and customary fees.

# ABIQUA COMMUNITY HOSPITAL
## MONTHLY EMPLOYEE CONTRIBUTION

**Employee Monthly Premiums**
July 2004

**Full-Time**

**Health America**

|  | ACH | Non-ACH |
|---|---|---|
| Employee | $30.72 | $30.72 |
| Parent/Child | $73.28 | $73.28 |
| Husband/Wife | $82.62 | $82.62 |
| Family | $95.70 | $95.70 |

### VOLUNTARY BENEFITS ($50 Stipend)

**Vision Benefits of America**

| Employee | $7.55 |
|---|---|
| Employee + 1 | $13.50 |
| Employee + Family | $18.60 |

**MetLife Dental**

|  | Plan | |
|---|---|---|
|  | Low | High |
| Employee | $10.81 | $21.62 |
| Family | $38.49 | $65.61 |

### AFLAC

**Personal Accident Expense**

| Individual | $17.50 |
|---|---|
| Husband & Wife | $23.80 |
| One Parent Family | $25.90 |
| Two Parent Family | $32.20 |

**Intensive Care**

| Individual | $8.70 |
|---|---|
| One Parent Family | $9.90 |
| Two Parent Family | $17.54 |

**Personal Sickness Indemnity (Level 3)**

|  | 18-39 | 40-49 | 50-59 | 60-70 |
|---|---|---|---|---|
| Individual | $33.00 | $35.50 | $43.20 | $60.20 |
| One Parent Family | $56.10 | $57.30 | $63.50 | $76.80 |
| Husband/Wife | $61.80 | $63.60 | $77.80 | $105.60 |
| Two Parent Family | $66.30 | $69.60 | $83.50 | $107.00 |

**Personal Cancer Protector (Level 3)**

|  | 18-39 | 40-49 | 50-59 | 60-70 |
|---|---|---|---|---|
| Individual | $20.60 | $32.40 | $45.40 | $57.30 |
| One Parent Family | $28.10 | $38.70 | $50.40 | $67.70 |
| Two Parent Family | $37.10 | $58.00 | $86.80 | $111.40 |

**Personal Recovery Plus (Level 2)**

|  | 18-35 | 36-45 | 46-55 | 56-70 |
|---|---|---|---|---|
| Individual | $6.90 | $12.90 | $21.90 | $33.90 |
| One Parent Family | $7.50 | $13.50 | $22.50 | $34.50 |
| Two Parent Family | $10.90 | $21.90 | $39.90 | $66.90 |

RF (010105)

APPENDIX H

## ALIQUIPPA COMMUNITY HOSPITAL
## MONTHLY EMPLOYEE CONTRIBUTION (continued)

**Employee Monthly Premiums**
**July 2004**                                                                          Regular Part-time

### Health America

|              | ACH      | Non-ACH  |
|--------------|----------|----------|
| Employee     | $153.62  | $153.62  |
| Parent/Child | $366.38  | $366.38  |
| Husband/Wife | $413.32  | $413.32  |
| Family       | $476.50  | $476.50  |

### VOLUNTARY BENEFITS

**Vision Benefits of America**

| Employee          | $7.55   |
| Employee + 1      | $13.50  |
| Employee + Family | $18.50  |

**MetLife Dental**

|          | Plan    |         |
|----------|---------|---------|
|          | Low     | High    |
| Employee | $10.81  | $21.62  |
| Family   | $38.49  | $65.51  |

### AFLAC

**Personal Accident Expense**

| Individual       | $17.50  |
| Husband & Wife   | $23.80  |
| One Parent Family| $25.90  |
| Two Parent Family| $32.20  |

**Intensive Care**

| Individual        |         | $8.70   |
| One Parent Family |         | $9.90   |
| Two Parent Family |         | $17.54  |

**Personal Sickness Indemnity (Level 3)**

|                   | 18-39   | 40-49   | 50-59   | 60-70    |
|-------------------|---------|---------|---------|----------|
| Individual        | $33.00  | $35.50  | $43.20  | $60.20   |
| One Parent Family | $56.10  | $57.30  | $63.50  | $76.80   |
| Husband/Wife      | $61.80  | $63.60  | $77.80  | $105.60  |
| Two Parent Family | $66.30  | $69.60  | $83.50  | $107.00  |

**Personal Cancer Protector (Level 3)**

|                   | 18-39   | 40-49   | 50-59   | 60-70    |
|-------------------|---------|---------|---------|----------|
| Individual        | $20.60  | $32.40  | $45.40  | $57.30   |
| One Parent Family | $28.10  | $38.70  | $50.40  | $67.70   |
| Two Parent Family | $37.10  | $58.00  | $86.80  | $111.40  |

**Personal Recovery Plus (Level 2)**

|                   | 18-35   | 36-45   | 46-55   | 56-70    |
|-------------------|---------|---------|---------|----------|
| Individual        | $6.90   | $12.90  | $21.90  | $33.90   |
| One Parent Family | $7.50   | $13.50  | $22.50  | $34.50   |
| Two Parent Family | $10.90  | $21.90  | $39.90  | $66.90   |

RP (010105)

**Employee Monthly Premiums**                                          **LP & PRN**
**July 2004**

| AFLAC |
|---|

**Personal Accident Expense**              **Intensive Care**
Individual            $17.50              Individual            $8.70
Husband & Wife        $23.80              One Parent Family     $9.90
One Parent Family     $25.90              Two Parent Family     $17.64
Two Parent Family     $32.20

**Personal Sickness Indemnity (Level 3)**

|  | 18-39 | 40-49 | 50-59 | 60-70 |
|---|---|---|---|---|
| Individual | $33.00 | $35.50 | $43.20 | $60.20 |
| One Parent Family | $56.10 | $57.30 | $63.50 | $76.80 |
| Husband/Wife | $61.80 | $63.60 | $77.80 | $105.60 |
| Two Parent Family | $66.30 | $69.60 | $83.50 | $107.00 |

**Personal Cancer Protector (Level 3)**

|  | 18-39 | 40-49 | 50-59 | 60-70 |
|---|---|---|---|---|
| Individual | $20.60 | $32.40 | $45.40 | $57.30 |
| One Parent Family | $28.10 | $38.70 | $50.40 | $67.70 |
| Two Parent Family | $37.10 | $58.00 | $86.80 | $111.40 |

**Personal Recovery Plus (Level 2)**

|  | 18-35 | 36-45 | 46-55 | 56-70 |
|---|---|---|---|---|
| Individual | $6.90 | $12.90 | $21.90 | $33.90 |
| One Parent Family | $7.50 | $13.50 | $22.50 | $34.50 |
| Two Parent Family | $10.90 | $21.90 | $39.90 | $66.90 |

APPENDIX H

APPENDIX I
## LIFE INSURANCE, AD&D, LONG-TERM AND SHORT-TERM DISABILITY

## ALL BENEFITS HEREIN ARE ADMINSTERED THROUGH AFLAC:

**Short Term Disability:** Helps offset the loss of pay for an employee resulting from a sickness or off the job injury through monthly benefits. Prices depend on waiting periods, election of coverage and months of coverage.

**Accident Expense:** 24-hour coverage helps provide a financial cushion in the event of a covered accident. Includes Accidental Death and Dismemberment Benefit and $60 Wellness Benefit. Coverage may include Spouse and Children.

**Cancer Indemnity:** Helps offset the medical expenses related to cancer treatment and other specified diseases. Includes $75 Wellness Benefit. Coverage may include Spouse and Children.

**Hospital Intensive Care Policy:** Covers confinement in hospital intensive care. Coverage may include Spouse and Children.

**Specified Health Event/Personal Recovery Plus:** Helps offset the medical expenses related to a covered life-threatening health event (Heart Attack, Stroke, Coronary Artery bypass, End Stage Renal Failure, Major Human Organ Transplant, Major Third Degree Burns). Coverage may include Spouse and Children.

**Hospital Confinement Sickness Indemnity Policy:** Provides a physician feature that covers sickness, accident and wellness visits in addition to the plan's basic sickness only benefits. Coverage may include Spouse and Children.

**Life Assurance:** Provides a choice of whole life and 10 year renewable term life policies including associated riders. The price depends on type of coverage, amount of coverage, smoker or nonsmoker rates. Coverage may include Spouse and Children. Levels available include $5,000 to $100,000.

**Personal Long Term Care:** Provides coverage for First Occurrence, Nursing Home Daily, Assisted Living Daily, Home Care/Adult Day Care/Adult Foster Care. Coverage may include Spouse. The price depends on amount and length of coverage.

**Flexible Spending Account:** Flexible is a service, rather than a product. Two types are available. The first is un-reimbursed medical (URM) and the second is dependent day care (DDC). The dollar amounts of flexible spending accounts depend upon employer's specifications.

APPENDIX J

OUTLINE OF UNION RETIREMENT PLAN

This agreement (hereinafter, "Agreement") is entered into by and between:
District 1199P, Service Employees International Union, AFL-CIO, CLC
(hereinafter "the Union"), as party of the first part, - / and / – Aliquippa
Community Hospital (hereinafter referred to as "the Hospital"), as party of the
second part, for the purpose of resolving issues related to the replacement of the
Hospital's now-defunct defined benefit pension plan.  The Hospital enters into
this Agreement for the sole purpose of establishing and maintaining a
replacement to the above-referenced defined benefit pension plan
("Replacement Plan" or "NIPF" or "Plan") for bargaining unit employees.  Said
Replacement Plan, and all contributions remitted to same, will become effective
retroactively to June 30, 2004 except as otherwise and explicitly agreed to
herein.

The parties hereby agree, with the intent of being legally bound, to the following
terms and conditions regarding the Hospital's participation in the Service
Employees International Union National Industry Pension Fund ("NIPF").
Accordingly, the Union shall waive all rights it had, or may have had, pertaining to
enforcement of the Hospital's duties and obligations concerning the Aliquippa
Community Hospital single employer Pension Fund and shall defer all said rights
to the Pension Benefit Guarantee Corporation (PBGC) and US Bankruptcy Court
as such entities may have jurisdiction over same.  Provided, however, that such
waiver is contingent upon PBGC approval of the Hospital termination of the plan
and its participation in this NIPF Plan pursuant to the provisions of this
agreement

It is understood by the parties that the current Collective Bargaining Agreement
between the Hospital and the Union is set to expire on December 31, 2004.  In
order to ensure that the terms set forth herein are continued on an uninterrupted
basis, the parties agree that the terms of this Agreement shall be binding upon
the parties until such time as a successor Collective Bargaining Agreement has
been agreed upon and ratified by the Hospital and the Union.  This Agreement
shall be annexed to any subsequent Collective Bargaining Agreement between
the parties, and shall be referenced thereto as "Pension MOA –February, 2005".
It is further understood and agreed that the Replacement Plan terms and
contribution levels specified and agreed upon by the parties in this Agreement
shall be carried forward into the successor agreement and incorporated into
same as a permanent section and appendix thereto, to be fully recognized and
adhered to by the parties.  Provided, however, that such contribution levels may
be negotiated from the herein-specified amount during the 2004-2005 negotiation
cycle, including any extensions thereof, and provided that the parties recognize
the herein-specified contribution levels as being a inclusive and on behalf of all
bargaining unit employees, and for all paid hours applied to same.  It is
recognized by the parties hereto that the National Industry Pension Fund and the

62

terms set forth in this agreement shall at all times be in full accordance with the Trust agreement and rules of the Plan, and shall further be in accordance with all ERISA statutes as they may be so applicable.

The following provisions shall be agreed upon by the parties and entered into the full Collective Bargaining Agreement (as a numbered section/article of *agreement*) upon the mutual conclusion and ratification of a successor agreement, or extension of the current Collective Bargaining Agreement:

## PENSION

The Employer agrees to provide all employees covered by the Agreement with pension benefits under the Service Employees International Union National Industry Pension Fund (hereinafter "Fund") in accordance with Section 19.1 and Appendix J

*Effective, and retroactive to June 30, 2004 and in addition to any payment of interest or penalties due to the Fund, and for the duration of this Collective Bargaining Agreement, including any extensions or renewals thereof, the Employer agrees that for each hour of pay paid to each employee to whom this Agreement is applicable, for any reason provided for in this Collective Bargaining Agreement, it will contribute to the Fund, effective and retroactive to the date of Plan Termination, the total sum of sixty cents ($.60) per hour. It is understood and agreed to by the parties that all newly organized and recognized residual unit employees shall be subject to, and covered under, the terms of this agreement, except that contributions for said employees shall be retroactive only to date of their initial recognition as an appropriate unit by the Hospital.*

Section 1. COVERAGE

Aliquippa Community Hospital ("The Hospital") agrees to make periodic contributions on behalf of all employees covered by the Collective Bargaining Agreement to the Service Employees International Union National Industry Pension Fund ("Fund") in the amounts specified in Section 3, below:

Section 2. TERM

The Employer agrees to become and remain a participating employer in the Fund throughout the term of the Collective Bargaining Agreement including any extensions thereof.

Section 3. CONTRIBUTIONS

As of, and retroactive to, the date of Plan Termination, the Employer agrees to contribute to the Fund sixty cents ($0.60) per paid hour for all employees covered by the Collective Bargaining Agreement from the employees initial date of

employment or the effective date of the Collective Bargaining Agreement, whichever is later, provided said employee(s) exceed 1000 paid hours in any rolling calendar year from the effective date of this agreement (see subsection C for exclusions and additional provision concerning the 1000 hour rule).

(a)   Contributions required by this provision shall be paid to the Fund on or before the fifteenth day of the month following the period on which contributions are due or before such date as the Trustees may hereafter determine.

(b)   Contributions shall be transmitted together with a remittance report containing such information, in such manner, and on such form, as may be required by the Fund or their designee

(c)   Employees who exceed 1000 paid hours in any rolling calendar year from the effective date of this agreement shall be subject to the terms of this agreement including all contributions specified herein.  Where an employee who has been previously ineligible for benefits and contributions in accordance with the Plan, becomes eligible for benefits and contributions by virtue of his/her accumulated paid hours (in excess of 1000 paid hours) in any rolling calendar year from the effective date of this agreement, the Employer shall make the appropriate contribution for said employee pursuant to Section 3 of this agreement, including all contributions retroactive to the initial date of the rolling calendar year, and shall continue to remit contributions to the fund for said employee(s) for so long as the employee remains a bargaining unit employee, regardless of hours worked.

Section 4.   TRUST AGREEMENT

The Hospital agrees to be bound by the provisions of the Agreement and Declaration of Trust establishing the Fund, as it may from time to time be amended, and by all resolutions and rules adopted by the Trustees pursuant to the powers delegated to them by that Agreement, including collection policies, receipt of which is hereby acknowledged.  The Hospital hereby designates the Employer members of the Funds Board of Trustees, or their duly selected successor(s), as its representatives on the Board.

Section 5.   COOPERATION

The Hospital and the Union agree to cooperate with the Trustees of the Fund in distributing plan booklets, literature, and other documents supplied by the Fund administrator, and in obtaining and providing such census and other data as may be required by the Fund's Administrator or Trustees to enable them to comply with the applicable provisions of the Employee Retirement Income Security Act ("ERISA").

Section 6.    APPROVAL BY THE TRUSTEES

The undersigned parties acknowledge that the provisions of this Article and the participation of the employees covered by it are subject to approval by the Trustees of the Fund and that the Trustees reserve the right to terminate, at their sole and unreviewable discretion, the participation of the employees covered by this Agreement and to establish the level(s) of benefits to be provided. Termination may be directed by the Trustees for reasons including, but not limited to, failure of the Hospital to timely pay contributions, and expiration of a Collective Bargaining Agreement. The parties further acknowledge that the Trustees acceptance for participation in the Fund of the employees covered by the Collective Bargaining Agreement is limited to the categories of employment covered by the Collective Bargaining Agreement at the time application for acceptance occurs and admission of other categories of employment to participate in the Fund will require specific acceptance by the Trustees.

Section 7.    AUDITS

The Employer agrees to permit auditors authorized by the Fund to inspect and review any of its records necessary to ensure compliance with this Agreement and to forward such records or true copies thereof to the Fund's auditors upon request.

Section 8.    DELINQUENCIES

The Employer agrees and affirms that, should it default or become delinquent in any of its obligations to the Fund set forth in this Article, it shall be liable for such damages, penalties and costs as may be provided for by the Fund's Trust Agreement, resolution(s) and collection policy(ies) of the Fund's Trustees including, but not limited to, a late payment penalty, interest, liquidated damages, and all costs of collection including reasonable attorney's and accounting fees.

Section 9.    TERMINATION OR DENIAL OF CONTINUED PARTICIPATION

If the Trustees deny participation to the employees covered by this Collective Bargaining Agreement or terminated their participation for any reason, the contributions provided for herein shall be added to the employees' wages unless the parties agree to participation in an alternative qualified employee benefit plan within sixty (60) days of their being notified by the Trustees that participation of the employee group covered by the Collective Bargaining Agreement was denied or that the participation of such employees was terminated.

This Agreement is entered into this 1st day of February, 2005 and shall remain in full force and effect through the expiration of the Collective Bargaining Agreement (December 31, 2004), including any extensions thereof, and shall be further incorporated into any successor Collective Bargaining Agreement at such

65

time as said Agreement is established, pursuant to the provisions set forth
herein, unless modified by the parties pursuant to, and in accordance with, the
provisions set forth above.

APPENDIX K
SIDE LETTER
NURSING AND BEHAVIORAL HEALTH UNIT ISSUES

I. Per Diem and PRN employees    The Hospital shall establish reasonable minimum work requirements for Per Diem and/or PRN employees. The issue of minimum work requirements for Per Diem and/or PRN employees shall be discussed by the Joint Staffing and Quality Care Committee, and the Hospital shall give full consideration to the Committee's recommendations.

II. Three Twelve Hour Shift Schedules    The Hospital and the Union agree to implement  as soon as is financially feasible a program in the nursing department (including behavioral health) of three (3) twelve (12) hour shifts being considered a full-time work week. The Joint Quality Care Committee shall discuss the policies and procedures for implementing this program, and the Hospital shall give full consideration to the Committee's recommendations.

III. RN Clinical Ladder    The Hospital and the Union recognize that programs to facilitate nurses' professional development are desirable from the perspective of enhancing quality of patient care, fostering individual nurses' professional advancement, and assisting in the retention and recruitment of nursing staff. Toward these ends, the parties agree to explore the establishment of an RN Clinical Ladder program at the hospital. The Joint Quality Care Committee shall discuss this issue, and any such program shall be implemented upon approval of both the Hospital and the Union.

IV. CCU/PCU Differential Grandfathering    The Hospital shall grandfather registered nurses currently employed in the Critical Care Unit and/or Progressive Care Unit as of February 10, 2002, to continue to receive a differential of twenty-five cents ($0.25) per hour in excess of the regular hourly base rate and any other differentials for those hours worked in such units.

V. Vacation Selection/Weekend Make Up Issues    The Hospital and the Union agree to meet and discuss within ten (10) days of the ratification of the contract regarding the procedure for vacation selection and the implementation of reasonable requirements for nursing staff who call off on weekends to make them up. The Hospital shall maintain current past practice in all units with respect to the process for vacation selection according to seniority. Such practice shall remain in effect until such time that any revised policy and procedure for vacation selection may be developed through the Labor-Management Committee that is deemed reasonable and acceptable to both parties.

VI. Behavioral Health Unit Issues    The parties agree to meet and discuss within thirty (30) days through the Labor-Management Committee regarding the procedures for flexible scheduling and regarding the job responsibilities and job descriptions of Mental Health Worker IIIs.

# APPENDIX L
## SIDE LETTER
## HOUSEKEEPING AND MAINTENANCE ISSUES

I.   The Hospital shall grandfather the following part-time employees in the housekeeping and maintenance departments with regard to accrual of pro-rated personal days and sick leave and the level of employer contributions (i.e. percentage of premiums paid by the employer) for health, vision, and prescription benefits to the extent that they are participating in the above referenced benefits as of January 30, 2002:

Mary Ann Kon
Janice Mayes
Michelle Markusic
Roberto Spears
Ed Pontis

II.   The Hospital shall implement an eight (8) hour work schedule in place of the current seven and a half (7½) hour work schedule in the maintenance department.

## APPENDIX M
## SIDE LETTER
## <u>DIETARY ISSUES</u>

The parties agree to meet and discuss issues related to job descriptions and cross training in the dietary department through the Labor-Management Committee.

APPENDIX N
SIDE LETTER
LABOR-MANAGEMENT COMMITTEE FOR
A STRONG ALIQUIPPA COMMUNITY HOSPITAL

Effective February 7, 2005, the parties agree to the re-activation of the "LABOR MANAGEMENT COMMITTEE FOR A STRONG ALIQUIPPA COMMUNITY HOSPITAL" committee. Said committee shall be reconstituted, and shall meet collectively no later than May 7, 2005.

- The Hospital and the Union agree to establish a Labor-Management Committee for a Strong Aliquippa Community Hospital to discuss potential avenues for the parties to work together in the areas of marketing and community relations.

- The Committee shall consist of an equal number of Management and Union representatives and shall meet within 90 days of ratification of the Agreement and at mutually agreeable times thereafter.

- Information regarding the committee's agenda, the content of Committee discussions and Committee decisions will be disclosed to the media only upon mutual agreement of the parties.

- The parties agree that this side letter shall not be subject to the provisions of Article 6 (Grievance Procedure and Arbitration) of the Collective Bargaining Agreement.

70

APPENDIX O
AGREEMENT
FOR AN EXPEDITED UNION RECOGNITION PROCEDURE

WHEREAS, Aliquippa Community Hospital (hereinafter "the hospital") and District 1199P, Service Employees International Union, AFL-CIO, CLC (hereinafter "the union") share common goals of ensuring a strong future for the hospital, the highest quality of care for patients, and the best possible working conditions for hospital employees; and

WHEREAS, Aliquippa Community Hospital was originally built as a result of a unique labor-management partnership, with its construction made possible in part through the voluntary contributions and labor of unionized steelworkers in the Beaver Valley in order to serve the health care needs of the working families of the community; and

WHEREAS, the hospital's recent rebirth as an independent provider following the successful effort to save the facility for the community would not have been possible without the creation of new labor-management partnerships and a renewed spirit of cooperation and collaboration among the hospital, the union, and the employees; and

WHEREAS, the hospital and the union are committed to the principle that unrepresented employees' choice of whether or not to be represented by the union should be left up to the employees themselves to decide.

THEREFORE, the hospital and the union, intending to be legally bound, hereby agree to the following:

I.  Bargaining Unit Definition

A.  The union may request recognition as the exclusive bargaining representative for any appropriate unit (or combination of units) of unrepresented employees at the hospital's present or future facilities in which the union claims majority status.  The parties agree that all unrepresented service and maintenance employees, all unrepresented technical employees, all other professional employees, and all business office clerical employees are examples of appropriate units.  The parties further agree that department heads and supervisory personnel are not covered by this agreement.

B.  It is the intent of the parties that disputes regarding the supervisory status of employees be resolved through direct discussion between the parties or through expedited arbitration as per the dispute resolution process outlined below.  Disputes over the supervisory status of any employee shall not delay recognition of units including units in which the disputed individuals are employed.  Similarly, disputes over the supervisory status of any employees in units shall not delay recognition of any other units for which the supervisory status of employees is

not in question.  Neither the hospital nor the union shall file a petition with the National Labor Relations Board (NLRB) for an election or other proceeding (e.g. unit clarification) in connection with any request for recognition by the union resulting from this agreement.

II.  Employee Lists

A.  Upon the union's request, the hospital will provide the union with a list of names, addresses, home telephone numbers, job classifications, and work locations of unrepresented employees employed in any appropriate bargaining unit at any of the locations of the hospital.

B.   The list provided by the hospital in response to the union's request shall serve as the eligibility list for the Expedited Union Recognition Procedure.  No employee who was not employed on the date the list was requested by the union shall be added to the list.  The list shall be provided to the union within five (5) working days of the receipt of the request by the hospital.

C.   The hospital and the union shall act promptly to resolve any disputes concerning inclusions and exclusions from the list.  Any unresolved disputes shall be resolved in accordance with the procedure for resolution of disputes set forth below.

III.  Code of Conduct

A.   The hospital agrees to maintain a neutral position with regard to the question of unionization.  As part of its commitment to neutrality, the hospital shall co-sign with the union and, within five (5) working days of the hospital's receipt from the union of the request for employee list(s) as set forth above, distribute to all employees a statement in the form of Attachment A which articulates its neutrality on the issue of unionization, and shall meet with managers and supervisors to inform them of this policy and ensure that they understand and are directed to adhere to the provisions of this agreement.  While the parties recognize that managerial and supervisory staff may personally hold a variety of views on the issue of union representation, administrators, managers, supervisors, and other representatives of the hospital will refrain from campaigning or attempting to influence hospital employees' choice on the question of unionization, leaving this choice to the employees themselves to decide.  The hospital agrees that it will not discriminate, interfere with, restrain, or coerce employees regarding membership in the union or participation in activities on behalf of the union.  For its part, the union will not threaten or coerce employees and will not engage in negative public campaigning against the hospital as part of its organizational activities.

72

B.   The hospital will grant the union reasonable access to its premises, its departments and units, and its employees.  Such access shall include the right to post notices on hospital bulletin boards and in employee mailboxes.  The union will avoid interference with hospital operations and with the performance of work by the employees.

C.   The hospital agrees to provide the union reasonable opportunity to meet with employees, during non-working time, at the hospital to provide information about the union.

## IV.   Recognition Procedure

A.   The hospital agrees to voluntarily recognize the union upon showing of majority status in a designated bargaining unit.  Proof of majority status shall be based on signed authorization cards or petitions verified by a neutral third party, or Independent Officer, mutually selected by the parties.  If the parties are unable to reach agreement on the selection of the Independent Officer, they shall invoke the procedure described in Section V (C) below to select him or her.  The Independent Officer shall also be empowered to resolve any disputes that may arise concerning the signed cards or petitions.

B.   The union shall submit the signed cards or petitions to the Independent Officer no later than forty-five (45) days after the receipt by the union of the employee list(s) referred to in Section II above.  If the union fails to submit signed cards or petitions from a particular bargaining unit within this 45-day period, or if the union fails to demonstrate majority status as set forth above in a particular bargaining unit, the union may not re-initiate the Expedited Union Recognition Procedure in connection with this bargaining unit for at least one (1) year from the end of the 45-day period referred to above.  The 45-day period may be extended by mutual agreement of the parties.

C.   Following proof of majority status and voluntary recognition as set forth above, the hospital agrees to meet promptly with the union and to engage in good faith negotiations with the union over the terms of a collective bargaining agreement.

## V.   Dispute Resolution Procedure

A.   The hospital and the union agree to attempt to resolve any disputes regarding the interpretation or application of this agreement promptly first through discussion via telephone, fax, or electronic mail, or upon request of either party through a meeting of representatives of the parties.  Such a meeting shall be held within two (2) working days of the request by either party, unless this timeline is mutually extended by the parties.  When the parties agree that a violation of this agreement has occurred, and it is possible to correct the problem, the party responsible for the violation shall make a good faith effort to correct the problem immediately.

73

B.   The Independent Officer referred to in Section IV above shall be available to expeditiously resolve disputes regarding the interpretation or application of this agreement.  In the event that any dispute cannot be resolved through the discussion and meeting process set forth above, the parties agree that either party may submit the dispute to the Independent Officer.  The Independent Officer shall have discretion to establish procedures for the resolution of disputes which may include submission of evidence by the parties, and shall be authorized to develop and order remedies which shall be binding upon the parties.  All disputes shall be resolved within five (5) working days of the submission of the issue, unless this timeline is mutually extended by the hospital and the union.

C.   In the event that the hospital and the union are unable to agree on the selection of the Independent Officer, the parties shall apply to the Federal Mediation and Conciliation Service (FMCS) for a list of arbitrators from western Pennsylvania from which list the Independent Officer shall be selected.  A flip of the coin shall determine which party shall strike the first arbitrator from the FMCS list.

D.   The hospital and the union shall share equally in any costs associated with the work of the Independent Officer and/or the dispute resolution process described above.

74

## ATTACHMENT A

Joint Statement to Employees
From Aliquippa Community Hospital and
District 1199P/SEIU, Pennsylvania's Health Care Union

Aliquippa Community Hospital and District 1199P/SEIU, Pennsylvania's Health Care Union, are committed to working together to ensure a strong future for our hospital, the highest quality of care for the patients we serve, and the best possible working conditions for employees. Our hospital was built decades ago as a result of a unique labor-management partnership, and the hospital and the union are dedicated to building a positive relationship going forward that we believe will benefit everyone at the facility and the community at large. Aliquippa Community Hospital believes that the question of whether currently non-union employees at our hospital will be represented by 1199P/SEIU is a question that should be left to the employees themselves. Therefore, the hospital will remain neutral on this question. The hospital recognizes employees' right to organize, and will not discriminate against, restrain or interfere with employees in the exercise of this right. The hospital has granted union representatives reasonable access to our facility in order to give all employees an opportunity to discuss and obtain information about the union and the unionization process.

For its part, 1199P/SEIU is equally committed to respecting employees' freedom to choose whether or not to be represented by the union. 1199P/SEIU will avoid interference with the operations of the hospital and performance of work by employees, and will not engage in any negative public campaigning against the hospital.

Should a majority of unrepresented employees in any appropriate bargaining unit(s) choose unionization with 1199P/SEIU, Aliquippa Community Hospital will recognize this choice and promptly begin good faith negotiations toward a collective bargaining agreement. The hospital and the union believe that a fair, positive and expeditious union recognition procedure serves the interests of the facility, the employees, and the community we serve.
Signed,

75

APPENDIX P
AGREEMENT

WHEREAS, over the last year the union employees and the management of Aliquippa Community Hospital have worked together to maintain our hospital and preserve vital health care services for the community; and

WHEREAS, in January 2002 the union employees and management of the hospital reached agreement on a new 1199P/SEIU contract that included wage increases, pension changes, and non-economic improvements for union staff; and

WHEREAS, while our hospital has made significant progress since our rebirth as an independent community-based provider but continues to face financial challenges in a difficult economic environment; and

WHEREAS, the union and management of Aliquippa Community Hospital remain strongly committed to the mutual goals of ensuring the highest possible working conditions for union employees and building a strong future for our community hospital.

THEREFORE, District 1199P/SEIU (hereinafter "the union") and Aliquippa Community Hospital (hereinafter "the hospital"), intending to be legally bound, hereby agree to the following:

1.   Temporary cost saving measures    Effective June 16, 2002, through June 30, 2003, the hospital shall implement the following temporary cost saving measures:

(a) Dietary department – Reduction of forty-two (42) hours per week department-wide as discussed by the parties at the departmental level.

(b) Housekeeping department – Reduction of fifty (50) hours per week department-wide as discussed by the parties at the departmental level.

(c) Maintenance department; CCU, Med-Surg, SNF, Messengers – Reduction of regularly scheduled work day by one-half (½) hour. During the period of this reduction, employees in these departments shall receive overtime pay at a rate of one and one-half (1½) times their regular straight time rate under the terms of Article 15.10 of the collective bargaining agreement for all hours worked in excess of forty (40) hours in a week.

(d) OR – Reduction of regularly scheduled work day by one-half ( ½) hour, up to a maximum of four (4) days per week. During the period of this reduction, employees in the OR shall receive overtime pay at a rate of one and one-half (1½) times their regular straight time rate under the terms of Article 15.10 of the collective bargaining agreement for all hours worked in

excess of forty (40) hours in a week.

(e) Emergency department – reduction of four (4) hours per pay period for employees scheduled eighty-four (84) hours per pay period (elimination of "automatic overtime") as discussed by the parties at the departmental level.

Effective July 1, 2003, all of the above temporary cost saving measures shall be rescinded and all areas of reduction shall be fully and completely restored. It is understood that this restoration includes the reinstatement of overtime pay after thirty-six (36) hours, thirty-seven and one-half (37 ½) hours, or forty (40) hours per week as set forth under Article 15.10 of the collective bargaining agreement for employees referred to in (c) and (d) above.

The hospital and the union shall meet after June 15, 2003, at the request of either party, to review the hospital's financial status and discuss the possible extension of temporary cost saving measures. Under no circumstances shall the above temporary cost saving measures be extended beyond June 30, 2003, except by mutual written agreement of the hospital and the union.

2.  Employee(s) status   In the event that implementation of any of the temporary cost savings measures listed in Section 1 above would result in a negative change in employee(s) status (e.g. from full time to regular part time, regular part time to irregular part time, etc.), such employee(s) shall maintain their prior status for benefit accrual purposes and for all other purposes under the collective bargaining agreement during the period the temporary cost savings measures are in effect (including any extensions that might be agreed to by the parties).

3.  Additional cost saving measures   In addition to the temporary cost savings measures listed in Section 1 above, it is understood that the hospital does not intend to fill the vacancy created by the departure of Patty Bohy, UR nurse, in the Behavioral Health Unit.

4.  Avoidance of layoffs   In agreeing upon the cost saving measures set forth above, it is the intent of the hospital and the union to avoid workforce reductions and preserve maximum employment of bargaining unit employees at the highest possible conditions. In the event that the hospital implements layoff(s) of bargaining unit employee(s) under Article 14.6 or Article 14.7 of the collective bargaining agreement during the period that the temporary cost saving measures listed in Section 1 above are in effect (including any extensions that might be agreed to by the parties), the temporary cost savings measures listed in Section 1 above shall be rescinded and all areas of reduction shall be fully and completely restored as of the effective date of the layoff(s).

5.  Shared sacrifice   The hospital and the union agree upon the cost savings measures set forth above in the spirit of shared sacrifice for the common good. The hospital hereby agrees to implement reductions among non-bargaining unit

and management employees as represented by the hospital to the union in discussions between the parties. In the event that the hospital rescinds any of these measures or restores any of these reduction(s) among non-bargaining unit and/or management employees during the period that the temporary cost saving measures listed in Section 1 above are in effect (including any extensions that might be agreed to by the parties), the hospital shall notify the union in writing of such action(s) and the temporary cost savings measures listed in Section 1 above shall be rescinded and all areas of reduction shall be fully and completely restored as of the effective date of the rescinding or restoration of the reduction(s) among non-bargaining unit and/or management employees.

6.   Information Disclosure   The hospital agrees to provide financial information requested by the union necessary to verify its financial status.  The Hospital agrees to cooperate fully with the union by disclosing all relevant financial records of the hospital, including but not limited to, copies of all IRS Form 990s; monthly, quarterly, and annual financial reports; audited and unaudited financial statements; periodic balance sheet data (information regarding all assets, liabilities, and fund balances); and periodic cash flow reports, upon request of the union.

7.   Notwithstanding the temporary system of payment of overtime pay under Article 15.10 as referred to in Sections 1(c) and 1(d) above, all provisions of the current collective bargaining agreement shall remain in full force and effect.  The hospital shall continue its current practice regarding the replacement of call offs.

8.   The Hospital shall work with employees to ensure that employees are made whole for any premature implementation of cost-savings measures prior to June 16, 2002.

9.   The above Memorandum of Agreement shall become effective upon ratification by the union.

MAR 1 3 2001

RESTATED TRUST AGREEMENT AS OF JANUARY 1, 2000
OF THE SERVICE EMPLOYEES INTERNATIONAL UNION
NATIONAL INDUSTRY PENSION FUND

TRUST AGREEMENT made and entered this _____ day of July, 2000, by and between ANDREW L. STERN, CHARLES RIDGELL, MIKE GARCIA, SHARLEEN STEWART, ROD BASHIR of the SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO C.L.C., ("International") on behalf of the International Executive Board thereof and as Union Trustees and WILLIAM F. STUHLBARG, JOHN J. SHERIDAN, EDWARD J. MANKO, JESSE LINZER, LEE CRETAROLO as Employer Trustees (hereinafter collectively referred to as the "Trustees").

WITNESSETH:

WHEREAS, at the 13th General Convention of the International a resolution was adopted concerning the establishment of a pension fund for the benefit of employees ("Employees") covered by collective bargaining agreements with certain locals of the International ("Locals") and employers who have executed or will execute collective bargaining agreements with the Locals or International and amendments thereto requiring periodic payments by such employers to such Pension Fund ("Employers"); and

WHEREAS, in order to effectuate the purposes of the 13th General Convention, this Trust Agreement ("Agreement") was entered into by the International and Employers and their respective trustees on May 20, 1968, which Agreement established a trust fund which is known as the Service Employees International Union National Industry Pension Fund (hereinafter referred to as the "Fund") which Fund has been used and is to be used in the manner hereinafter set forth in this Agreement; and

WHEREAS, the parties to this Agreement have amended same effective August 15, 1968, September 6, 1973, January 1, 1976, October 12, 1977, November 30, 1983, January 17, 1990, February 8, 1991 and January 14, 1992.

THEREFORE, the Trustees now enter into this Agreement for the purposes of further amending this Agreement and consolidating into a single document all of the provisions of the Agreement and all of its amendments thereto; the parties agree as follows:

ARTICLE I

1.1    The Trustees shall continue to administer, one or more pension plans ("Plan") on behalf of the said Employees and shall hold in trust all assets which shall be used for the exclusive purpose of providing benefits to Employees and their beneficiaries ("Participants") as decided by the Trustees,

EXHIBIT
PLAINTIFFS'
2

and shall further provide the means for defraying reasonable expenses of administering and operating the Plan in accordance with this Agreement.

1.2    The Fund shall comprise the entire assets derived from employer contributions made to or for the account of this Fund under agreements requiring contributions to the Fund together with any and all investments made and held by the Trustees, or monies received by the Trustees as contributions or as income from investments made and held by the Trustees or otherwise, and any other money or property, received and/or held by the Trustees for the uses, purposes and trust set forth in this Agreement.

1.3    The terms used herein which are also used in the Plan shall have the respective meanings ascribed thereto by the provisions of the Plan.

1.4    The said Plan is hereby made a part of this Agreement.

## ARTICLE II

2.1    The terms and provisions of both this Agreement and the Plan shall be binding upon the Trustees, Employers, Participating Local Unions and Plan Participants as set forth in this Agreement and in the Plan.

## ARTICLE III

3.1    An Employer shall mean one who is accepted by the Trustees for participation in the Fund and may include employers who have collective bargaining agreements with the International or with local unions affiliated with the International, as well as local unions and other organizations affiliated with the International and trust funds sponsored by the International or organizations affiliated with the International. Each Employer shall contribute to the Fund the required contributions and shall make such reports to the Fund as may be required by the Trustees.

3.2    The Trustees shall have the power to assess against Employers whose contributions are received by the Fund after the date when such contributions were due, an amount in addition to such contributions, as liquidated damages (which said charge shall not be deemed to be a penalty) as the Trustees deem appropriate, provided, however, that any such charge shall be assessed in a uniform and non-discriminatory manner.

## ARTICLE IV

4.1    The Trustees shall pay out of the Fund the benefits provided for in the Plan.

## ARTICLE V

5.1    In the administration of the Trust, the Trustees are authorized and empowered in their

sole and absolute discretion:

5.1 (1) To invest and reinvest the Fund, and to keep same invested in such property, real or personal, tangible and intangible, as they shall determine, whether or not such investments and reinvestments are then authorized to be made by fiduciaries under applicable law, including but not limited to, bonds, stocks (including stocks of or interests in mutual funds or so-called "investment trusts"), securities, choses-in-action, debentures, notes or other evidence of indebtedness, mortgages on real or personal property, wherever situated (including any part interest in a bond or mortgage whether insured or uninsured).

5.1 (2) To sell, at public or private sale, and for such prices and upon such terms as they shall determine, any or all property, real or personal, tangible or intangible, at any time held by them.

5.1 (3) To permit to remain uninvested, and/or to deposit in savings and/or other banks, for such periods as they shall determine, any monies at any time received or held by them.

5.1 (4) To join in and to dissent from and/or to oppose any agreement, merger, consolidation, reorganization, liquidation, sale or exchange affecting any corporation or properties in which they may be interested as Trustees, as to accept and hold any property which may be received as a result thereof.

5.1 (5) To deposit any securities and/or other properties with any protective, reorganization or other committee, and to pay a share of the expenses and compensation of any such committee, and to pay any assessments levied with respect to any securities or other properties so deposited.

5.1 (6) To exercise any conversion privileges and/or subscription rights available in connection with the whole or any part of the Fund.

5.1 (7) To vote in person or by proxy on all stocks and other securities at any time held by them, and to delegate discretionary power to any proxies designated by them for such voting.

5.1 (8) To compromise, settle and/or arbitrate any claim of or against the Trust, and to reduce the rate of interest on, to extend or otherwise modify and/or foreclose upon default or otherwise enforce any obligation to the Trust.

5.1 (9) To abstain from enforcing any claim at any time held by them.

5.1 (10) At any time and from time to time, to mortgage, pledge, hypothecate, exchange, partition, and otherwise dispose of any or all property, real or personal, tangible or intangible any time held by them and to lease the same for such terms as they shall determine.

-3-

5.1 (11) To borrow money from any persons, firms, corporations or institutions, upon such terms and conditions as the Trustees shall determine, and for the sums so borrowed, the Trustees may issue their promissory notes or other evidence of indebtedness.

5.1 (12) To register any securities or other property with or without the addition of words indicating that such securities or other property are held in a fiduciary capacity; and to hold in bearer form any securities or other property so that title thereto will pass by delivery, but the books and records of the Trustees shall show that all such investments are part of the Fund.

5.1 (13) To purchase, acquire, receive, retain, administer, surrender or assign any life insurance or annuity contract and pay the premium and exercise the rights, privileges, options and benefits contained therein.

5.1 (14) To examine the payroll and other pertinent records of any Employer whenever such examination is deemed necessary or advisable by them in connection with the proper administration of the Plan.

5.1 (15) To enter into agreements, contracts, and other instruments for the deposit of funds with banks or trust companies and to authorize such depositaries to act as custodians of the funds, whether in case of securities or other property, and to authorize such depositaries to convert, invest and reinvest the funds, entirely or in part, in securities of any kind and nature whatsoever provided that such depositaries obtain such approval, if any, of the Trustees for each such transaction as may be specified by the Trustees in such agreement, contract or other instrument or in a supplement thereto.

5.1 (16) To designate other persons to carry out their fiduciary responsibilities, or any part thereof, to the full extent permitted by the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

5.1 (17) To allocate all or any part of their fiduciary responsibilities for the operation and administration of the Trust and the Plan among any of the named fiduciaries as that term is defined in the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

5.1 (18) To retain such accountants, attorneys, actuaries, investment counsel and consultants (who may be accountants, attorneys, actuaries, investment counsel, and consultants to any or all of the Employers, Locals or the International) as they may select. To the extent permitted by applicable law, the opinion of any accountant, attorney, investment counsel or consultant retained or employed by the Trustee shall be full and complete authority and protection in respect of any action taken, suffered or omitted by the Trustees in good faith and in accordance with such opinion.

-4-

5.1 (19) To employ such persons as they shall deem necessary to effectuate the purposes of the Plan and Trust and compensate them in such matter as the Trustees deem appropriate and to provide benefit programs for such persons.

5.1 (20) To designate, by a written instrument signed by all of them, each or any of them, severally, or any two or more of them, jointly, and/or any one of more other persons severally or jointly, to execute on behalf of all of them documents and other instruments (including but not limited to directions, authorizations and checks) proper, necessary or advisable in order to effectuate the purposes of the Plan, and by a written instrument executed by any six of them, revoke any such designation theretofore made.

5.1 (21) To appoint an Investment Manager or Managers, as that term is defined in the Employee Retirement Income Security Act of 1974, together with any future amendment thereto, to manage (which shall include the power to acquire and dispose of Trust Assets) any assets of the Trust and to delegate to such Investment Manager or Managers all or any part of the investment powers vested in the Trustees by this Trust Agreement, and any Investment Manager so appointed shall acknowledge in writing to the Trustees that he is a fiduciary with respect to the Plan. If any Investment Manager or Managers have been appointed in accordance herewith, then no Trustees shall be liable for the acts or omissions of such Investment Manager or Managers, or be under an obligation to invest or otherwise manage any assets of the Plan which is subject to the management of such Investment Manager.

5.1 (22) Except as otherwise provided herein, to establish such procedures, rules and regulations, not inconsistent with the provisions of this Agreement and the Plan, as shall be necessary to carry out the operation of the Plan and effectuate the purpose thereof.

5.1 (23) To enter into agreements with Trustees of other Pension Plans, providing for merger or joinder or for the exchange of pension credits.

5.1 (24) To purchase insurance to protect the Fund and the Fund's fiduciaries, including themselves collectively and/or individually, against any loss occurring by reason of the act or omission of a fiduciary; provided, however, that such insurance shall be in the form and manner permitted by law.

5.1 (25) If the Trustees determine that it furthers the interests of the Participants of the Trust, to cause the Trust to join or to join on their own behalf, at the expense of the Trust, such educational organizations as they deem appropriate and may attend educational seminars and similar programs of such organizations. The Trustees may be reimbursed by the Trust for all reasonable expenses actually incurred by them in connection with attendance at such seminars and programs.

-5-

5.1 (26) To provide for the administration of the Fund, the Trustees in their discretion may appoint a custodian of all or part of the assets of the Fund a bank or trust company organized and doing business under the laws of the United States or of any State, authorized under such laws to exercise trust powers, subject to supervision or examination by Federal or State authority, ("Custodian").

5.1 (27) To transfer to the custody of the Custodian all, or such part as they deem desirable, of the assets of the Fund, and may enter into an agreement(s) with Investment Manager(s), which shall be in such form and contain such provisions as the Trustees may deem appropriate and consistent with the provisions of the Employee Retirement Income Security Act of 1974.

5.1 (28) The foregoing shall be supplemental and not exclusive, and the Trustees shall have all of the general powers of fiduciaries, and in addition, said special powers and all other powers reasonably to be implied therefrom or necessary for the proper exercise thereof. None of such powers shall be construed to limit in any manner any other thereof.

5.1 (29) To do all acts, whether or not expressly authorized in this Restated and Amended Trust Agreement, which the Trustees deem necessary to accomplish the general objectives of the Trust.

5.1 (30) To commingle assets for investment purposes with other qualified plans or funds sponsored by the International.

5.2    The Trustees' or, where Trustee responsibility has been delegated to others, such other persons, shall subject to the requirements of law, be the sole judges of any determination of fact, the standard of proof required in any matter and the application and interpretation of this Agreement and the Plan, and decisions of the Trustees or their deputies shall be final and binding upon all persons dealing with the Trust or claiming any benefit hereunder, except to the extent that such decision is determined by a court or arbitrator having jurisdiction over such matter to be arbitrary or capricious or an abuse of discretion.

## ARTICLE VI

6.1    Any Trustee may resign upon giving thirty days' notice in writing to the remaining Trustees, or such shorter notice as the remaining Trustees may accept as sufficient, in which notice there shall be stated a date when such resignation shall take effect. Such resignation shall take effect on the date specified in such notice unless a successor Trustee shall have been appointed at an earlier date, in which event such resignation shall take effect immediately upon the appointment of such successor Trustee.

6.1(1)  The Trust and the United States Plan or Plans shall be administered by not less than four (4) Trustees.  The Canadian Plan or Plans shall be administered solely by one of the Union Trustees who shall be a resident of Canada, and by one of the Employer Trustees.  The Union Trustees shall be ANDREW L. STERN, CHARLIE RIDGELL, MIKE GARCIA, SHARLEEN STEWART, ROD BASHIR, and their successors designated as hereinafter provided.  The Employer Trustees shall be WILLIAM F. STUHLBARG, JOHN J. SHERIDAN, EDWARD J. MANKO, JESSE LINZER, LEE CRETAROLO, and their successors designated as hereinafter provided.  The Union Trustee of the Canadian Plan or Plans shall be SHARLEEN STEWART and the Employer Trustee of the Canadian Plan or Plans shall be WILLIAM F. STUHLBARG.

6.1(2)  In the event there shall be a vacancy in the position of Union Trustee, the successor shall be designated by the International Executive Board.  In the event the Fund includes Canadian Employers and Participants one of the Union Trustees shall be a Canadian resident.

6.1(3)  In the event that there shall be a vacancy in the position of Employer Trustee, held by LEE CRETAROLO the successor and his Deputy Trustee shall be designated by American Building Maintenance Industries Incorporated, (herein referred to as "ABM") if ABM is an Employer at the time such vacancy occurs.  All other Successor Employer Trustees shall be designated by a majority of the then remaining Employer Trustees.  In the event of other Employer Trustees vacancies, the remaining Employer Trustees shall designate a Successor Trustee.  All Employers who contributed to the Fund in the preceding calendar month shall be notified by first class mail of the identity of the Successor Employer Trustee designated in accordance with the Agreement.  If, within 20 days of the mailing of such notice, there is no such objection to such designation from a majority of Employers such Successor Employer Trustee shall be the Employer Trustee with full power and authority to act under this Agreement.  In the event that objection from a majority of Employers are received, or in the event that no such Successor Employer Trustee is designated within 180 days after a vacancy exists, or in the event that there is no other Employer Trustee to make the designation in accordance with the foregoing, then all Employers shall be notified in writing of the existence of such vacancy and given an opportunity to nominate a Successor Trustee.  Each Employer shall have twenty calendar days after the date of mailing of notice to Employer of the vacancy to designate and notify the Trustees of its nominee.  A ballot shall be prepared listing the names of all such nominees which are received by the Fund Administrative Director within twenty (20) calendar days after the mailing of such notice and such ballot shall be distributed to all such Employers.  Each such Employer shall have the number of votes equal to the number of Employees for whom that Employer contributed to the Fund in the month immediately preceding the month in which the ballot is mailed to the Employer.  The nominee receiving the largest number of votes cast in the date such ballots were mailed by the Fund shall be deemed to be elected Successor Employer Trustee.

6.1(4)  Any Union Trustee may be removed at any time by the filing with the remaining Trustees of a writing signed by the President and Secretary/Treasurer of the International certifying

the removal of such Trustee by resolution of the International Executive Board, and such removal shall become effective immediately upon such filing. Any Employer Trustee may be removed at any time by a majority of votes of the remaining Employer Trustees or by a writing or writings signed by such Employers employing a majority of Employees employed by all Employers, provided, however, that LEE CRETAROLO, and his successors may be removed only by ABM as long as it continues to be an Employer.

6.1 (5) In the case of a vacancy in the office of Union Trustee, or Employer Trustee, the successor shall be designated as herein provided. Upon the filing with the remaining Trustees of a writing signed by the President and/or Secretary/Treasurer of the International, or by action of the remaining Employer Trustees, other Employers or ABM whichever shall be applicable, the designation of such successor Trustee shall become effective immediately upon filing with the remaining Trustees his/her written acceptance of the Trust.

6.2 (1) Each Employer Trustee and each Union Trustee shall be entitled to one vote.

6.2 (2) If at any time there shall be an unequal number of Employer Trustees and Union Trustees serving on the Board of Trustees, the votes of the Trustees on the side having the fewer Trustees shall be increased proportionately so that the total number of votes on each side shall be equal.

6.3    Whether and to what extent any bond or other security shall be required for the faithful performance of the Trustees or any of them or any employee of the Fund, shall be determined by the Trustees, subject to applicable law.

6.4    Each Trustee may designated in writing any other person to act as his/her Deputy. Any such Deputy Trustee shall be bonded to the same extent as the Trustees and shall be clothed with all of the same powers as the Trustee designating the Deputy Trustee. Any action of such Deputy Trustee shall be of the same force and effect as if done by the Trustee. The Deputy Trustee may act only if the designating Trustee is absent.

6.5    With respect to matters concerning changes in any benefit formula, no action shall be taken at any meeting of the Trustees unless all Trustees or a Deputy Trustee shall be present and vote in favor of such action, or, if not present, vote by proxy in favor of such action.

6.6    With respect to all other matters, no action shall be taken at any meeting of the Trustees unless there shall be at least one Trustee present from each side and a majority of Trustees present vote in favor of such action. In instances where there are deputy trustees who are authorized to act for a Trustee, then there must be at least one Union and one Employer Trustee, present and voting. If at any time there shall be an unequal number of Employer Trustees and Union Trustees, or their Deputy Trustees voting, then the votes of the Trustees on the side having the fewer trustees shall be increased proportionately so that the number of votes on each side shall be equal.

-8-

6.7.    Action may be taken by the Trustees without a meeting on any matter by their unanimous written concurrence.

6.8.    The Trustees may, by resolution, adopt such procedures as they deem appropriate for the purpose of approving or adopting decisions relating to investment of trust assets.

6.9.    If the Trustees shall deadlock upon any action involving the administration of the Plan or Fund, or interpretations of the Trust Agreement, the disposition of such action shall, upon the demand of any Trustee, be submitted to arbitration in accordance with applicable rules of the American Arbitration Association, and the decision of such arbitrator shall be final and binding. The arbitrator shall be without power or authority to amend, modify or vary any provision of the Plan or this Agreement.

## ARTICLE VII

7.1    Any controversy or claim made arising out of or relating to a claim for benefits payable by this Plan shall be settled by arbitration in accordance with the Employee Benefit Plan Claims Arbitration Rules of the American Arbitration Association incorporated by reference herein. The decision of the Arbitrator shall be final and binding and judgment upon the award may be entered in any court having jurisdiction thereof.

## ARTICLE VIII

8.1    Either or both of the Plan and the Trust may be terminated at any time by vote of all Trustees and with such effective date as the Trustees may determine. In the event of such termination, to the extent that the assets then remaining in the Fund shall be sufficient and after providing for any administrative expenses, such assets shall be allocated for the purpose of paying benefits (based on Service Credits accumulated prior to the date of such termination) in accordance with the provisions of the Plan.

8.2    In no event shall such termination result in the return or diversion of any part of the Fund to the International or Local, or any Employer.

8.3    Contributions paid to the Fund as a result of a mistake of fact may be returned by the Trustees to such Employer to the extent and within the time permitted by applicable law.

## ARTICLE IX

9.1    To the extent permitted by applicable law, no Trustee shall be liable for any action taken or omitted to be taken by him in good faith, nor for the wrongful acts of any agent, employee,

fiduciary, co-fiduciary or attorney selected by the Trustees, nor for any act or omission of any other Trustee. The fact that such action or omission was advised by counsel employed by the Trustees shall be conclusive evidence of the good faith of such act.

## ARTICLE X

10.1    The Plan has been submitted to the Internal Revenue Service and has been determined to be qualified Plan pursuant to the requirements of the Internal Revenue Code. The Trustees hereby agree to amend the Plan in the future as may be necessary to continue its IRS qualification.

## ARTICLE XI

11.1    The Trustees shall establish and maintain its principal office in Washington D.C., and may maintain offices at other locations of the United States and Canada to service the Employers

## ARTICLE XII

12.1    Any notice given hereunder to any of the Trustees, Locals, Employers, or the International, shall be sufficient if given in writing and delivered to or sent by first class mail, fax or electronic-mail to the addressee at the address on file at the Fund office.

## ARTICLE XIII

13.1    Except to the extent that Federal Law requires a different construction, the respective terms and provisions hereof and of the Plan shall be construed in accordance with the laws of the District of Columbia.

## ARTICLE XIV

14.1    The Trustees hereby accept the Trust and agree to execute the same in accordance with the provisions hereof and of the Plan.

## ARTICLE XV

15.1    This Agreement may be executed in one or more counterparts, and the signature of a party or any counterpart shall be sufficient evidence of his execution thereof.

## ARTICLE XVI

16.1    Any Employer entering into a Standard Participating Agreement or other Participation

Agreement approved by the Trustees shall be bound by the provisions of this Agreement and of the Plan.

ARTICLE XVII

17.1    This Trust Agreement may be amended by a majority of the Trustees' votes being cast in favor of any amendment provided, however, that no such amendment shall cause any part of the Fund to be used for or diverted to any other purpose other than the purposes of the Fund provided for in this Agreement.

ARTICLE XVIII

18.1    The Trustees designated hereunder, and their successors shall be "Named Fiduciaries": as the same are defined in the Employee Retirement Income Security Act of 1974.

IN WITNESS WHEREOF, the undersigned, being all of the Trustees of said Trust Fund, have caused this instrument to be executed on the date appearing opposite their respective names.

Date: 9-28-00

ANDREW L. STERN

Date: 9/28/00

CHARLIE RIDGELL

Date: 9-28-00

MIKE GARCIA

Date: 9-28-00

SHARLEEN STEWART

Date: 9/28/00

ROD BASHIR

Date: 9/28/00

WILLIAM F. STUHLBARG

Date: 9-28-00

JOHN J. SHERIDAN

Date: 9-28-00

EDWARD J. MANKO

Date: 9/28/00

JESSE LINZER

Date: 9-28-00

LEE CRETAROLO

-11-

# SEIU NATIONAL INDUSTRY PENSION FUND
## STATEMENT OF POLICY FOR COLLECTION OF DELINQUENT CONTRIBUTIONS
(Revised January 18, 2007)

The Board of Trustees of the Service Employees International Union National Industry Pension Fund ("Fund") hereby adopts the following policy for the collection of delinquent contributions.

## SECTION 1
### General Policy

It is the policy of the Fund to make such diligent and systematic efforts as are appropriate under the circumstances to collect all Employer contributions when they are due.

The Trustees have the legal right to exercise all remedies allowable under the Trust Agreement and under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including but not limited to:

1. The right to establish a date on which contributions are due and the format in which remittance reports supporting such contributions must be made, provided that such date and format requirements are not inconsistent with the terms of the collective bargaining agreement;

2. The right to conduct a review of the payroll records of all employees of the Employers required to contribute to the Fund including, but not limited to, payroll ledgers, federal and state tax returns, IRS Form 941 and such other books and records of the Employers that are necessary in order for the auditor to give an unqualified opinion that the proper contributions have been made;

3. The right to establish an audit or payroll review program;

4. The right to require that a participating Employer pay the cost of a payroll review, plus interest, liquidated damages, attorneys' fees, and any other expenses incurred by the Fund in conducting the payroll review;

5. The right to recover interest, liquidated damages, attorneys' fees and any other expenses incurred by the Fund in collecting any delinquency;

6. The right to require a bond or a cash deposit as security for prompt future payments due from an Employer that has been habitually delinquent in its contributions to the Fund;

7. The right to enforce this Policy against any Employer that ceases to have an obligation to contribute to the Fund with regard to the time period during which the Employer was obligated to contribute to the Fund;

8. The right to terminate a delinquent Employer's participation in the Fund in appropriate circumstances, as determined by the Trustees in their sole discretion; and

**EXHIBIT**

PLAINTIFFS'
3

9. The right to take all other steps and to perform all other acts that are necessary in order to collect contributions due to the Fund in a timely and expeditious manner.

The procedures set forth herein shall be followed unless the Board of Trustees determines that they should be waived in a particular instance.

All questions or disputes relating to the interpretation, meaning and/or application of this policy shall be finally and exclusively resolved by the Board of Trustees in the exercise of its discretion and in the performance of its fiduciary obligations to the Fund's participants and beneficiaries, in the protection of the financial integrity and soundness of the Fund and the efficient and effective administration of the Fund.

## SECTION 2
### Collection Procedure

In accordance with the Trust Agreement, ERISA, and the above declaration policy, the following procedures shall be required of all contributing Employers and the steps set out below shall be taken to effectuate the collection of delinquent contributions.

1. Contributions and supporting remittance reports(s) are due by the 15th day of the month following the month in which the work was performed for which the contributions are owed. Initial contributions and supporting remittance reports for Employers who are newly subject to collective bargaining agreements (*i.e.* for all months necessary to bring the employee group current) are due no later than the 15th day of the month following the month in which the collective bargaining agreement was executed by the bargaining parties. Retroactive contributions made on behalf of employees shall be considered timely made if paid by the 15th of the month following the month in which the employee becomes eligible for those contributions.

2. Contributions shall not be regarded as having been timely made unless accompanied by a completed remittance report form (or forms) supplied by the Fund supporting such contributions. The Executive Director may approve the submission of reports in other forms, including on magnetic media, if he determines that providing reports in such form will not cause additional burden or expense to the Fund.

3. If the contributions and the remittance report are not received by the last day of the month in which they were due, the Fund Office shall send a notice of delinquency to the Employer requesting immediate payment of the delinquent contributions plus interest thereon at the rate prescribed by Section 5 of this policy. The notice will demand immediate payment of all delinquent contributions and submission of supporting remittance report(s). The notice will inform the delinquent Employer that, unless the full amount due is received, the matter will be referred to the Fund's legal counsel for collection.

4. If contributions and supporting remittance report(s) in a form acceptable to the Fund are not received by the end of the month in which they are due, the Employer shall, in addition to the underlying delinquent contributions owed, be obligated to pay to the Fund interest at the rate prescribed by Section 5 of this Policy. If contributions and supporting remittance report(s) are not received by the

2

15th day of the month following the month in which contributions are due, liquidated damages in the amount of 5% of the amount owed, with a minimum of $50 and a maximum of $800 for each month's delinquency, shall also be due from the Employer. Notwithstanding the foregoing, interest calculated to be less than one dollar ($1.00) shall not be charged.

5.  If the contributions and remittance report(s) are not received by the fifteenth day of the month following that in which contributions were due, the delinquency shall be referred to legal counsel, with copies of notices sent to the Employer. The Fund Office also shall refer to counsel the cases of Employers who have accrued balances of unpaid interest or liquidated damages that equal or exceed $1,000.

6.  If the Fund Office has not received the proper remittance reports to determine the amounts owed by the Employer, the Fund Office shall estimate the contributions due based on the most recent contributions remitted to the Fund and the Employer shall be deemed delinquent in its contributions in that amount, as a minimum, in any subsequent legal action.

7.  If an Employer makes payment of the amount of the delinquency but not payment of accrued interest and other amounts owed, acceptance of the payment shall not constitute a waiver of the Fund's claim for such accrued interest or other amounts.

8.  Any unpaid interest or liquidated damages shall be billed to the Employer on the monthly delinquency letters or pre-printed remittance forms generated each month. The Executive Director may suspend collection procedures for liquidated damages and interest when extenuating circumstances are present. However, the Executive Director shall prepare a report to the Trustees of all such actions for their consideration at their next scheduled meeting. The Trustees may, at that time, waive such charges or direct that collection proceedings be reinstated.

9.  If an Employer believes it has overpaid contributions, the Employer shall bring the matter to the attention of the Board of Trustees, in writing. If the Trustees determine that the Employer overpaid its contributions for a period of not more than three (3) months, and that such overpayment was due to mistakes of law or fact, the Trustees shall, not later than six (6) months after they determine the contributions were made pursuant to such mistake, give the Employer a credit for the amount of such overpayment. If the Employer is not a participating Employer at the time the request is made, a refund may be made to the Employer. The Trustees hereby delegate to the Executive Director the authority to make the foregoing determination on their behalf. The Executive Director shall refer to the Trustees or the Delinquency Committee described in Section 3, Paragraph 9, any requests for credit or refund for overpayment occurring during a period of more than three (3) month's duration. The Trustees or the Delinquency Committee may, in their sole discretion, authorize credits or refunds for overpayments for periods of time longer than three (3) months, but such credits or refunds for overpayments shall be issued only in a manner consistent with ERISA section 403 (c)(2) and Internal Revenue Code section 401(a)(2). No interest shall be due to any Employer on any overpayment.

10. The Fund Office shall promptly notify legal counsel of receipt of any payment and/or remittance reports from any Employer that has previously been referred to counsel.

11. Legal counsel shall follow the procedures set out in Section 3 of these Rules.

3

## SECTION 3
## Legal Action and Settlement

1. When a delinquency matter is turned over to the Fund's legal counsel for collection. legal counsel shall send a letter to the Employer demanding the required remittance report with payment of the delinquent contributions and advising the Employer of its liability for interest, liquidated damages, and costs.

2. In the event an Employer fails to pay the delinquent contributions and submit the remittance report(s) within twenty (20) days after legal counsel's demand for payment. legal counsel shall initiate legal action for any delinquency in excess of $1,000.00, unless legal counsel recommends a different course of action based upon pertinent factors which shall include, but are not limited to the following:

    a. The financial condition of the Employer,
    b. The probability of collecting a judgment once it is obtained.
    c. The Employer's past performance as a contributing Employer,
    d. The amount of the delinquency,
    e. The length of time the delinquent amount has been owed,
    f. The likelihood that the costs of the suit will exceed the recovery, and
    g. Any other factor that, in the judgment of the legal counsel, may have a material bearing on the collection of the delinquent contributions.

3. Legal counsel is authorized to enter into settlement negotiations with delinquent Employers. Without further approval of the Board of Trustees, legal counsel is authorized to settle claims against delinquent Employers in instances where the delinquent Employer promises immediate payment of the delinquent contributions owed, interest thereon, attorney's fees and costs. Any proposed settlement that waives or compromises those amounts must be approved by the Board of Trustees. It shall be the responsibility of legal counsel to advise the Fund, whether, and when, to reinstate any previously waived charges.

4. Legal counsel has the authority to accept any proposal for settlement that contemplates payment of all amounts (including interest and late fees or liquidated damages) due over a reasonable period of time, not to exceed six (6) months. Legal counsel has the authority to reject any proposal for settlement that contemplates payment of amounts due over a period of time or if its acceptance would result in collection of less than the total amount owed. Such rejection shall be subject to the Board of Trustees' subsequent review.

5. At the discretion of the Trustees. settlements may take many forms. Among those forms of settlement specifically authorized is the suspension of liability for interest, liquidated damages, or attorney's fees until a subsequent delinquency by the same Employer, if the collection of such amounts would involve unwarranted expense or risk to the Fund. Such a written settlement providing for nonpayment of interest. late payment penalty, liquidated damages, costs or attorneys' fees may contain a reservation to the Trustees of the right to collect such amounts in the event the

4

Employer again becomes delinquent in paying contributions during a period not to exceed three (3) years after the settlement is consummated.

6. The Board of Trustees reserves the right to accept or reject an Employer's proposal to pay delinquent contributions, interest, liquidated damages, and attorneys' fees over a period of time and to compromise any claim or delinquent account as recommended by legal counsel; provided however, that any such decision to extend the time for payment, or to compromise the amount owing, complies with Prohibited Transaction Exemption 76-1 promulgated by the United States Department of Labor.

7. Settlements calling for payments over time or compromising the amount owed, including interest, liquidated damages, attorneys' fees, or costs, must be in writing and signed on behalf of the Fund and the Employer.

8. Notwithstanding the procedures set out in this policy, the Board of Trustees or Executive Director may refer any delinquent account to legal counsel at an earlier or later date than provided for herein where circumstances warrant that the collection action be expedited or delayed.

9. The Trustees may, from time to time, appoint a Committee of at least one (1) Employer and one (1) Union Trustee to act on behalf of the Board of Trustees, as provided for under this policy.

## SECTION 4
### Payroll Review Procedure

1. The Board of Trustees shall randomly select such number of participating Employers each year for payroll reviews as it deems for time to time to be appropriate. The Board of Trustees may, at its discretion, delegate the task of selecting which Employers shall be reviewed pursuant to this policy to the Executive Director. The Board of Trustees, in the exercise of their discretion, may also choose for a payroll review an Employer who was not randomly selected.

2. The Executive Director may coordinate audit/payroll review activities with those of any other employee benefit plan(s) covering the same employees of the selected Employer. In each case of a joint audit/review, the Fund Office shall enter into an agreement (or agreements) with the other Plan(s) for an equitable allocation of the costs of such audit/review. The Executive Director is authorized to enter into any cost sharing agreement with respect to preliminary payroll reviews (in which testing for discrepancies is involved) in which costs are shared equally. The Executive Director is authorized to enter into any cost sharing agreement with respect to detailed payroll reviews (in which data on a per participant basis is generated) pro-rata in the same proportions as the discovered delinquencies of, or underpayments to, the respective Plans bear to one another. Cost sharing agreements on any other basis must be approved by the Trustees or Committee appointed under Section 3, paragraph 9.

3. The period covered by the payroll review shall be not less than one (1) year.

4.  The right of the Fund to conduct a review of an Employer's records shall survive the termination of an Employer's collective bargaining agreement, any other written agreement under which the Employer is contributing to the Fund, or any bankruptcy filing.

5.  The Fund Office shall forward a letter to the Employer advising it of the impending review and citing the Trustee's authority to conduct the review.

6.  The auditor shall schedule the payroll review with the Employer, who shall make available to the auditor all books and records which the auditor determines are required. Employers with fewer than thirty-five (35) bargaining unit employees shall be required to send the pertinent records to the Fund Office or make the records available to the auditor for inspection at a location in the Washington, D.C. metropolitan area.

7.  Where a payroll review of an Employer is conducted and the payroll review discloses an underpayment, the Fund Office shall send a letter to the Employer advising of the underpayment and requesting that the Employer make payment of the underpayment, liquidated damages, interest, testing fees (when appropriate under this policy) and attorneys' fees within thirty (30) days of the date of its receipt of the letter. After the expiration of the thirty (30) day period, a second letter shall be sent to the Employer demanding that the underpayment be remitted immediately. If payment is not received within ten (10) days of the date of such letter, the Fund Office will turn the matter over to legal counsel who will then send a third letter. If payment is not received following the third request, legal counsel shall file suit against the Employer.

8.  In the event an Employer refuses to permit a payroll review upon request by the Trustees or if the Employer refuses the Fund auditor access to pertinent records, the Fund auditor shall refer the matter to legal counsel.

9.  Legal counsel shall thereafter demand that the Employer make available such books and records as are necessary for the Fund auditor to conduct the payroll review. If, within a reasonable period of time not to exceed 60 days, the records are not forwarded to the auditor or made available at a Washington, D.C. Metropolitan area location or at such other location as the Trustees may agree to, the Employer shall be liable for any attorneys' fees and costs incurred by the Fund in enforcing the Fund's right to review the Employer's records. If necessary, upon approval of the Trustees or Executive Director, counsel shall institute legal action to enforce the Trustees' right to conduct a payroll review and the Employer shall be assessed all costs and attorney's fees incurred as a result of the Employer's refusal to permit the payroll review or refusal to make available all pertinent records. Contributing Employers have a duty to maintain a record of individual hours worked by its employees for at least six years. If an Employer violates this rule of the Fund, the Employer shall have a duty to sign necessary authorizations for any state or federal agency to release tax or other records showing payroll records and expense. If an Employer violates the duty to maintain required records, the burden will be on the Employer to show that any portion of the payroll expense was not for work requiring contributions to this Fund.

6

10. **Employers** will be billed for net amounts owed in excess of $50.00. Billings will be calculated as **follows.**

    (a)    Principal: This will be the total of the amount owed for all months showing a net underpayment during the audit period. Each monthly amount due will be net of overpayment.

PLUS

    (b)    Interest: Calculated monthly at 10% per annum. Interest will be calculated for net amounts owed each month and not for months with a net overpayment.

PLUS

    (c)    Liquidated Damages: Calculated at 5% of the total net principal amount, or, if greater, $50.

PLUS

Testing Fee:    The testing fee will include the auditor's time and expenses in performing the payroll review. The cost of the payroll review, in addition to any other applicable fees and costs, shall be payable by the Employer whenever a review of an Employer's record discloses principal due equal to or greater than:

    (i)    in the case of an Employer that contributed (or should have contributed) $50,000 or more in any contract year, 5% of the Employer's total required contributions for such period,

or

    (ii)    in the case of an Employer that contributed (or should have contributed) $10,000 or more but less than $50,000 in any contract year, the lesser of

        (A)    7% of the Employer's total required contributions for such period;

**or**

        (B)    $2,500

or

    (iii)    in the case of an Employer that annually contributed (or should have contributed) less than $10,000, the lesser of

        (A)    10% of the Employer's total required contributions for such period;

**or**

or

7

(B)    $1,000.

The testing fee will be charged for the entire audit period whenever one of the above thresholds is met in any of the calendar years tested.

11. The Board of Trustees shall authorize the Executive Director to make decisions regarding the collection of audit billings following the advice of legal counsel. In such cases where legal counsel has advised that the cost of further collection efforts for unsubstantial amounts would not be financially prudent to pursue, the Executive Director may then instruct that no further collection efforts are to be made.

12. The Board of Trustees authorize the Executive Director to issue a refund or credit to any Employer that notifies the Fund during an audit that the Employer overpaid contributions. The written refund request must be presented within two years of the date of the overpayment and the Trustees authorize the Executive Director to deny refunds and credits where appropriate. If an overpayment is discovered by the Fund during an audit, the Executive Director is authorized to issue a refund or credit for such overpayments made during the entire audit period.

## SECTION 5
### Interest, Liquidated Damages, Attorneys' Fees and Costs

1.    Interest owed by a delinquent Employer shall be calculated from the due date for the delinquent contributions through and including the date payment is actually received by the Fund Office at the rate of ten percent (10%) per annum.

2.    In the event a lawsuit or other legal action is filed pursuant to Section 3, and notwithstanding the provisions of Section 2, paragraph 4 and Section 4, paragraph 12(c), liquidated damages shall be calculated from the due date, and shall become due and owing if a lawsuit is filed pursuant to Section 3. The amount of the liquidated damages shall be greater of:

   (a)    The interest on the delinquent contributions determined in accordance with paragraph 1 above;

Or

   (b)    20% of the delinquent contributions.

3.    Attorneys' fees shall be assessed against a delinquent Employer, at a reasonable hourly rate (which rate shall be no less than the hourly rate charged to the Fund for such services) for all time spent by legal counsel in collection efforts pursuant to this policy or in enforcing the Board of Trustees' rights to payroll reviews pursuant to Section 4 hereof.

8

4. All costs actually incurred in court actions for collection of delinquent contributions or to enforce the Trustees' right to conduct a payroll review of the Employer's records shall be assessed against the delinquent Employer, including, but not limited to, filing fees, fees for service of process, copying charges, postage, and such other costs as would otherwise be charged to the Fund.

5. The obligations to pay interest, liquidated damages and fees chargeable under this policy are contractual in nature and independent of the provisions of ERISA Section 502(g). In consideration for permitting its participation, or continued participation, in the Fund, each contributing Employer agrees to be obligated to pay all interest, liquidated damages, fees, and costs chargeable pursuant to this policy.

## SECTION 6
### Reports and Records

1. Legal counsel and the Fund Office shall each prepare a delinquency report to be presented at each Board of Trustees meeting. The report shall show all Employers that are delinquent. The determination of the Board with respect to action on such Contributions, and the specific bases therefore, shall be recorded in the minutes.

2. The Fund Office shall maintain a file of currently effective collective bargaining agreements and other agreements detailing the basis upon which Employers are obligated to make Contributions to the Fund.

## SECTION 7
### Effective Date

The revisions to this Policy, which originally was adopted May 1, 1994, shall be effective **March** 1, 2007.

9